1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TETSUO AKAOSUGI, HIEU NGUYEN,
on behalf of themselves and all others
similarly situated,                                      No. C 11-01272 WHA

       Plaintiffs,

  v.                                              **ORDER CONDITIONALLY**
                                                        **GRANTING IN PART MOTION**
BENIHANA NATIONAL CORPORATION,                          **FOR CLASS CERTIFICATION**

       Defendant.
                         /

**INTRODUCTION**

      In this employment class action, plaintiffs move for certification of two classes under

Rule 23(b)(3) and one class under Rule 23(b)(2). Plaintiffs also request appointment of class

counsel and authorization of class notice. This order conditionally certifies one class.

**STATEMENT**

      This putative class action presents two types of wage claims. The first is a

misclassification claim on behalf of all salaried managers at Benihana-branded restaurants in

California since February 14, 2007, and the second is a wage claim that arises out of defendant

Benihana National Corporation's vacation policy.

      In the first amended complaint, named plaintiffs Tetsuo Akaosugi and Hieu Nguyen, on

behalf of themselves and all others similarly situated bring the following state claims for relief

against BNC: (1) failure to pay overtime; (2) unlawful forfeiture of accrued vacation pay; (3)

failure to provide meal periods; (4) failure to provide rest periods; (5) failure to pay wages on

**United States District Court**
For the Northern District of California

1  termination; (6) failure to provide accurate itemized wage statements; and (7) unfair business

2  practices.

3        This statement proceeds by way of setting forth the facts relevant to BNC's corporate and

4  management structure, BNC's guidelines and policies, the duties of managers and how they

5  spend their time, and BNC's relationship to its subsidiaries.  It then moves on to identify the

6  proposed classes and class representatives.

7        **1.    CORPORATE AND MANAGEMENT STRUCTURE**.

8        All Benihana-branded teppanyaki-style restaurants in the United States, including the

9  fourteen in California, are owned by Benihana National Corporation, either directly or through

10  one of its subsidiaries (Allen Exh. C at 11, XX).  Six of the California restaurants are directly

11  owned by BNC and eight are owned by subsidiaries (Allen Exh. XX).  BNC operates all of its

12  Benihana-branded restaurants from its corporate support center in Florida, which includes a

13  human resources department, training department, and finance department for all BNC locations

14  (Allen Exh. B at 17–23).

15        Each restaurant has a general manager and assistant managers referred to generally as

16  "managers."  General managers approve managers' schedules and give them work assignments

17  (Zaletel Exh. E ¶ 25, F ¶ 37).  The number of managers at each restaurant varies according to the

18  location's annual sale's volume (Allen Exh. C at 134).  Each restaurant must have no fewer than

19  three managers (Allen Exh. D at 364).  There is one manager's guide, which outlines managers'

20  obligations and pay structure (Allen Exh. C at 35–36).  BNC has a single job description for the

21  general manager position and a single job description for the manager position, which is used

22  across all restaurants (Allen Exh. VV at 594–97, 600-01; D at 213–16).

23        **2.    STANDARDIZING CUSTOMER EXPERIENCE.**

24        BNC has adopted guidelines to standardize the customer experience across Benihana

25  teppanyaki-style restaurants.  One such guideline is the "service sequence outline," which has

26  been in effect since 2009 at all Benihana locations in California (Allen Exh. K at 57).  The

27  service sequence outline sets forth BNC's expectations for the timing and sequence of all parts

28  of the customer experience.  For example, the server must acknowledge guests within two

United States District Court
For the Northern District of California

1  minutes of being seated, the menu must be introduced to the server within one to one and half

2  minutes, the bartender must prepare beverages within three minutes of the order being placed,

3  and beverages should be delivered to guests within two minutes.  In addition to outlining detailed

4  steps to guide the customer experience at the table, it also instructs employees on the timing for

5  answering the phones, how to greet guests, usher them to their table, how to seat a table, and

6  instructs on the best time for management to "touch" the table, meaning visit the table and

7  interact with customers about their experience, which is required (Allen Decl. L).

8      BNC strives for compliance with the service sequence outline.  One enforcement

9  mechanism is its mystery shopper program, where a secret shopper dines at a restaurant and then

10  answers questions about their dining experience (Allen Decl. K at 78).  BNC uses this program

11  to evaluate compliance with the service sequence outline and penalizes managers for poor

12  mystery shopper evaluations by deeming them ineligible for part of the manager's bonus (Allen

13  Exh. D at 346–57).

14      **3.    MANAGERS.**

15          **A.    Training.**

16      BNC has developed Benihana University, an online learning site for employees, which

17  includes training materials for all BNC employees.  Benihana University is used to train BNC

18  employees in California (Allen Exhs. P; K at 44).  New managers receive training through the

19  management training program ("MT").  The MT program lasts eight weeks and consists of seven

20  modules, with accompanying written material from Benihana University (Allen Exh. K at 95,

21  97).  Each module covers a particular area of the restaurant, such as bartending and sushi

22  preparation (Allen Exh. K at 95).  Managers are required to learn about the different areas of the

23  restaurant so they can monitor other employees working in those areas and make sure they are

24  doing their job correctly, so they can "step in" if the restaurant is "short in a particular area" and

25  do the job at the same level as the regular employee (Allen Exh. F at 236).

26          **B.    Overtime.**

27      All BNC managers, both general managers and mangers, are salaried and classified as

28  exempt employees.  As a blanket policy, "[e]mployees who are regarded by the Company as

3

United States District Court

For the Northern District of California

1    exempt employees are not entitled to overtime compensation" (Allen Exh. E at 874).  This policy

2    has been in place since at least 2003 (Allen Exh. R at 187).

3    　　　　BNC managers are expected to work at least 50 hours a week (Allen Exh. D at 236).

4    BNC's meal and rest break policy does not apply to them (Allen Exh. R at 204–06).  Managers

5    do not clock out for meal periods (*id*. at 206).

6    　　　　　　　**C.**　　　　**How Managers Spend Time In Restaurant.**

7    　　　　　　　　　　*(1)*　　　　*Policies.*

8    　　　　The Benihana employee guide and manager's guide establishes standard policies and

9    procedures, applicable to managers at BNC teppanyaki-style restaurants nationwide (Allen Exhs.

10   E, S).  A single version of each guide was in effect at any given time (Allen Exhs. C at 35–36; R

11   at 99–100).  The manager's guide instructs on most aspects of managing a Benihana teppanyaki-

12   style restaurant (Allen Exh. S).

13   　　　　During the class period, BNC's operational model mandated that 60% of all managers'

14   time be spent performing management in dining room ("MID") and table touching duties.

15   Specifically, the operational model required managers to allocate 60% of their time each week to

16   guests, 30% to employees, 5% to facilities, and 5% to bookkeeping.  This model was known as

17   the "60-30-5-5 model" (Allen Exhs. X at 1884).  The 60% portion allocated to guests required

18   managers to perform MID, talk to guest, and provide "tender loving care" to customers.  The

19   30% allocated to employees required managers to perform interviews, orientation, training,

20   delegate tasks, and provide praise and feedback to non-manager employees.  The 5% allocated

21   for facilities was for managers to conduct repair and maintenance checks, pest control, carpet

22   cleaning and other necessary cleaning of the restaurant.  And the 5% allocated for bookkeeping

23   was for managers to handle invoices and reports (Allen Exh. X at 1184).

24   　　　　BNC's MID and table touching policies required on-duty managers to be in the dining

25   room to personally ensure there would be no breaks in the customer's dining experience and the

26   service cycle (Allen Exh. K at 85).  The MID policy was in effect during the class period and

27   applied to all managers (Allen Exh. K at 83, 91).  Mangers were educated about the MID policy

28   during their training process (Allen Exh. K at 89).  If needed, MID also required managers to

United States District Court

For the Northern District of California

1  perform tasks ranging from dishwasher to front desk (Allen Exh. TT ¶ 14).  BNC monitors

2  managers' compliance with MID through the mystery shopper program and regional manager

3  visits (Allen Exh. C at 70, 71).  Mangers who do not comply are disciplined (Allen Exh. OO ¶

4  11).

5      BNC's table-touching policy is an off-shoot of the MID policy.  Table touching refers to

6  BNC's requirement that managers speak with each customer at least once during their dining

7  experience (Allen Exh. K at 63–64).

8                  *(2)    **Practices**.*

9      Although BNC has adopted uniform policies for its California stores, managers exercise

10  "considerable discretion" in "how they manage their stores, and in the tasks they perform on a

11  day-to-day basis (Zaletel Exh. E ¶ 25).

12      In August 2011, BNC retained time and motion expert Christina G. Banks, Ph.D, to study

13  the actual tasks and activities performed by general managers and managers at California

14  Benihana restaurants.  She was "asked to "stud[y] the tasks managers perform, through direct

15  observation, to determine the time spent on exempt and nonexempt tasks, and the variation of

16  their work" (Opp. 5).  Dr. Banks oversaw observations of managers in six California BNC

17  restaurants as part of a larger study of 30 managers at both BNC-owned and subsidiary

18  restaurants.  Observations were scheduled Monday through Sunday, "enabling at least four

19  observations on each of the seven days of the week."  The study was based on a random

20  selection of managers (Zaletel Exh. C ¶¶ 19–21).  The study followed managers for an entire

21  shift recording every activity longer than ten seconds, broken down into 14 task areas (*id.* ¶ 28).

22  Dr. Banks reported that in the six BNC-owned restaurants, all managers observed spent more

23  than 50% of their time performing what had been classified as exempt work (*id.* ¶ 55, Chart 27).

24      The results of the study showed discrepancies between the eleven class members'

25  testimony of what work they performed and the actual work performed (*id.* ¶ 87).  The study

26  concluded that managers spent between 57.1% to 93.9% of time performing tasks which the

27  study classified as exempt tasks (*id.* ¶ 3).  Eleven managers testified, however, that they spent

28

                                    5

United States District Court
For the Northern District of California

1  only 40% of their time or less performing exempt task (Allen Exhs. SS ¶ 16; TT ¶ 15; QQ ¶ 15;

2  OO ¶ 16; RR ¶ 11; UU ¶ 15; PP ¶ 13; MM ¶ 20; LL ¶15; NN ¶ 15; WW ¶ 16).

3  **D.    Labor Costs.**

4  BNC aims for labor costs to be between 18% and 24% of sales (Allen Exh. D at 327).  To

5  meet this goal, BNC requires managers to avoid scheduling employees for block shifts and to

6  only bring in hourly wage earners when absolutely necessary (*id*. at 322–2).  Eleven mangers

7  testified the only way for them to meet BNC's goal for labor costs was to send hourly employees

8  home and perform the absent employee's job duties themselves (Allen Exhs. SS at ¶ 16; TT ¶ 15;

9  QQ ¶ 15; OO ¶ 16; RR ¶ 11; UU ¶ 15; PP ¶ 13; MM ¶ 20; LL ¶ 15; NN ¶ 15; WW ¶¶ 13, 20).

10  Furthermore, a few managers also reported being instructed by the regional manager to "supplant

11  labor costs" by sending hourly employees home and performing their job duties (Allen Exhs. OO

12  ¶ 17; SS ¶ 16).

13  **4.    VACATION POLICY.**

14  Throughout the relevant time period, BNC maintained a vacation policy that governed

15  the vacation benefits of all employees of Benihana-branded teppanyaki-style restaurants in the

16  United States, including California.  Prior to November 1, 2009, BNC distributed "vacation pay

17  in advance on or around the employees' seniority dates whether eligible employees actually

18  t[ook] days off later or not (Nako Exh. E at 14915).  This policy was amended November 1,

19  2009, so that vacation benefits were paid at the time the vacation was taken, rather than in

20  advance, and unused benefits were forfeited either when the employee terminated work or on

21  March 27, 2011, whichever occurred first (Nako Exh. C).  On September 12, 2011, the policy

22  was amended again such that forfeiture of unused vacation benefits occurred at the end of each

23  fiscal year, as well as upon termination (Nako Exh. D at 16336).  For all current employees, the

24  vacation policy also requires forfeiture of all unused, accrued vacation benefits on April 1, 2012.

25  Throughout the class period, BNC has paid its vacation benefits from a Voluntary

26  Employee Beneficiary Association ("VEBA") account, first through Wachovia and then through

27  Bank of America (Nako Exh. B at 88).

28

United States District Court
For the Northern District of California

### 5. BNC'S RELATIONSHIP TO SUBSIDIARIES.

Eight Benihana teppanyaki-style restaurants in California are owned by subsidiaries of BNC, and six are directly owned by BNC (Allen Exh. XX). BNC compensates employees at all fourteen locations, and through, its various policies, instructs as to how to perform their jobs. BNC and its subsidiaries share the same headquarters and are governed by the same board of directors (Allen Exh. B at 19, 31, 41). BNC's finance, human resources, franchising, marketing, training, construction, real estate, and purchasing departments each provide their services to all fourteen California locations (Allen Exhs. B at 18, 75–78; C at 11). Managers at all fourteen locations report to the same BNC regional managers (Dkt No. 50-1 at 15; Allen Exh. C at 15). All fourteen locations have the same job titles, job descriptions, use the same menu, the same Aloha point-of-sale system, and are subject to the same customer service requirements and mystery shopper surveys (Allen Exhs. D at 216, 385; C at 64, 70–71, 99). BNC pays the wages of all of its employees at the Benihana-branded teppanyaki-style restaurants in California from a single payroll account (Allen Exh. B at 49). BNC uses a second bank account to pay for all of the non-wage items, such as leases and insurance premiums (Allen Exh. B at 51–57). BNC pays all vacation benefits from the same VEBA account (Nako Exh. B at 64, 88–89). All fourteen California Benihana locations share the same policies regarding overtime and vacation pay (Dkt. No. 50-1, Exh. F at 91–96). There are not variations in expectations for managers at subsidiary locations versus BNC-owned locations (Allen Exh. C at 168).

Plaintiffs allege seven state law claims and propose three classes. Plaintiffs originally named BNC and seven subsidiaries as defendants. By order dated November 9, 2011, all claims against BNC subsidiaries, were dismissed due to lack of Article III standing. The dismissal order, however, did not preclude any plaintiff from seeking damages directly from BNC as their employer of the workers at the subsidiary-owned restaurants.

### 6. PROPOSED CLASSES.

Named plaintiffs request certification of three classes. The class period is designated as four years prior to the filing of the original complaint, filed on February 14, 2011 (First Amd.

7

Compl. ¶ 2).  Plaintiffs request certification under Rule 23(b)(3) for two classes in order to seek

damages:

> Manager []class:  All persons who were employed as exempt restaurant managers by defendant at one or more Benihana-branded, teppanyaki-style restaurants in California at any time during the Class Period.
>
> Vacation[-]Pay Terminated[-]Employee []class:  All persons who were employed by defendant at any Benihana-branded, teppanyaki-style restaurant in California during the class period for more than one year, and terminated after November 1, 2009.

Plaintiffs also request certification of the following class under Rule 23(b)(2) for

injunctive and declaratory relief:

> Vacation[-]Pay Current[-]Employee []class:  All persons currently employed by defendant at any Benihana-branded, teppanyaki-style restaurant in California whose rights to vacation benefits are determined according to the terms of the Vacation Benefit Plan and Summary Plan Description Prepared for Full-Time Restaurant Team Members of the Benihana Companies (as amended and restated effective as of September 12, 2011).

Benihana, its officers, directors, and regional managers are excluded from the plaintiff

classes (First. Amd. Compl. ¶ 40).

**7.    NAMED PLAINTIFFS.**

Plaintiffs Tetsuo Akaosugi and Hieu Nguyen are proposed class representatives for the

manager class.  Both allege that they were subject to the same BNC policies and operational

model that caused the misclassification alleged in the first amended complaint.

Plaintiff Akaosugi was employed by BNC at a BNC-owned restaurant as a salaried

restaurant manager at the San Francisco restaurant location from September 2009 through on or

around August 8, 2010.  Plaintiff Akaosugi claims to have suffered a loss of accrued vacation

pay at the time of his termination.  Prior to working at the San Francisco location, he was

employed by Benihana as a regional manager, a position which is not included in the proposed

plaintiff classes (First Amd. Compl. ¶ 10).  Plaintiff Akaosugi does not pursue claims for the

period during which he was a regional manager.

Plaintiff Nguyen was employed by BNC as a salaried manager at the BNC-owned

Cupertino location during the entirety of the class period.  He is currently an employee.  Plaintiff

Nguyen claims to face a threat of forfeiture of his vacation pay.  Plaintiff Nguyen's conduct, including deleting work files from a USB drive and inconsistency in deposition testimony, was put at issue in defendant's motion for sanctions due to spoliation of evidence, which was recently denied.  This is discussed in greater detail below.

*          *          *

On January 3, 2012, plaintiffs filed a motion for class certification and a motion for partial summary judgment as to defendant's thirty-seventh affirmative defense that plaintiffs' claims for vacation pay and penalties are preempted by ERISA.  Briefing on the motion for partial summary judgment was postponed until resolution of the class certification motion.  On January 31, 2012, BNC filed a motion for sanctions due to alleged spoliation of evidence and self-help discovery by plaintiff Nguyen.  That motion was denied on March 19, 2012.  On February 27, 2012, defendant's were granted leave to file a motion to strike plaintiffs' expert reply declaration in support of their motion for class certification.  That motion was granted (Dkt. No. 140).  This order follows full briefing and a hearing.

**ANALYSIS**

"A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23] — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original).  Although a motion for class certification is not the appropriate point at which to resolve the merits of plaintiffs' claims, courts are "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *Hanlon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).  This "rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped." *Wal-Mart*, 131 S. Ct. at 2551.

Pursuant to Rule 23(a), for a named plaintiff to obtain class certification, the court must find:  (1) numerosity of the class; (2) common questions of law or fact; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the named plaintiff and plaintiff's counsel can adequately protect the interests of the class.

In addition to satisfying the requirements of Rule 23(a), a named plaintiff must also show that one or more grounds for maintaining the class action are met under Rule 23(b).

Here plaintiffs seek certification of three classes. Certification as to the manager class and vacation-pay terminated-employee class is sought under Rule 23(b)(3). Certification of the vacation-pay current-employee class is sought under Rule 23(b)(2). The proposed classes will now be considered in turn.

## 1. PROPOSED MANAGER CLASS.

As previously explained, plaintiffs seek certification under Rule 23(b)(3) of the following class to pursue its state law claims: "All persons who were employed as exempt restaurant managers by defendant at one or more Benihana-branded, teppanyaki-style restaurant in California at any time during the class period" (First Amd. Compl ¶ 39).

Plaintiffs state law claims brought by the proposed manager class depend on their allegation that BNC misclassified plaintiff managers and putative class members as exempt employees. Plaintiffs request that a single determination be made as to whether they and other putative class members were, in fact, misclassified as exempt employees. The Court finds that class treatment of these claims is not the superior method of fairly and efficiently adjudicating these claims as individual stories will likely overwhelm the trial, such that any common questions of fact or law will not predominate.

### A. Standard.

Rule 23(b)(3) requires that plaintiffs show common questions of law and fact "predominate over any questions affecting only individual members." This "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler*, 150 F.3d 1011, 1022 (9th Cir. 1998).

The Industrial Welfare Commission has established exemptions from the requirement that an overtime rate of compensation be paid for executive, administrative, and professional employees, provided that employees are "primarily engaged" in duties that meet the test of the exemption. 8 CAL. CODE REGS. § 11050. California courts have construed the "primarily engaged" requirement for managers to mean that they "spend more than 51% of their time on

United States District Court
For the Northern District of California

10

1  managerial tasks in any given workweek." *Dunbar v. Albertson's Inc.*, 141 Cal. App. 4th 1422

2  (2006).  Plaintiffs "bear[] the burden of demonstrating that the requirements of Rule 23(a) and

3  (b) are met."  *United Steel Workers v. ConoccoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010).

4          Plaintiffs rely on the declarations of eleven managers who testified they spent more than

5  60% of their time performing nonexempt tasks such as waiting tables to show that defendant

6  misclassified all of its managers.  Plaintiffs allege the following common questions to be capable

7  of classwide resolution (Br. 18):

8              (1) whether managers were uniformly classified by defendant as
             exempt; (2) whether BNC's common policies and 60-30-5-5 model
9             resulted in managers spending more than half of their time
             performing the same tasks as servers, hostesses, and other hourly
10            employees; (3) whether defendant expected and instructed
             managers to primarily perform non-exempt tasks; and (4) whether
11            managers were required to be on-duty throughout their shift such
             that they were not provided off-duty meal periods and rest breaks.

12  Plaintiffs contend there was a "common course of conduct" that was "generally relied upon" and

13  that violated "common statutory provisions."  *Harris v. Palm Springs Alpine*, 329 F.2d 909,

14  914–15 (9th Cir. 1964).  Their theory is that BNC's common policies resulted in managers

15  performing a majority of nonexempt tasks.

16          Defendant argues that commonality is not satisfied.  To rebut plaintiffs' contention that

17  commonality exists defendant has provided declarations from a manager and regional managers

18  showing how varied and unpredictable the daily managerial schedule can be and how managers

19  use their discretion in allotting their time, has cited to numerous authorities, and has relied on the

20  conclusions of a study conducted by Dr. Christina Banks, its time and motion expert, retained for

21  litigation.  Based on the time and motion study, Dr. Banks concluded that BNC managers spent

22  an average of 73.3% of their time performing exempt work (Zaletel Exh. C ¶ 3).

23                     **B.      No Common Method of Proof.**

24          In order to protect the interests of absent class members, as judges are required to do in

25  the context of class actions, a common method of proof is needed.  At trial, plaintiffs cannot

26  possibly call every single member of the class in order to prove up his or her case.  Thus, a

27  common method of proving up the claims of class representatives and absent class members is

28  necessary.  This will ensure that the individual claims of absent class members get a full and fair

United States District Court

For the Northern District of California

1   hearing and will not be compromised.  We can tolerate a limited number of individual issues

2   with discrete proof but the common method of proof must cover the predominance of fact issues.

3          To obtain certification under Rule 23(b)(3), plaintiffs must demonstrate a common

4   method of proof, so that the trial will not be overwhelmed by individual stories.  Our court of

5   appeals has held that company-wide policies governing how employees spend their time or

6   uniformity in work duties may serve as a common method of proof.  *Vinole v. Countrywide*

7   *Home Loans*, *Inc.*, 571 F.3d 935, 947 (9th Cir. 2009).  At the same time, it cautioned that "in

8   cases where exempt status depends upon an individualized determination of an employee's work,

9   and where plaintiffs allege no standard policy governing how employees spend their time,

10  common issues . . . may not predominate."  *Id.* at 946.  Furthermore, certification is not

11  appropriate where resolution of the misclassification claims and defenses requires a "fact-

12  intensive, individual analysis of each employee's exempt status."  *Id.* at 947.  Where a blanket

13  exemption policy exists, this "does not eliminate the need to make a factual determination as to

14  whether class members are actually performing similar duties."  *Marlo v. United Parcel Service,*

15  *Inc.*, 639 F.3d 942, 948 (9th Cir. 2011).  This is because the policy may have accurately

16  classified some employees and misclassified others.  Whether or not a blanket exemption policy

17  is in place, the central inquiry is "where the individual employees actually spent their time."  *In*

18  *re Wells Fargo Home Mortgage Overtime Pay Lit.*, 571 F.3d 953, 959 (9th Cir. 2009).

19         Plaintiffs point to non-binding state court decisions wherein the court certified a class of

20  managers in misclassification actions.  But those decisions are distinguishable.  In *Upson v. Sur*

21  *La Table*, *Inc.,* BC424012, Sup. Ct. of Los Angeles (June 6, 2011), the court certified a class of

22  61 store managers.  In so doing, it emphasized that the testimony of plaintiffs' declarants showed

23  that "each of them spent well in excess of 50 per cent of their time performing tasks generally

24  performed by hourly employees," and that this evidence was not directly contradicted by

25  defendant.  The court also found that the "absence of [] a verification study . . . [was] significant"

26  because there was no evidence to directly contradict plaintiffs' testimony regarding how much

27  time they spent on nonexempt tasks.  That is not the case here.  Likewise in *Puchalski v. Taco*

28  *Bell*, *Corp.*, No. GIC870429, Sup. Ct. of San Diego (Jan. 29, 2010), the court certified a class of

1    managers, where the evidence showed, without contradiction, that the majority of the managers

2    tasks were nonexempt.  Finally, in *Anna's Linen Overtime Cases*, J.C.C.P. No. 4437, Sup. Ct. of

3    Orange County (Apr. 16, 2010), the court granted class certification of a class of assistant

4    managers and store managers, but there was no analysis of the misclassification issue.  Indeed,

5    the order issued in that decision appears simply to be the proposed order submitted by plaintiffs.

6    These decisions do not overcome the clear authority in our court of appeals on misclassification

7    cases that certification is not appropriate where resolution of the misclassification claims and

8    defenses requires a "fact-intensive, individual analysis of each employee's exempt status."

9    *Vinole*, 571 F.3d at 947.

10         At the hearing, the Court asked plaintiffs' counsel whether there has ever been a single

11   overtime federal class action in our court of appeals that has been certified and litigated.

12   Counsel referred only to a decision by Judge Patel, "Benito v. Kagg Oil."  Counsel did not

13   provide a citation and plaintiffs failed to cite to this decision in their briefing on this motion.

14   The Court has not been able to locate a decision by Judge Patel in a case called Benito v. Kagg

15   Oil.  The Court did review a decision by Judge Patel in *Mowdy v. Beneto Bulk Transport*, 2008

16   WL 901546 (N.D. Cal. 2008) (noting that Kag West was formerly Beneto Bulk Transport).  That

17   decision is an overtime case, but it was not a Rule 23 action, it was a federal collective action,

18   and thus has no bearing here.

19         It is clear, that the fact that mangers are expected to follow certain procedures or perform

20   certain tasks does not establish whether they are actually "primarily engaged" in exempt

21   activities during the course of the workweek.  Each of plaintiffs' eleven managers declarations

22   states, generally:  "During my employment, I believe that I spent at least [60% or more] of my

23   time each week dealing directly with customers and performing the same job duties as the

24   [server, host, bartender, etc.]," and other hourly employees.  The declarations do not state with

25   specificity how much time was spent performing managerial tasks directed at customers or how

26   much time was spent performing non-exempt work or how the managers calculated the

27   percentages of their time spent on each.  Moreover, the declarants appear to presume all work

28   done in the dining room is non-exempt work, but managers direct hosts, resolve customer

United States District Court

For the Northern District of California

13

United States District Court

For the Northern District of California

complaints, process voids, and perform other managerial tasks while in the dining room (Zaletel Exhs. M at 74; N at 55–58; L at 24–26; O at 19–21; Q at 24–25, 27; B at 98–99).

Plaintiffs' theory is that the existence of common policies, such as a systematic policy of hiring too few hourly people, forcing managers to fill in for hourly employees because of a shortage of manpower, the 60-30-5-5 policy, the MID and table-touching policies, and defendant's policies for labor budgeting provide a common method of proving up plaintiffs' and absent class members' claims.  It is true that a company-wide policy can answer the need for class-wide method of proof where the policy affects all class members in the same way and the policy itself is the point in controversy, but here the policies are not unlawful in themselves and would be merely contributing factors.  In no instance could these contributing factors alone prove up any class members' overtime case.  Individualized proof would still be important. Common background facts are not enough to supply a common method of proof.

Here, it is unclear that these common policies result in managers performing hourly tasks for more than fifty percent of their time at work.  The record shows that one of the managers interviewed testified to the contrary (Zaletel Exh. H at ¶ 22).  Indeed, the policies do not entail any such explicit requirement.  And whereas here, the evidence contradicts plaintiffs' theory, the Court cannot rely on the policies, common, as they may be.  Plaintiffs' theory is further undermined by the fact that several regional managers testified that they were not even familiar with the 60-30-5-5 policy and that it was not used in their region  (Zaletel Decl. D ¶ 52; E ¶ 47; G ¶ 17).  Others testified that "[i]t was not an absolute rule about how managers were to spend their time (*id*.; Zaletel Decl. F ¶ 41).

Furthermore, in direct contradiction to the eleven declarations of managers put forward by plaintiffs, the declaration put forward by defendant of manager David Leon stated:  "I believe that I spend the majority of my time managing, not performing the work that hourly employees do.  The main purpose of my job is to maintain an orderly dining room and run the shift" (Zaletel Exh. H at ¶ 22).  In further contradiction to the declarations of managers presented by plaintiffs are the results of the time and motion expert who reported that based on the results of the time

United States District Court

For the Northern District of California

1   and motion study, all managers spend an average of 73.3% of their time performing exempt

2   work.

3         Plaintiffs challenge the reliability of defendant's expert report because Dr. Banks, the

4   expert, was retained specifically for this litigation and her findings are unreliable.  Specifically,

5   plaintiffs raise six objections:  (1) the study improperly channeled nonexempt tasks into exempt

6   task categories; (2) the study ignored tasks taking fewer than 10 seconds, (3) the study's lists of

7   tasks is biased; (4) the study is biased in how tasks were sorted into exempt and nonexempt

8   categories; (5) the study failed to address the Hawthorne Effect, which is the tendency for people

9   to alter their behavior when they know they are being observed; and (6) observers deterred

10  managers from performing nonexempt tasks (Reply Br. at 6–9).

11        Plaintiffs have not provided expert testimony to call into question or undermine the

12  reliability of Dr. Banks' study.  *See* Dkt. No. 140.  Bare assertions of unreliability and bias are

13  insufficient.  Dr. Banks' 72-page report set forth her methodology and controls used in the study

14  and her conclusions (Zaletel Exh. C).  There is no basis for this Court to call into questions Dr.

15  Banks' study based on the six bare assertions plaintiffs have raised.

16        Plaintiffs have failed to show that the question of how managers spend their work days

17  will be capable of a common method of proof at trial.  The misclassification claim would require

18  an individualized analysis of how each manager spent his or her time and what percentage of that

19  time was spent on exempt tasks.  Even if Dr. Banks' study is not perfect, at a minimum, it raises

20  factual issues as to how managers actually spend their time while at work.  So, too, do the

21  declarations of managers submitted by plaintiffs and the declaration of manager Leon, submitted

22  by defendant, wherein he testified that he spent the majority of his time at work performing

23  exempt tasks.  The evidence shows that managers spend their time in various ways over the

24  course of day and workweek.  Were this class to be certified, the trial would devolve into various

25  mini trials, wherein the fact finder would need to determine, on a individual basis, how class

26  members spent their time.  The misclassification claim brought by the manager class, upon

27  which all of the state law claims asserted by the manager class are premised, is not suitable for

28  class treatment.  The motion to certify the proposed manager class is **DENIED**.

**2.     PROPOSED VACATION CLASSES.**

Plaintiffs seek to certify two classes that arise out of wage claims relating to BNC's vacation policy:  (1) the vacation-pay terminated-employee class and (2) the vacation-pay current-employee class.  Defendant raises a preliminary objection based on procedural grounds, namely that these two classes are different from the classes defined in the first amended complaint.  While this is true, this is not a ground on which certification will be denied, as defendant cites no binding precedent that requires denial on this ground.  Instead, plaintiffs are provided leave to amend the complaint to include the new class definitions.  The order addresses the two vacation classes in turn.

**A.     Vacation-Pay Terminated-Employee Class.**

Plaintiffs seek to certify, under Rule 23(b)(3), the following class:  "All persons who were employed by Defendant at any Benihana-branded teppanyaki-style restaurant in California during the Class Period for more than one year, and terminated after November 1, 2009."  This putative class brings the following state claims:  (1) unlawful forfeiture of accrued vacation pay; (2) failure to pay wages on termination; (3) failure to provide accurate itemized wage statements; and (4) unfair business practices.

*(1)     Numerosity.*

The numerosity requirement of Rule 23(a)(1) is satisfied when "joinder of all members is impracticable."  The numerosity requirement is not tied to any fixed numerical threshold, but courts generally find the numerosity requirement satisfied when a class includes at least forty members.  *Rannis v. Recchia*, 380 F. App'x 646, 650–51 (9th Cir. 2010).  "[A]n estimated 416 employees terminated employment between November 1, 2009, and the present, after completing the one year of work required to receive vacation benefits under the vacation policy" (Br. 18).  Defendant does not dispute numerosity.  The class satisfies the numerosity requirement.

*(2)     Typicality and Adequacy.*

The typicality requirement of Rule 23(a)(3) is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  A plaintiff's claims

United States District Court

For the Northern District of California

are typical if they "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

The adequacy requirement of Rule 23(a)(4) permits certification if "the representative parties will fairly and adequately protect the interests of the class." This factor has two requirements: (1) that the proposed representative plaintiffs and their counsel do not have any conflicts of interest with the proposed class; and (2) that the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020. "A class representative must be a part of the class and possess the same interest and suffer the same injury as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

Plaintiff Akaosugi is the proposed class representative of the vacation-pay terminated-employee class. Defendant contends his claims are not typical of the class and that he is not an adequate representative because "[t]to the extent any terminated employee's requested vacation was denied by a Manager (and thus forfeited), there is a real conflict within the subclass" (Opp. 23). Pursuant to the vacation policies, however, the only circumstance that triggered forfeiture of accrued, unused vacation pay was termination of employment (Dkt. Nos. 78-3 at D0000927; 78-4 at D0016336). Managers do not retain discretion regarding the forfeiture of vacation benefits (*ibid.*; Dkt. No. 78-5 at D0014915). Thus, no apparent conflict exists.

As a terminated employee who participated in defendant's vacation plan, and who suffered loss of accrued vacation pay at the time his employment terminated, plaintiff Akaosugi shares the same interests as the rest of the members of the vacation-pay terminated-employee class. Plaintiff Akaosugi worked at a BNC-owned restaurant. Regardless of whether the restaurant was BNC-owned or subsidiary-owned, his claims are reasonably co-extensive with all class members and he will be an adequate representative (*see infra* Part 3 at ¶¶ 23–25).

The order also finds that plaintiffs' counsel of record at Minami Tamaki, LLP and Lewis, Feinberg, Lee, Renaker & Jackson, P.C., would be adequate class counsel. Plaintiffs' counsel are experienced class-action counsel (Allen Decl. ¶¶ 53–56; Feinberg Decl. ¶¶ 1–14). Defendant does not challenge the adequacy of plaintiffs' counsel to serve as class counsel.

1    The Court is concerned that appointing two firms as class counsel will lead to duplication

2    of efforts and increased attorney's fees.  By NOON ON APRIL 13, counsel must submit a joint

3    statement of no more than three pages indicating how they propose to address this concern and

4    why appointment of two firms as class counsel would be appropriate.

5                    *(3)        Commonality, Predominance, and Superiority.*

6           Rule 23(a)(2) requires that there are questions of law or fact common to the class, and

7    Rule 23(b)(3) requires that plaintiffs show those common questions of law and fact "predominate

8    over any questions affecting only individual members."  Since November 1, 2009, BNC's

9    vacation policy provided that vacation benefits would be paid at the time vacation was taken and

10   required forfeiture of all accrued, unused vacation benefits upon separation of employment or on

11   March 27, 2011, whichever occurred first.  BNC's vacation policy has twice been amended. The

12   two amendments do not appear to change the fact that all restaurant-level employees received

13   vacation benefits under the same vacation policy during the class period.  The predominate

14   issues are whether the BNC vacation policy requires forfeiture of accrued vacation pay in

15   violation of California Labor Code Section 227.3 and whether plaintiffs' state law vacation

16   forfeiture claim is preempted by ERISA.[*]

17          If entitlement to vacation pay is proven, then further class-wide determinations may be

18   made regarding restitution under Section 17200, the adequacy of BNC's record-keeping and

19   payroll deductions, and whether plaintiffs are owed waiting time penalties.  Because BNC

20   tracked the amount of vacation time owed employees, damages calculations will be

21   straightforward. *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir.

22   2010) ("the amount of damages is invariably an individual question and does not defeat class

23   action treatment").  The class method of adjudication will be an efficient and effective means of

24   adjudicating the claims brought by the vacation-pay terminated-employee class.  It will therefore

25   be the superior method of adjudication of these claims.

26

27

28   [*] Plaintiffs brought a motion for partial summary judgment on this issue.  Briefing on the motion was postponed pending resolution of the motion for class certification.  Thus, the merits of the ERISA affirmative defense are not addressed herein.

*(4)* *Ascertainability*.

Defendant complains that the vacation-pay terminated-employee class is not ascertainable because the class definition assumes BNC's VEBA plans are not valid under ERISA and that the Court cannot determine membership without determining the merits of defendant's ERISA preemption affirmative defense.

In addition to the explicit requirements of Rule 23, an implied prerequisite to class certification is that the class must be sufficiently definite. *See, e.g., Dietz v. Comcast Corp.*, 2007 WL 2015440, at *8 (N. D. Cal. July 2007) (Alsup, J.); *Xavier v. Philip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (Alsup, J.). Classes are sufficiently definite when "[a]ll the parameters for membership in th[e] class are objective criteria, and defendant['s] business records should be sufficient to determine the class membership status of any given individual." *Hofstetter*, 2011 WL 1225900, at *12, 14 (N.D. Cal. 2011) (Alsup, J.).

Whether the vacation plan is valid under ERISA is a common question that applies uniformly to the class. Defendant maintains employment records for each current and past employee that includes the necessary information to determine the class' membership, such as hire dates, pay group, employment status, job title, and scheduled work hours (Dkt. Nos. 83-4; 83-6).

Defendant further contends that the class may include individuals who did not forfeit vacation pay upon termination. This is not a basis to deny certification.

Additionally, defendant contends that this class should not be certified because "it includes employees who have not yet, but will be, terminated" (Opp. 22). Our court of appeals has held that "[t]he inclusion of future class members in a class is not itself unusual or objectionable." *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2009). The order concludes that the class is ascertainable.

The proposed class meets all of the Rule 23(a) and (b)(3) requirements. The class will not be certified until plaintiffs amend their complaint to include the class definition and address the Court's concerns regarding appointment of two firms as class counsel. The amended complaint must be filed by **NOON ON APRIL 13.**

United States District Court

For the Northern District of California

1

## B.     Vacation-Pay Current-Employee Class.

2          Plaintiffs did not identify a vacation-pay current-employee class for injunctive relief in

3   their first amended complaint.  The current vacation policy, effective September 12, 2011,

4   requires the forfeiture of accrued, unused vacation benefits at the end of each fiscal year, starting

5   with forfeiture on April 1, 2012, as well as upon termination.  Plaintiffs now seek to certify the

6   following class under Rule 23(b)(2):

7                    All persons currently employed by Defendant at any Benihana-
                    branded, teppanyaki-style restaurant in California whose rights to
8                    vacation benefits are determined according to the terms of the
                    Vacation Benefit Plan and Summary Plan Description Prepare for
9                    Full-Time Restaurant Team Members of the Benihana Companies
                    (As Amended and Restated Effective as of September 12, 2011).
10
           This putative class brings the following state claims:  (1) unlawful forfeiture of accrued
11
    vacation pay; (2) failure to pay wages on termination; (3) failure to provide accurate itemized
12
    wage statements; and (4) unfair business practices.
13
           Certification under Rule 23(b)(2) is proper if "the party opposing the class has acted or
14
    refused to act on grounds that apply generally to the class, so that final injunctive relief or
15
    corresponding declaratory relief is appropriate respecting the class as a whole."  Plaintiffs must
16
    also meet the requirements of Rule 23(a).
17
                        *(1)     Numerosity.*
18
           Throughout the class period, "hundreds of employees have been entitled to vacation
19
    benefits under the Vacation Policy each year" (Br. 17–18 & n.88)  As of September 11, 2011,
20
    349 active employees at the six BNC-owned California locations had accrued, unused vacation
21
    benefits.  Defendant does not dispute numerosity.  The class satisfies the numerosity
22
    requirement.
23
                        *(2)     Commonality.*
24
           Commonality is satisfied here because, as stated above, all BNC restaurant-level
25
    employees receive vacation benefits under the same vacation policy, at least for the class period.
26
    Plaintiffs allege questions common to the class, such as whether defendant's vacation-pay
27
    forfeiture policies violate California law.  Thus, the order finds the commonality requirement is
28
    satisfied.

**United States District Court**
For the Northern District of California

*(3)* ***Rule 23(b)(2) Generally Applicability***.

Certification under Rule 23(b)(2) is proper if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Defendant's vacation policy is such an act.  Accordingly, certification of a vacation-pay current-employee class seeking injunctive and declaratory relief would be appropriate under Rule 23(b)(2).

*(4)* ***Ascertainability and Ripeness.***

Defendant argues that the proposed vacation-pay current-employee class cannot be ascertained and is not ripe because "at present, no vacation time for any current BNC employee has been forfeited, and may not take place until April 1.  By then, a now-current employee may have taken all his vacation or have terminated" (Opp. 23–24).

Proposed classes are ascertainable when their membership is "determinable from objective rather than subjective criteria."  *Xavier*, 787 F. Supp. 2d at 1089.  Courts need to be able to ascertain the class in order to determine who will be bound by judgment.  Classes are sufficiently definite when "[a]ll the parameters for membership in th[e] class are objective criteria, and defendant['s] business records should be sufficient to determine the class membership status of any given individual."  *Hofstetter*, 2011 WL 1225900, at *12, 14.  Plaintiffs vacation-pay current-employee class is defined by objective criteria that will enable the class membership to be determined (*see supra* Part 2.A.4 at 19).

Defendant also contends that the class claims are not ripe because they are based on the assumptions that:  "(1) prior to any ruling by the Court, [] BNC's existing VEBA plan [] is invalid under ERISA; (2) despite repeated notice over the last three years, a sizeable group of current BNC employees will not have used all their vacation under the prior plans before April 1, 2012 and thereafter; and (3) all current, eligible employees will continue to be employed by BNC on April 1, 2012 and thereafter."  Defendant claims that "[w]hether or not each, or any, of these events will occur is too speculative to mandate BNC to change its current practices" (Opp 23–24).

United States District Court

For the Northern District of California

A controversy is ripe if it "is essentially legal in nature," "no further factual amplification is necessary," and postponing review would cause the parties to suffer a hardship. *City of Auburn v. Qwest*, 260 F.3d 1160, 1172–73 (9th Cir. 2001), *overruled on other grounds by Sprint Telephony PCS, L.P. v. Cnty of San Diego*, 543 F.3d 571 (9th Cir. 2008). The injunctive and declaratory claims for relief are ripe for adjudication because no further facts need to be developed and postponing review would require employees to forfeit accrued benefits before they could bring suit.

### (5) *Adequacy and Typicality.*

Defendant has put into question the adequacy of plaintiff Nguyen as a class representative. At the time of the filing of the motion for class certification, plaintiff Nguyen was the sole proposed class representative for the vacation-pay current-employee class. Defendant brought a motion for sanctions due to spoliation of evidence and self-help discovery by plaintiff Nguyen. Although the motion was denied, it has raised serious issues regarding plaintiff Nguyen's conduct, which may be admissible at trial.

The adequacy requirement of Rule 23(a)(4) permits certification if "the representative parties will fairly and adequately protect the interests of the class." This factor has two requirements: (1) that the proposed representative plaintiffs and their counsel do not have any conflicts of interest with the proposed class; and (2) that the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020.

The gist of defendant's motion for spoliation was that plaintiff Nguyen copied company documents from a work computer onto a USB drive provided to him by his employer. Then, he deleted the documents from the USB drive prior to sending the drive to defendant. In an effort to explain why he downloaded nearly 6,500 files from the work computer to the USB drive, he testified in deposition that notification of a computer virus prompted him to back up large quantities of files onto the USB drive. But defendant's responded stating that plaintiff Nguyen was not told of the computer virus until some time after he backed up the files.

The order denying the motion for sanctions made clear that sanctions were not warranted because the record did not show that plaintiff Nguyen permanently destroyed any documents.

While he deleted the documents from the USB drive, another copy of the documents either remained on the work computer or was subsequently recovered.  Still, serious questions were raised as to the impropriety of plaintiff Nguyen's actions in erasing the documents before mailing the USB drive to defendant.  And defendant has raised credible accusations as to plaintiff Nguyen's unauthorized copying of company records and his attempts to conceal his wrongdoing.

In a class action, absent class members give up control of their claims and transfer control to the class representative and their counsel.  There is too much at risk, here, that issues unique to plaintiff Nguyen, namely those addressed in the briefing on the motion for sanctions, will impede plaintiff Nguyen's ability to vigorously represent the interests of the class.  The order concludes that plaintiff Nguyen is not an adequate class representative.  At the hearing, plaintiffs were permitted to file a second amended complaint in order to name another class representative for this proposed class.  Plaintiffs have done so and have named Rinko Donahue, who has been employed as a salaried manager at defendant's Cupertino locations during the entirety of the class period.

By **NOON ON APRIL 13**, plaintiffs must file a motion addressing only the issue of adequacy and typicality of plaintiff Donahue.  Defendant's response will be due **APRIL 20**.  The reply will be due **APRIL 27**.  By **NOON ON APRIL 13** plaintiffs must file an amended complaint that includes the class definition for the vacation-pay current-employee class.

**3.    SCOPE OF CLASS.**

Defendant contends that should a class be certified, it should be limited to employees of the six BNC-owned restaurants and not those of its subsidiaries (Opp. 24–25).  The argument is that plaintiffs lack Article III standing and cannot represent employees of subsidiaries for whom they never worked.

All fourteen Benihana restaurants in California were owned by defendant, either directly or through one of its wholly-owned subsidiaries.  Plaintiffs filed claims for violations of California wage laws on behalf of all California Benihana restaurant employees, naming BNC and all subsidiaries as defendants.  On November 9, 2011, this Court granted a motion to dismiss

United States District Court

For the Northern District of California

1  all BNC subsidiaries as named defendants, leaving only BNC as a defendant.  The order held

2  that plaintiffs had failed to establish Article III standing based on alter ego liability because they

3  could not demonstrate that the harm to plaintiffs at the BNC-owned restaurants was "fairly

4  traceable" to the subsidiaries.

5       Article III standing requires the demonstration of three elements:  (1) the plaintiff

6  suffered an "injury in fact" that is concrete and particularized and actual or imminent, not

7  conjectural or hypothetical; (2) the injury is "fairly traceable" to the challenged action of the

8  defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

9  by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  Before deciding

10 on class certification, standing must first be established.  *Lee v. State of Oregon*, 107 F.3d 1382,

11 1390 (9th Cir. 1997).  To prove Article III standing without resorting to alter ego liability,

12 plaintiffs of the subsidiary-owned restaurants must show that their injuries were "fairly

13 traceable" to BNC.

14      To establish standing in a suit for labor violations or unpaid wages, a worker must show

15 that the defendant is an "employer" under the applicable order of the Industrial Welfare

16 Commission.  *Martinez v. Combs*, 49 Cal. 4th 35 (2010).  Restaurant employees fall under

17 Chapter 5 of California's Order Regulating Wages, Hours, and Working Conditions in the Public

18 Housekeeping Industry.  8 CAL. CODE REGS. § 11050.  The order defines "employer" as one who

19 "employs or exercises control over the wages, hours, or working conditions of any person."

20      In *Martinez*, plaintiffs were seasonal agricultural workers who alleged that their

21 employer, Munoz, did not pay minimum wages.  The definition of "employer" in the IWC order

22 for agricultural work is identical to the definition for restaurants.  In holding Munoz would be

23 the proper defendant to hold liable, the California Supreme Court noted:

24          [Munoz] decided which fields to harvest on any given day and
            whether to harvest strawberries for fresh market sale or for the
25          freezer . . . [He] operated a single, integrated business operation,
            growing and harvesting strawberries for several unrelated
26          merchants and combining revenue from all sources with a personal
            investment, in the hope of earning a profit at the end of the season
27          . . . [He] paid his employees out of those combined revenues and
            assets . . . Finally, Munoz alone, with the assistance of his foremen,
28          hired and fired plaintiffs, trained and supervised them, determined
            their rate and manner of pay (hourly or piece-rate), and set their

24

hours, telling them when and where to report to work and when to take breaks.

49 Cal. 4th at 72.

Plaintiffs have shown that, like Munoz, BNC "employed or exercised control over wages, hours, or working conditions of any person" working in the subsidiary-owned locations. BNC set the policy guidelines and pay structure of all Benihana restaurants. All locations were similarly organized, and answered to the same regional manager in a given region. A single payroll bank account was used for all California employees, and all vacation benefits came from the same VEBA bank account.

In its motion to dismiss, the subsidiaries as named defendants, claimed that each subsidiary had its own corporate officers, boards of directors, tax identification numbers, and tax returns. Yet this is not enough to prevent employees from the subsidiary-owned locations from bringing suit against BNC, as their injuries were "fairly traceable" to the wage and working condition policies instituted by BNC. Under Article III, the IWC order, and *Martinez*, BNC is an "employer" of all Benihana workers for the purpose of our standing inquiry on this motion for class certification.

**4.     PLAINTIFFS' REQUESTS FOR JUDICIAL NOTICE.**

Plaintiffs have submitted two requests for judicial notice. The first request for judicial notice requests that notice be taken of Exhibit 13.01 to Benihana Inc.'s 10-K report, which was filed with the Securities and Exchange Commission on June 9, 2011 (Dkt. No. 62-3).

The second request for judicial notice requests that notice be taken of the following: (1) *Upson v. Sur La Table, Inc.*, Sup. Ct. of Los Angeles, Case No. BC424012 (June 6, 2011); (2) *Puchalski v. Taco Bell Corp.*, Sup. Ct. of San Diego, No. GIC870429 (January 29, 2010); (3) *Anna's Linen Overtime Cases*, Sup. Ct. of Orange County, J.C.C.P. No. 4437, Orange County Sup. Ct. (April 16, 2012); and (4) California Department of Labor Standards Enforcement Opinion Letter dated January 7, 1993 (Dkt. No. 113-2).

"The Court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be

1   questioned." FRE 201(b)(2).  Defendant does not oppose plaintiffs' requests for judicial notice.

2   Plaintiffs' request for judicial notice of the above-stated documents is **GRANTED**.

3                                        **CONCLUSION**

4          For the reasons stated above, the vacation-pay terminated-employee class is

5   **CONDITIONALLY CERTIFIED**.  Certification of the manger class is **DENIED**.  The motion to

6   certify the vacation-pay current-employee class will be **HELD IN ABEYANCE** pending further

7   submissions.

8

9          **IT IS SO ORDERED.**

10

11  Dated:  March 30, 2012.

12                                                 WILLIAM ALSUP
                                                   UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California