United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TETSUO AKAOSUGI, HIEU NGUYEN, and RINKO DONAHUE,<br><br>Plaintiffs,<br><br>v.<br><br>BENIHANA NATIONAL CORP.,<br><br>Defendant.<br>_____ / | No. C 11-01272 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

In February 2011, a putative class action was brought against defendant Benihana National Corp. ("BNC"). Named plaintiffs Tetsuo Akaosugi and Hieu Nguyen claimed in part that they were denied California overtime pay requirements because they were misclassified as exempt in their positions as managers at Benihana restaurants. A prior order denied class certification as to the proposed class of managers but certified two classes of employees in relation to BNC's vacation pay policies. The instant potion pertains only to the non-certified claims. For the reasons stated below, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

Plaintiffs Tetsuo Akaosugi, Hieu Nguyen, and Rinko Donahue were or are currently employed as salaried managers at Benihana restaurants in Cupertino and San Francisco. The restaurants have approximately 85 and 90 employees, respectively. They are teppanyaki-style

restaurants with a sushi bar, lounge, and "teppan" tables where chefs prepare food table-side. Each restaurant has one lead manager, called a "General Manager," and three subordinate managers referred to as "Managers" (collectively, "managers"). The managers at both restaurants report to the same regional manager, Steve Diaz. All manager positions were salaried. Both restaurants had the same hourly positions, including servers, hosts, bussers, and chefs, among others.

Akaosugi was a general manager at the San Francisco location from September 2009 until August 2010. At the time of his resignation, he was earning approximately $74,880 a year. As the general manager, Akaosugi was considered by BNC to be in charge of the entire San Francisco restaurant (Diaz Decl. ¶ 5). Donahue is presently employed as a manager in Cupertino, and has been since before 2007. After receiving a raise in April 2012, her salary is currently $50,427. Nguyen has been a manager in Cupertino since August 2009, with a yearly salary of $40,300.

BNC has established policies and procedures governing managers and employees, which are embodied in and communicated by training programs, employee and manager handbooks, manager quizzes, and performance reviews. BNC has a policy called "Management in the Dining Room," which requires that at least one manager be in the dining room when customers are present. As part of this policy, managers are also required to speak with each group of customers at a teppan table at least once. Managers thus spend a large amount of time in the dining room. Plaintiffs claim that, although they were salaried employees, they spent the majority of their time doing the same work as hourly employees, including bussing tables and serving guests. BNC counters that all three plaintiffs qualify for the executive exemption, such that BNC is not required to pay them overtime and meal-and-break benefits under California law.

BNC has moved for summary judgment on its affirmative defense that plaintiffs qualified for the executive exemption. BNC has also moved for summary judgment as to plaintiffs' claims for wage statement violations under California Labor Code Section 226(a) and waiting-time penalties under Section 203.

2

**ANALYSIS**

Under Rule 56, a court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." FRCP 56(e). The nonmoving party must identify factual disputes that "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Irrelevant or unnecessary factual disputes do not raise any genuine issue for trial. *Ibid*. To preclude entry of summary judgment, the nonmoving party must present sufficient evidence such that a jury could return a verdict in his or her favor. *Ibid*. In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255; *Sullivan v. United States Dep't. of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004).

In California, an employee is generally entitled to receive overtime wages of one and one-half times his or her regular rate of pay for time worked in excess of forty hours per week or eight hours per day. *See* Cal. Labor Code § 510(a). The central issue presented here is whether plaintiffs meet the requirements of the "executive exemption," such that they are exempt from overtime compensation and benefits such as meal and rest breaks. The "executive exemption" applies to an employee:

> (a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and
>
> (b) Who customarily and regularly directs the work of two or more other employees therein; and
>
> (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and

> promotion or any other change of status of other employees will be given particular weight; and
>
> (d) Who customarily and regularly exercises discretion and independent judgment; and
>
> (e) Who is primarily engaged in duties which meet the test of the exemption.
>
> (f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment . . .

8 C.C.R. § 11070; California Industrial Welfare Commission Order No. 7-2001 ("Wage Order No. 7"). The statute provides that activities constituting exempt work and non-exempt work are to be construed in the same manner as "are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116." *Ibid*. As an affirmative defense, an employer bears the burden of demonstrating that an employee falls within the exemption. *See, Ramirez v. Yosemite Water Co.*, 20 Cal. 4th 785, 794-95 (Cal. 1999). A court must determine "the realistic requirements of the job," including "first and foremost, how the employee actually spends his or her time." A court should also examine whether the employees' practices diverge from the employer's realistic expectations. *Id*. at 802.

In addition to the federal regulations referred to in Wage Order No. 7, a court may find further guidance in construing these exemptions in federal law. *Nordquist v. McGraw-Hill Broadcasting Co., Inc*., 32 Cal. App. 4th 555, 562 (Cal. Ct. App. 1995). This order notes, however, that "[t]he IWC's wage orders, although at times patterned after federal regulations, also sometimes provide greater protection than is provided under federal law in the Fair Labor Standards Act (FLSA) and accompanying federal regulations." *Ramirez*, 20 Cal. 4th at 795.

Plaintiffs do not contest that they meet the minimum salary requirement but argue that defendant has not met its burden of establishing the remaining five requirements of the executive exemption defense. Each disputed requirement is analyzed below.

### A.   MANAGEMENT OF A DEPARTMENT OR SUBDIVISION OF AN ENTERPRISE AND SUPERVISION OF TWO OR MORE OTHER EMPLOYEES.

Plaintiffs do not contest that Akaosugi meets this requirement. As general manager, Akaosugi was the lead manager responsible for ensuring that the San Francisco restaurant ran smoothly, and was in charge of overseeing all departments (Diaz Depo. 31:7-9). Plaintiffs, however, dispute that the subordinate managers Nguyen and Donahue were "in charge of any particular department by themselves." *First*, plaintiffs argue that they are not executives with the authority and responsibility of overseeing and managing a restaurant, or a subdivision therein, and at most merely assist the general manager. *Second*, because a manager may be periodically rotated through different departments, plaintiffs claim that they were not in charge of any recognizable unit or department.

Federal Code of Regulations Section 541.102 provides helpful guidance in enumerating a number of duties generally recognized as managerial, including tasks related to supervising and directing employee work (*e.g.*, interviewing and selecting employees, directing their work, appraising their productivity and efficiency for the purposes of recommending promotions, handling employee complaints and discipline), maintaining production or sales records for use in supervision and control of employees, planning and apportioning work, controlling the flow and distribution of merchandise and supplies, and providing for the safety of employees and the property.

Plaintiffs admit that their principal responsibility was to ensure that the restaurant and dining experience ran smoothly overall, both as they themselves understood their jobs and as communicated to them by BNC in the job description and manager manuals. Moreover, plaintiffs Nguyen and Donahue were charged with duties and responsibilities that are traditionally managerial in nature. They regularly performed managerial tasks such as scheduling employees, managing and directing the work of employees while in the dining room, ensuring food quality and compliance with BNC standards, handling customer complaints, and overseeing record-keeping and reporting of labor costs and other reports. Although the manager positions reported to and were subordinate to the general manager, plaintiffs have not identified

5

any facts supporting an inference that they merely assisted the general manager and supervised employees only in his absence. *See*, 29 CFR 541.104(c).

The restaurants were divided into separate departments, headed by managers with responsibility over the employees in that department. For example, the restaurants had a culinary manager, a service manager, a beverage and bar manager, and a facilities manager who were in charge of different groups of employees. The divisions within the restaurants satisfy the requirement of "specific, identifiable group[s] of employees who performed a regular set of specific tasks" within a larger organization. *In re United Parcel Service Wage & Hour Cases*, 190 Cal.App.4th 1001, 1018 (Cal. Ct. App. 2010). Nothing in the rule suggests that having managers periodically rotate through established departments disqualifies them for exemption. Plaintiffs have identified no authority that would require a manager to be assigned to the same department throughout his or her employment to satisfy this element.

### B.    AUTHORITY TO HIRE OR FIRE EMPLOYEES.

To qualify for the executive exemption, an employee must be someone with "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight." Wage Order No. 7. The Federal Code of Regulations further instructs that the employee must be "directly concerned *either with* the firing *or* the hiring and other change of status of the employees under his supervision, whether by direct action or by recommendation to those to who the hiring and firing functions are delegated." 29 CFR 541.106 (emphasis added). Plaintiffs dispute that they were invested with, or did in fact exercise, hiring or firing authority. As set forth below, plaintiffs have not established a genuine factual dispute as to this element.

It is undisputed that Akaosugi and Donahue had the authority to and did in fact *hire* employees. Plaintiffs assert, however, that neither had the authority to *fire* employees. A close reading of Wage Order No. 7 and the federal regulations referenced therein establishes that the rule does not require that an exempt employee have authority to both hire *and* fire. Moreover, an executive who does not himself hire or fire employees may still be considered exempt if his

6

hiring or firing recommendations are generally given serious consideration. Plaintiffs have not advanced any decision or authority that would require an alternate interpretation beyond the clear language of the rule. Regional Manager Steve Diaz, to whom all three plaintiffs reported, stated in his declaration that both general managers and managers give recommendations for terminations, to which he gives considerable weight. General managers and managers hire employees and can promote hourly employees to higher paid positions, which they frequently do. Plaintiffs have not identified any specific facts to dispute these statements.

Plaintiff Nguyen testified that he participated in only one interview with a job applicant, and that he himself had never hired anyone. He admitted, however, that he understood that managers had the authority to hire or fire employees. Nguyen's statement that he did not in fact hire or fire any employees is not sufficient to establish that he did not have the authority to do so, particularly in light of the fact that other managers such as Donahue were authorized to, and did in fact, hire people and made employment decisions or recommendations.

### C. EXERCISING DISCRETION AND INDEPENDENT JUDGMENT.

Plaintiffs argue that BNC's procedures and policies are so restrictive as to remove all discretion from any employee below the level of regional manager. As evidence of this, plaintiffs point to BNC's "service sequence," which sets forth specific customer service procedures and expectations, the Management in Dining ("MID") policy, sales-based labor budgets, and automated record-keeping and reporting systems. Plaintiffs claim that the MID policy, which requires that at least one manager be in the dining room when customers are present, resulted in managers having to be in the dining room for the majority of the day. While in the dining room, they were required to ensure the service sequence was followed precisely; thus, plaintiffs claim that managers did not exercise discretion during most of their working hours, as they were concerned with enforcing a rigid set of service procedures. Plaintiffs further claim that they did not have discretion in setting labor budgets and schedules because the budgets were set based on a set percentage of sales. Lastly, they argue that most of their record-keeping and administrative functions — typically considered managerial tasks — were more akin to simple printing and delivery of pre-prepared reports.

7

"Discretion and independent judgment involves the comparison and evaluation of possible courses of conduct, and acting or making a decision after considering various possibilities have been considered. It implies that the employee has the power to make an independent choice free from immediate supervision and with respect to matters of significance." *Nordquist,* 32 Cal. App. 4th at 564. Courts have recognized that modern companies often implement policies aimed at standardizing procedures and services, but the exercise of discretion "even where circumscribed by prior instruction" is still required and critical to the success of the enterprise. *See, Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982). Although plaintiffs may not have influenced or created certain policies, such as labor budgets, this does not refute the fact that they regularly exercised discretion and independent judgment. Plaintiffs were expected to and did train employees, appraised employee performance, disciplined employees when they determined it necessary, determined how to deal with customer complaints and concerns, scheduled and assigned work, determined when and which employees to send home or call back in keeping with labor cost policies, and ensured compliance with company regulations and federal labor, health, and safety regulations (Donahue Dep. 288-298, 305; Nguyen Dep. 194-97, 346-49, Akaosugi Dep. 156, 159, 209-210, 344-49).

Plaintiffs assert that while they were in the dining room, they were subject to the "very specific guidelines" set forth in the service sequence, implying that they did not exercise discretion as to matters of significance while in the dining room. Plaintiffs, however, repeatedly testified that one of their primary responsibilities while overseeing the dining room was to make sure everything was running smoothly, which necessarily entailed directing and managing employees on a time-sensitive basis. Plaintiffs also testified that they dealt with customer complaints and handled customer relations in the dining room, such as by giving out gift cards or free items (Donahue Dep. 72-73; Nguyen Dep. 100-101; Akaosugi Dep. 132-133). There is no dispute of material fact that plaintiffs were "responsible for making numerous discretionary decisions on a daily basis, with little or no supervision, and usually under time-sensitive, pressure-filled conditions." *In re United Parcel Serv. Wage & Hour Cases*, 190 Cal. App. 4th 1001, 1025 (Cal. Ct. App. 2010).

8

### D.  PRIMARILY ENGAGED IN DUTIES WHICH MEET THE TEST OF THE EXEMPTION.

Under California law, the phrase "primarily" means more than one-half of the employee's work time is spent performing duties that qualify as exempt. Cal. Labor Code, § 515 (e); Cal. Code 8 § 11090 (2)(J). The California Supreme Court has described this method of determining whether an employee is primarily engaged in exempt work as "a purely quantitative approach." *Ramirez*, 20 Cal.4th at 797 (discussing application of the outside salesperson exemption to determine whether "more than half" of an employee's time is spent on outside sales). Exempt work includes the "actual management of the department and the supervision of the employees therein" as well as activities which are "closely associated" with the performance of such managerial functions. By way of illustration, a manager in a retail or service establishment "who goes about the sales floor observing the work of sales personnel under his supervision to determine the effectiveness of their sales techniques, checking on the quality of customer service being given, or observing customer preferences . . . is performing work which is directly and closely related to his managerial and supervisory functions. His actual participation, except for supervisory or demonstration purposes, in such activities as making sales to customers, replenishing stocks of merchandise on the sales floor, removing merchandise from fitting rooms and returning to stock or shelves, however, is not." 29 CFR 541.108(e). Whether a task is properly classified as exempt or non-exempt is a mixed question of law and fact, while calculating the amount of time an employee actually spent on specific tasks is a factual determination. *Sav-on Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 330 (Cal. Sup. Ct. 2004).

The parties do not dispute that managers spend a significant portion of their working time in the dining room. Plaintiffs' position is that the requirement that management be on the floor most of the time meant that managers necessarily did the same work as hourly employees, and essentially functioned as floaters who pitched in wherever necessary. Defendants counter that managers are expected to supervise and oversee the work of hourly employees, rather than actually perform the same work. Any work spent on non-exempt tasks should be incidental to

9

their main supervisory duties. For example, a manager might approach a table of customers to discuss whether they are satisfied with the service, using the pretense of filling waters.

Plaintiffs admit that their overarching responsibility in the dining room was to ensure that the everything ran smoothly. In practice, this meant that they generally walked around the dining room observing, directing employees, and jumping in to help when necessary. Defendants are correct that the time spent overseeing the dining room is properly characterized as exempt, because it is supervisory in nature. Like the sales manager observing sales personnel and evaluating performance and customer preferences, plaintiffs were generally engaged in the exempt managerial tasks of supervising and directing personnel and evaluating customer service.

Time spent performing manual work that was generally the responsibility of hourly employees, however, is non-exempt and must be counted in computing the percentage of time spent on nonexempt work. *See* 29 CFR 541.108(e). A non-exhaustive list of non-exempt work in this case includes: taking orders, delivering food or drinks, bussing tables, answering phones, seating guests, and opening doors for guests. Plaintiffs testified that they often filled in for hourly employees, whether because there was a temporary gap in labor as compared to customer demand or because BNC's labor budget policy resulted in generally being understaffed. For example, Donahue stated that she spent 80% of her time "dealing directly with customers and performing the same job duties as the servers and hosts" (Donahue Decl. ¶ 17). Ken Nakamoto, the General Manager in Cupertino to whom plaintiffs Nguyen and Donahue reported, expected managers under his supervision to "do whatever they need to do" to ensure the dining room ran smoothly. He stated that "if [the managers] are doing hourly employee type of activities, it's not one particular type of employee. In other words, they may spend 70 percent of their time or 80 percent of their time in the dining room, but it's not necessarily as a busboy or as a server or as a host or as a bartender, but it could be a compilation of all those." He further testified that he himself spent "a lot of time" on non-exempt tasks, such as answering the phones, opening doors for guests, seating guests, and bussing or setting up tables (Nakamoto Dep. 249).

Defendant attempts to establish that there is no real dispute that plaintiffs spent more than half of their working time on exempt tasks by pointing to plaintiffs' deposition testimony

10

1  regarding their estimates of time spent on various tasks.  Defendant's selected list of allegedly
2  exempt tasks and plaintiffs' estimated range of time spent on each is not sufficient to establish
3  that plaintiffs' testimony is contradictory or inconsistent.  Defendant makes no attempt to
4  describe the categories of tasks, and does not explain why there is no overlap among them, such
5  that it would be appropriate to sum the times.  If anything, defendant's list of tasks and estimated
6  times indicates that there is a genuine factual dispute, given that the range of times spent per 50-
7  55 hour work week on allegedly exempt tasks appears to be anywhere from below 40% to over
8  100%.[1]

Defendant also points to its expert's report to establish that managers at Benihana restaurants typically spend over 50% of their working time on exempt managerial tasks.  The expert, Dr. Christina Banks, and her staff conducted one-day observations of 14 managers in six locations in California.[2]  Of the three plaintiffs, only Donahue was observed.  Dr. Banks' report notes that "because of the degree of variability found among Managers, it is not possible to predict how a particular Manager performs his or her job based on knowledge of what other Managers do."  While the expert report indicates that the 14 managers observed spent the majority of their time on tasks characterized by the expert as exempt, it is not sufficient to carry defendant's burden on summary judgment.  The ultimate conclusion of the report appears to be that there are variations between individual managers, such that general conclusions cannot be extrapolated to individual managers to establish the percentage of time spent on exempt tasks.  The study, standing by itself, does not establish that there is no material dispute of fact on whether this exemption requirement has been met.

To the extent that defendant argues that if plaintiffs spent more than 50% of their time on non-exempt tasks, they did so in contravention of BNC's expectations, defendant has not

---

[1] If one adds up the high end of estimated time for Akaosugi, he would spend over 70 hours per five-day work week solely on the tasks listed in defendant's chart.

[2] To the extent that plaintiffs object that Dr. Banks' report is biased because it was done in response to litigation, or that it is inherently unreliable, they have not set forth any specific reasons why the study is not reliable and sufficiently relevant to assist the jury in resolving factual disputes.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

11

established that there are no material facts in dispute as to this defense. Where an employee who is supposed to be engaged in exempt activities "falls below the 50 percent mark due to his own substandard performance," the employee may not thereby evade a valid exemption. *Ramirez*, 20 Cal. 4th at 802. Defendant argues that BNC communicated its expectations through "job descriptions, training, quizzes, and performance reviews." These materials do not, however, directly address the amount of time BNC expected managers to spend on exempt or non-exempt tasks, although they do indicate that BNC expected managers to supervise and make discretionary decisions. It is undisputed that BNC was aware that managers spent at least some time on non-exempt tasks. Plaintiff Nguyen and Donahue's supervisor, General Manager Nakamoto, testified that he was satisfied with plaintiffs' performance, and that it would not be contrary to his expectations if they spent a majority of their time on hourly job duties as long as the restaurant was operating smoothly.

### E. WAGE STATEMENTS CLAIM UNDER LABOR CODE § 226(A).

Defendants claim that it provided plaintiffs with a pay stub with each check that contained all information required under section 226(a), including "a fixed number of hours (for example, 100.00) on which Plaintiffs' salary is based." Plaintiffs dispute that defendant was not required to also provide hours worked during the pay period. Section 226(a)(2) provides that wage statements do not need to include hours worked for exempt employees who are paid on a salary basis.

The parties do not provide, and the Court's research does not reveal, any controlling California Supreme Court decision regarding the definition of "injury" under Section 226(e). "While there must be some injury in order to recover damages, a very modest showing will suffice." *Jaimez v. Daiohs USA, Inc.*, 181 Cal.App.4th 1286, 1306 (Cal. Ct. App. 2010). Plaintiffs, however admitted that never complained about the fact that the hourly information was not included and were not harmed by the omission (Akaosugi Dep. 281; Nguyen Dep. 105-106). Plaintiffs have failed to establish they suffered injury.

### F.  WAITING TIME PENALTIES UNDER LABOR CODE § 203.

Defendant also for summary judgment on plaintiff Akaosugi's claim for penalties under Section 203, which provides that an employer is liable for penalties if an employer willfully fails to pay any wages of an employee who is discharged or quits. California decisions establish that the "settled meaning of 'willful,' as used in section 203, is that an employer has intentionally failed or refused to perform an act which was required to be done." *Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1201 (2008); Cal. Code Reg. 8 § 13520. *Amaral* found that there was a good faith dispute where the defendant raised numerous legitimate defenses to a living wage ordinance. Although it rejected the defenses, the court found that the "defenses were not unreasonable or frivolous," and thus concluded that the good faith dispute barred waiting time penalties. Here, BNC has raised reasonable, non-frivolous defenses to plaintiffs' claims. BNC has asserted that it believes the plaintiffs were properly classified as exempt managerial employees, which would serve as a defense to all of plaintiffs' claims. Accordingly, the Court is satisfied that there was a good faith dispute whether BNC owed Akaosugi any unpaid wages and **GRANTS** defendant's motion for summary judgment on this claim.

### CONCLUSION

Defendant's motion for summary judgment as to plaintiffs' claims under California Labor Code Sections 226(a) and 203 are **GRANTED**. Defendant's motion for summary judgment on its executive exemption affirmative defense is **GRANTED IN PART**, but **DENIED** as to the requirement that an exempt employee be "primarily engaged in duties which meet the test of the exemption."

**IT IS SO ORDERED.**

Dated: September 7, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13