1  MARGARET HART EDWARDS, Bar No. 65699
   ROBERT L. ZALETEL, Bar No. 96262
2  CONSTANCE E. NORTON, Bar No. 146365
   LUCAS V. MUNOZ, Bar No. 254900
3  LITTLER MENDELSON, P.C.
   650 California Street, 20th Floor
4  San Francisco, California 94108.2693
   Telephone:   415.433.1940
5  Facsimile:   415.399.8490
   Email: mhedwards@littler.com
6          rzaletel@littler.com
           cnorton@littler.com
7          lmunoz@littler.com

8  Attorneys for Defendant
   BENIHANA NATIONAL CORP.
9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13  TETSUO AKAOSUGI, HIEU NGUYEN,      Case No. 3:11-CV-01272 WHA
    and RINKO DONAHUE,
14                                     **DEFENDANT BENIHANA NATIONAL**
                  Plaintiffs,          **CORP.'S TRIAL BRIEF**
15
             v.                        Judge:      Hon. William H. Alsup
16                                     Trial Date: October 9, 2012
    BENIHANA NATIONAL CORP.,
17
                  Defendant.
18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

CASE NO. 3:11-CV-01272 WHA                    DEFENDANT'S TRIAL BRIEF

1    I.    **FACTS**

2         A.    **Plaintiffs And The Posture Of The Case.**

3              Plaintiffs Hieu Nguyen and Rinko Donahue are current Managers of the Defendant

4    Benihana National Corp. ("BNC") restaurant in Cupertino, California.   Plaintiff Tetsuo ("Ted")

5    Akaosugi is a former employee whose most recent position was as a General Manager in the San

6    Francisco BNC location in Japantown.   Each BNC restaurant location has one Manager called the

7    General Manager, who is the lead Manager. The subordinate Managers (whose job title is

8    "Manager") report to the General Managers.   For purposes of this brief, BNC will refer to these

9    positions collectively as "Managers".

10             Prior to serving as a General Manager in San Francisco from September 7, 2009 to

11   August 8, 2010, Mr. Akaosugi held the position of Regional Manager, supervising ten Benihana

12   restaurants in California and Alaska.   In 2009 for performance reasons, he was demoted to the

13   position of General Manager in San Francisco.   Only his tenure as a General Manager is at issue in

14   the case.   He resigned voluntarily on August 8, 2010.   As a General Manager in San Francisco, his

15   annual salary was $74,880.00.

16             Plaintiff Rinko Donahue has been a Manager in Benihana's Cupertino location for

17   many years.   Plaintiff Rinko Donahue's yearly salary from 2007 through April 2012 was $48,958.00.

18   She received a raise on April 2, 2012 and her current salary is $50,427.00.[1]

19             Plaintiff Hieu Nguyen has been a Manager at the Cupertino restaurant since August

20   of 2009.   His salary has been, and is, $40,300.00 per year.

21   _____

22   [1] There is a three-year statute of limitations for overtime under Labor Code §§ 510, 1194; C.C.P.
     § 338; *Murphy v. Kenneth Cole Productions, Inc.,* 40 Cal. 4th 1094, 1099 (2007). There is a four
23   year statute of limitations for Plaintiffs' Business & Professions Code Section 17200 claim. *Cortez
     v. Purolator Air Filtration Products Co.,* 23 Cal. 4th 163, 178 (2000).   However, the Business &
24   Professions Code Section 17200 Cause of Action ("Seventh Cause of Action") is restitutionary and
     equitable in nature and as such, is decided by the Court, not by the jury. *Hodge v. Superior Court,*
25   145 Cal. App. 4th 278, 284 (2006); *People v. Bestline Products, Inc.,* 61 Cal. App. 3d 879, 916
     (1976); *People v. Toomey,* 157 Cal. App. 3d 1, 17-18 (1984).   Therefore, in the unlikely event Ms.
26   Donahue is not found to be exempt, the jury would be asked whether to award damages from
     February 14, 2008 to the present, and the Court would decide whether to award "restitution" from
27   February 14, 2007 to the present (based on the four-year statute of limitations for Section 17200
     claims).   However, Ms. Donahue could not recover twice for the period from February 14, 2008 to
28   the present.

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

1    The issues to be decided are whether BNC has proven the Plaintiffs are exempt, and if

2 not, whether Plaintiffs have proven that their legal rights were violated, and if so, the extent of their

3 damages.[2]

4    As a result of the Court's granting partial summary judgment for BNC, the Court has

5 already determined that Plaintiffs meet five of the six criteria for the executive (managerial)

6 exemption from the overtime, meal period and rest break laws to apply.  The Court found:  1) the

7 Plaintiffs' positions as Restaurant Managers involved the management of the business enterprise in

8 which Plaintiffs were employed, or a customarily recognized department or subdivision thereof;

9 2) the Plaintiffs customarily and regularly directed the work of two or more employees throughout

10 the work week; 3) the Plaintiffs were authorized to hire or fire other employees, or their suggestions

11 or recommendations as to the hiring, firing, advancement or promotion or any other change of status

12 of other employees were given particular weight; 4) the Plaintiffs customarily and regularly

13 exercised discretion and independent judgment in performing their job duties; and 5) the Plaintiffs

14 earned a monthly salary of at least two times the state minimum wage for full-time employment,

15 leaving for trial the issue of whether three Plaintiffs are "primarily engaged in duties which meet the

16 tests of the exemption." (ECF No. 183). [3]

17

18

19

20 [2] Plaintiffs claim that under *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1945) they can estimate their damages for overtime if they prevail, since Defendant did not keep accurate records of their time (as they were exempt mangers).  This rule does not apply here.  As Managers, Plaintiffs

21 kept their own time records (they had to clock in to the POS timekeeping system daily in order to operate the register).  As such, the *Mt. Clemens* burden shifting, which is justified by the employers'

22 failure to maintain accurate time records (*see Mt. Clemens supra.,* 328 U.S. at 687) does not apply. If the time records are inaccurate, this is because Plaintiffs' failed to accurately record their time, and

23 not due to any action of the employer. *Mt. Clemens* does not apply. *Grimes v. Kinney Shoe Corp.,* 902 F. Supp. 1070, 1074 (D. Alaska 1995) (where the plaintiff had control over his own time

24 records, he was not entitled to a finding that the employer failed to keep accurate time records); *Cf. Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1951) (in an "off the clock"

25 work case, where the employee deliberately omitted hours from his time sheet, he could not recover for the time unless he could prove that the employer was aware of the omission); Cal. Civil Code

26 § 3515 ("He who consents to an act is not wronged by it").

27 [3] Whether a task is exempt or non-exempt is mixed question of law and fact, while calculating the amount of time an employee actually spends on specific tasks is a factual determination. *Sav-On*

28 *Drugstores, Inc. v. Superior Court,* 34 Cal. 4th 319, 330 (2004); *Ramirez v. Yosemite Water, Inc.,* 20 Cal. 4th 785, 803 n.5 (1999).

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108,2693
415.433.1940

CASE NO. 3:11-CV-01272 WHA          2.                    DEFENDANT'S TRIAL BRIEF

## II.    LEGAL ARGUMENT

### A.    Plaintiffs Are Exempt Under The Executive (Managerial) Exemption Since They Spend More Than Half Their Time Performing Managerial Tasks, Or If They Do Not, Are Not Meeting Their Employer's Realistic Expectations Based On The Requirements Of The Job.

The San Francisco restaurant, where Mr. Akaosugi was the General Manager from September 2009 until he resigned in August of 2010, has approximately 90 employees.   Mr. Akaosugi was the General Manager and supervised three Managers.   The Cupertino restaurant, where Plaintiffs Nguyen and Donahue work, has approximately 85 employees.   It has a General Manager and three Managers.

California Industrial Welfare Commission Wage Order 5 covering restaurants provides that for purposes of the executive (managerial) exemption:

> "The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this Order:  29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions.  The work actually performed by the employee during the course of the work week must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement."

*See* Wage Order 5 (Exhibit A) and copies of incorporated federal regulations as they existed in January of 2001, 8 Cal. Code Regs. Section 11070, 1(B)(1)(e) (Exhibit B).

Exempt managerial work includes not only the "actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of ... such managerial and supervisory functions or responsibilities."   29 CFR Section 541.108(a) (2001 version).   As the regulations recognize, "[t]he supervision of employees in the management of a department includes a great many directly and closely related tasks which are different from the work performed by subordinates and are commonly performed by supervisors

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

CASE NO. 3:11-CV-01272 WHA                            3.                            DEFENDANT'S TRIAL BRIEF

1    because they are helpful in supervising the employees who contribute to the smooth functioning of

2    the department for which they are responsible." 29 C.F.R. § 541.108(a).

3              The California Division of Labor Standards Enforcement ("DLSE"), the state agency

4    charged with enforcing the IWC Wage Orders has found:  [S]ome examples of management duties

5    which DLSE will accept include:  "interviewing and selecting employees; training employees;

6    setting up rates of pay and hours of work; directing the work of employees; maintaining production

7    or sales records; appraising work performance; recommending changes in status; handling

8    complaints; disciplining employees; planning work schedules; determining techniques to be used;

9    apportioning work among workers; determining the type of materials, supplies, machinery or tools to

10   be used; controlling the flow and distribution of materials, merchandise or supplies; controlling

11   revenue and expense; and providing for the safety of employees and property.  The above list is not

12   inclusive or exclusive." Division of Labor Standards Enforcement, Department of Industrial

13   Relations, "DLSE" Opinion Letter July 6, 1993 (Exhibit C); *Bell v. Farmers Ins. Exchange*, 87 Cal.

14   App. 4th 805, 814-15 (2001) (agency opinions "constitute a body of experience and informed

15   judgment to which courts and litigants may properly resort for guidance") (quoting *Yamaha Corp. of*

16   *American v. State Bd. of Equalization*, 19 Cal. 4th 1, 14).

17              BNC requests a jury instruction listing various tasks which the Plaintiffs perform as

18   either exempt or non-exempt (*see* Defendant's Proposed Jury Instruction No. 7.2 (Exhibit D). (The

19   authorities for the instruction are shown on the Instruction and in BNC's Memorandum of Law

20   submitted by Defendant in Support of Defendant's Jury Instruction No. 7.2).  BNC will show that

21   the Plaintiffs spent most of their time performing exempt tasks, through their own testimony, that of

22   their Regional Manager, and other witnesses, and the time and motion study performed by BNC's

23   expert Dr. Cristina Banks, which this Court has already found credible.  *See* (ECF No. 142 at p. 15

24   of 26, ll 11-15, ECF No. 183 at p. 11, 13 n.2).

25              The DLSE has stated that where, as here, all the requirements of the executive

26   (managerial) exemption have been established, with the exception of whether the employee is

27   primarily engaged in exempt work, the "presumption is that the activity employee is "engaged in" is

28   probably exempt, unless the facts prove otherwise."  DLSE Opinion Letter, July 6, 1993 at pp. 4-7.

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
-an Francisco, CA 94108.2693
415.433.1940

CASE NO. 3:11-CV-01272 WHA                 4.                    DEFENDANT'S TRIAL BRIEF

1    Even if the Plaintiffs did not spend more than 50% of their time on exempt tasks, they

2    still are exempt because they would not be meeting the employer's realistic expectations as to how

3    they should spend their time, based on the realistic requirements of the job.  Wage Order 5 Section

4    1(B)(1)(e) states:

> The work actually performed by the employee during the course of the work week must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

9    *Id.* An individual who does not spend more than half his or her time in managerial functions, but is

10   not meeting the employer's realistic expectations based on the realistic requirements of the job, is

11   still exempt. *Ramirez, supra*, 20 Cal. 4th at 802 (... "an employee who is supposed to be engaged in

12   sales activities during most of his working hours and falls below the 50% mark due to his own

13   substandard performance should not thereby be able to evade a valid exemption"); *Whiteway v.*

14   *Fedex Kinkos Office and Print Services, Inc.*, 2010 U.S. Dist. LEXIS 56124 at *3 (N.D. Cal. May

15   17, 2010); *Sav-on-Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 336-37 (2004).  The trier of

16   fact can also consider "whether there was any concrete expression of employer displeasure over an

17   employee's substandard performance, and whether these expressions were themselves realistic given

18   the actual overall requirements of the job." *Ramirez, supra*, 20 Cal. 4th at 802.  BNC will provide

19   testimony that the Managers and General Managers were expected to spend more than half their time

20   on managerial and/or administrative exempt tasks, and therefore in the unlikely event the Plaintiffs

21   did not meet the 50% threshold, they still would be considered exempt.

**B.    Plaintiffs Are Also Exempt Under The Administrative Exemption.**

23   BNC can "combine" exemptions for purposes of showing that Plaintiffs are exempt.

24   Wage Order 5-2001 §1(A) ("administrative, executive or professional capacities"); 29 C.F.R.

25   § 541.708.  Plaintiffs are exempt from the overtime and meal and rest break requirements as

26   administrative employees if BNC shows Plaintiffs are employed in an administrative capacity.

27   Plaintiffs are employed in an administrative capacity if:  1) their duties and responsibilities involve

28   the performance of office or non-manual work directly related to management policies or general

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

1    business operations of BNC or BNC's customers; 2) they customarily and regularly exercise

2    discretion and independent judgment; and 3) they fulfill <u>one</u> of the following criteria: a) regularly

3    and directly assist a proprietor, or an employee employed in a bona fide executive or administrative

4    capacity; or b) perform under only general supervision work along specialized or technical lines

5    requiring special training, experience or knowledge, or c) execute under only general supervision

6    special assignment and tasks[4] *See* Wage Order 5 Section 1(B)(2).

7         The activities constituting exempt and non-exempt work with respect to the

8    administrative exemption "shall be construed in the same manner as such terms are construed in the

9    following regulations under the Fair Labor Standards Act effective as of the date of this order

10   [January 1, 2001]." 29 C.F.R. §§ 541.201-205, 541.207-208, 541.210, 541.215; Wage Order 5,

11   Section 1(B)(2)(f)). With respect to the administrative exemption, "[E]xempt work shall include, for

12   example, all work that is directly and closely related to exempt work and work which is properly

13   viewed as a means for carrying out exempt functions. The work actually performed by the employee

14   during the course of the work week must, first and foremost, be examined and the amount of time

15   the employee spends on such work, together with the employer's realistic expectations and the

16   realistic requirements of the job, shall be considered in determining whether the employee satisfies

17   this requirement." *Id.* (Wage Order 5, Section 1(B)(2)(f)).

18        Plaintiffs engage in a variety of administrative tasks, including responding to

19   customer service issues, and adjusting customers' bills through meal discounts and complimentary

20   dishes or meals. *Haywood v. North American Van Lines, Inc.* 121 F.3d 1066, 1074 (7th Cir. 1997)

21   (customer service representative for moving company exempt under the administrative exemption);

22   Cf: *UPS Wage & Hour Cases, supra* 190 Cal. App. 4th at 1019 ("communicating with customers to

23   respond to service concerns" also exempt work under the managerial exemption). Plaintiffs perform

24

_____

25   [4] The Court has already determined in its summary judgment ruling that Plaintiffs meet the salary
     test, and that they exercise discretion and independent judgment. The fact that the Managers had to
26   adhere to guidelines and procedures issued by the employer does not diminish their discretionary
     powers. *UPS Wage & Hour Cases,* 190 Cal. App. 4th 1001, 1025-27 (2010). Plaintiffs' also argue
27   that because some hourly employees may perform exempt duties at times, such as certain cash
     control duties, this makes the work exempt. This is not the law. Exempt work is exempt regardless
28   of who performs it.

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

1   all the following administrative tasks:  scheduling, adjusting labor budgets, ordering and inspecting

2   for quality food, beverages, and supplies, managing costs and profitability, and inspecting and

3   enforcing food safety standards.

4           Time spent dealing with county and local health and safety inspectors, inspecting and

5   rejecting vendor deliveries, and the like, also qualifies under the administrative exemption.  *O'Dell*

6   *v. Alyeska Pipeline Service Co.*, 856 F.2d 1452, 1454 (9th Cir. 1988) (field inspectors for an oil

7   pipeline company who represented the company in contacts with the state inspectors, negotiated with

8   field supervisors to correct discrepancies onsite, and made recommendations for action, were exempt

9   administrative employees).[5]

10          Likewise, office managers, and employees with inventory control and inside sales

11  duties, have been found to be exempt under the administrative exemption.  *Lott v. Howard Wilson*

12  *Chrysler-Plymouth, Inc.* 203 F.3d 326, 331-32 (5th Cir. 2000); *Gilstrap v. Synalloy Corp. Ind.*

13  *Piping Supply Ca. Div.*, 409 F. Supp. 621, 627 (M.D. La. 1976).

14      **C.    Meal Period Claims.**

15          Establishing that an employee is exempt from overtime is a complete defense to

16  claims for meal period and rest break premiums as well under Labor Code Sections 512 and 226.7.

17  In the unlikely event the Plaintiffs are found to be non-exempt, BNC was required to provide them

18  with a meal period of not less than 30 minutes, if they worked a period of more than five hours in a

19  day, except that if a work period of not more than six hours would complete the day's work, the

20  meal period may be waived by mutual consent of the employer and the employee.  Labor Code

21  §§ 226.7, 512, Wage Order 5, Section 11.  However, the employer's obligation is only to provide

22

23  _____

24  [5] While Plaintiffs argue that BNC must prove the Plaintiffs are exempt for each workweek (over a
    more than 5-year period), the Courts have not placed such a burden on BNC.  There is no reason to

25  assume that Plaintiffs suddenly changed their activities from exempt to non-exempt tasks week to
    week.  Courts have routinely granted summary judgment for employers on misclassification claims

26  without a week-by-week analysis.  *See, e.g. UPS Wage & Hour Cases, supra*, 190 Cal. App. 4th
    1001, 1014; *Perine v. ABF Freight Sys., Inc.*, 457 F. Supp. 2d 1004, 1016 (C.D. Cal. 2007) (applying

27  California law).  The trial would be highly repetitive and take months if BNC had to prove Plaintiffs'
    activities on a week by week basis.  Moreover, BNC's realistic expectations as to how they should

28  spend their time did not change during the relevant time period, which makes Plaintiffs exempt
    regardless of how they spent their time.

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

1    meal periods. It need not "ensure" that the Managers in fact take such breaks. *Brinker Rest. Corp. v.*

2    *Superior Court*, 53 Cal. 4th 1004, 1040-42 (2012); *White v. Starbucks Corp.*, 497 F. Supp. 2d 1080,

3    1088-89 (N.D. Cal. 2007) (employee must show that he was forced to forego his meal periods as

4    opposed to merely showing that he did not take them, regardless of the reason); *Brown v. Federal*

5    *Express Corp.*, 249 F.R.D. 580, 587 (C.D. Cal. 2008) (employer must only provide a meal period).

6    If found to be not exempt, Plaintiffs would have the burden of proving they were not provided with

7    meal periods, as well as their purported damages therefrom.

8            Although not required to do so since Plaintiffs are exempt, BNC did provide meal

9    periods to the Plaintiffs. As Managers, they could eat when they pleased, and for as long as they

10   pleased. They were free to eat at the communal meal or at other times, and were responsible for

11   scheduling meal periods. There is no basis for awarding them one hour of pay for meal periods not

12   provided for every day worked under Labor Code Sections 512 or 226.7.

13       **D.     Rest Breaks.**

14           In the unlikely event the Plaintiffs are found to be non-exempt, BNC had an

15   obligation to authorize and permit them to take paid rest breaks. BNC was not required to ensure

16   that Plaintiffs actually took the rest breaks. Because BNC authorized and permitted Plaintiffs to take

17   rest breaks, and the Plaintiffs chose not to take the rest breaks, or chose to perform work during their

18   breaks, BNC has fulfilled its legal obligation, and Plaintiffs would not be entitled to recover one

19   hour of pay for missed rest breaks (Labor Code Section 226.7, Wage Order 5 Section 12). An

20   employer must authorize and permit each non-exempt employee a ten (10) minute rest break for

21   every four (4) hours worked or major fraction thereof, except that no rest periods are required if the

22   total daily work time is less than 3 ½ hours. Labor Code Section 226.7, 512, Wage Order 5, Section

23   12). *Brinker, supra.*, 53 Cal. 4th at 1033.[6] If found to be exempt, Plaintiffs would have the burden

24   of proving they were denied rest breaks, and the amount of their damages.[7]

25

26   _____

27   [6] In the unlikely event Plaintiffs are found to be non-exempt, and the employer is found to have violated the meal and rest break provisions, Plaintiffs would be entitled to a maximum of two hours of pay per day: one for all meal periods missed in that day, and one for all rest breaks missed in that

28   day, which were legally required. *United Parcel Service, Inc. v. Superior Court (Allen)*, 196 Cal.

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
San Francisco, CA 94108,2693
415.433.1940

**E.** **Plaintiffs' Seventh Cause of Action Under Business And Professions Code Section 17200 Claim Is To Be Decided By The Court And Not The Jury, And Lacks Merit.**

Plaintiffs Seventh Cause of Action for violation of Business & Professions Code Section 17200 is to be decided by the Court, not the jury. Section 17200 does not allow awards of damages or penalties. Only restitution and injunctive relief are permitted. [8] *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone*, 20 Cal. 4th 163, 179 (1999); *Cortez, supra*, 23 Cal. 4th at 178. Plaintiffs' Section 17200 Cause of Action alleges that BNC committed unlawful acts and unfair business practices, including violation of the overtime and meal period and rest break laws. Plaintiffs seek restitution as well as injunctive relief. Plaintiffs' Seventh Cause of Action is derivative of the other claims and fails for the same reasons that their statutory claims fail. *White v. Starbucks Corp.*, 497 F. Supp. 2d 1080, 1089-90 (N.D. Cal. 2007); *Pablo v. Service Master Global Holdings, Inc*. 2009 W.L. 2524478 at *6 (N.D. Cal. August 17, 2009).

///

///

---

App. 4th 57 (2011); *Marlo v. UPS*, 251 F.R.D. 476, 486 (C.D. Cal. 2009) *aff'd* 639 F.3d 942 (9th Cir. 2011).

[7] Plaintiffs may argue that BNC did not provide meal periods or authorize or permit rest breaks because they were exempt, and thus not explicitly covered by BNC's written meal and rest break policies. This is irrelevant as the law does not require written meal period and rest break policies. Plaintiffs also attempt to include a jury instruction concerning untimely meal period and rest breaks (*i.e.,* breaks were provided, but did not start within the first five hours of work (meal periods), or within four hours of starting work (rest breaks). However, the Third Amended Complaint ("TAC") only alleges that Plaintiffs were not provided meal periods (TAC ¶ 69, ECF No. 146, at p. 16 of 22), or rest breaks (TAC ¶ 74, 75, ECF No. 146, at p. 17 of 22). While the TAC states that Plaintiffs are entitled to timely rest breaks, the charging allegations only allege that Plaintiffs were not provided with rest breaks ("Benihana required ... Plaintiffs to work through rest breaks and to remain on duty during their shifts"). (TAC ¶ 74). There is no allegation of late meal or rest breaks. The Complaint determines the issue to be tried and the time to amend it has long expired. Plaintiffs are not entitled to jury instructions on the timelines of meal periods or rest breaks.

[8] Only Ms. Donahue and Mr. Nguyen could receive injunctive relief, since Mr. Akaosugi is no longer employed. *Wal-Mart Stores, Inc. v. Dukes*, ____ U.S. ____, 131 S. Ct. 2541, 2011 U.S. LEXIS 4567 at *44 (2011). However, injunctive relief would be meaningless, since it would be limited to ordering BNC to pay an overtime premium and provide meal periods and rest breaks if Plaintiffs were not meeting the tests of the exemptions in the future, which depends on how they spend their time, or BNC's realistic expectations as to how they should spend their time. This is not a suitable case for injunctive relief. Any future claims by Plaintiffs would be more appropriate for a new damage claim, not injunctive relief.

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

CASE NO. 3:11-CV-01272 WHA          9.          DEFENDANT'S TRIAL BRIEF

1    **III.    CONCLUSION**

2           Plaintiffs' remaining claims lacks merit and BNC is confident of prevailing at trial.

3

4    DATED:  September 24, 2012                    Respectfully submitted,

5

6                                                 */s/ Margaret Hart Edwards*
                                                  MARGARET HART EDWARDS
7                                                 LITTLER MENDELSON, P.C.

8                                                 Attorneys for Defendant
                                                  BENIHANA NATIONAL CORP.

9    Firmwide:114526364.4 062447.1005

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON, P.C.
650 California Street
20th Floor
an Francisco, CA 94108.2693
415.433.1940

CASE NO. 3:11-CV-01272 WHA                    10.                    DEFENDANT'S TRIAL BRIEF

# EXHIBIT A



# OFFICIAL NOTICE

### INDUSTRIAL WELFARE COMMISSION
### ORDER NO. 5-2001
### REGULATING
### WAGES, HOURS AND WORKING CONDITIONS IN THE

# PUBLIC HOUSEKEEPING
# INDUSTRY

*Effective July 1, 2003 as amended*

*Sections 4(A) and 10(C) amended and republished by the Department of Industrial Relations, effective January 1, 2007, pursuant to AB 1835, Chapter 230, Statutes of 2006*

*This Order Must Be Posted Where Employees Can Read It Easily*

IWC FORM 1105 (Rev. 10-2006)
OSP 06 98763

**Please Post With This Side Showing**

# OFFICIAL NOTICE
*Effective July 1, 2003 as amended*

*Sections 4(A) and 10(C) amended and republished by the Department of Industrial Relations, effective January 1, 2007, pursuant to AB 1835, Chapter 230, Statutes of 2006*

## INDUSTRIAL WELFARE COMMISSION
## ORDER NO. 5-2001
## REGULATING
## WAGES, HOURS AND WORKING CONDITIONS IN THE

# PUBLIC HOUSEKEEPING INDUSTRY



**TAKE NOTICE:**  To employers and representatives of persons working in industries and occupations in the State of California: The Department of Industrial Relations amends and republishes the minimum wage and meals and lodging credits in the Industrial Welfare Commission's Orders as a result of legislation enacted (AB 1835, Ch. 230, Stats of 2006, adding sections 1182.12 and 1182.13 to the California Labor Code.) The amendments and republishing make no other changes to the IWC's Orders.

## 1. APPLICABILITY OF ORDER
This order shall apply to all persons employed in the public housekeeping industry whether paid on a time, piece rate, commission, or other basis, except that:

(A) Except as provided in Sections 1,2,4,10, and 20, the provisions of this order shall not apply to student nurses in a school accredited by the California Board of Registered Nursing or by the Board of Vocational Nurse and Psychiatric Technician Examiners are exempted by the provisions of sections 2789 or 2884 of the Business and Professions Code;

(B) Provisions of sections 3 through 12 shall not apply to persons employed in administrative, executive, or professional capacities. The following requirements shall apply in determining whether an employee's duties meet the test to qualify for an exemption to those sections:

(1) Executive Exemption. A person employed in an executive capacity means any employee:

(a) Whose duties and responsibilities involve the management of the enterprise in which he or she is employed or of a customarily recognized department or subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretion and independent judgment; and

(e) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and nonexempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104-111, and 541.115-116. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the work week must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

(2) Administrative Exemption. A person employed in an administrative capacity means any employee:

(a) Whose duties and responsibilities involve either:

(i) The performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers; or

(ii) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department of subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or

(d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

(e) Who executes under only general supervision special assignments and tasks; and

(f) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and nonexempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the work week must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week.

(3) Professional Exemption. A person employed in a professional capacity means any employee who meets *all* of the following requirements:

(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or

(b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:

(i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged

course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or

(ii) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the above work; and

(iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(c) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in paragraph (a).

(d) Who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in Labor Code Section 515 (c) as 40 hours per week.

(e) Subparagraph (b) above is intended to be construed in accordance with the following provisions of federal law as they existed as of the date of this Wage Order: 29 C.F.R. Sections 541.207, 541.301(a)-(d), 541.302, 541.306, 541.307, 541.308, and 541.310.

(f) Notwithstanding the provisions of this subparagraph, pharmacists employed to engage in the practice of pharmacy, and registered nurses employed to engage in the practice of nursing, shall not be considered exempt professional employees, nor shall they be considered exempt from coverage for the purposes of this subsection unless they individually meet the criteria established for exemption as executive or administrative employees.

(g) Subparagraph (f) above, shall not apply to the following advanced practice nurses:

(i) Certified nurse midwives who are primarily engaged in performing duties for which certification is required pursuant to Article 2.5 (commencing with Section 2746) of Chapter 6 of Division 2 of the Business and Professions Code.

(ii) Certified nurse anesthetists who are primarily engaged in performing duties for which certification is required pursuant to Article 7 (commencing with Section 2825) of Chapter 6 of Division 2 of the Business and Professions Code.

(iii) Certified nurse practitioners who are primarily engaged in performing duties for which certification is required pursuant to Article 8 (commencing with Section 2834) of Chapter 6 of Division 2 of the Business and Professions Code.

(iv) Nothing in this subparagraph shall exempt the occupations set forth in clauses (i), (ii), and (iii) from meeting the requirements of subsection 1(B)(3)(a)-(d), above.

(h) Except as provided in subparagraph (i), an employee in the computer software field who is paid on an hourly basis shall be exempt, if *all* of the following apply:

(i) The employee is primarily engaged in work that is intellectual or creative and requires the exercise of discretion and independent judgment.

(ii) The employee is primarily engaged in duties that consist of one or more of the following:

—The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications.

—The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to, user or system design specifications.

—The documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems.

(iii) The employee is highly skilled and is proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering. A job title shall not be determinative of the applicability of this exemption.

(iv) The employee's hourly rate of pay is not less than forty-one dollars ($41.00). The Division of Labor Statistics and Research shall adjust this pay rate on October 1 of each year to be effective on January 1 of the following year by an amount equal to the percentage increase in the California Consumer Price Index for Urban Wage Earners and Clerical Workers.*

(i) The exemption provided in subparagraph (h) does not apply to an employee if *any* of the following apply:

(i) The employee is a trainee or employee in an entry-level position who is learning to become proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering.

(ii) The employee is in a computer-related occupation but has not attained the level of skill and expertise necessary to work independently and without close supervision.

(iii) The employee is engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment.

(iv) The employee is an engineer, drafter, machinist, or other professional whose work is highly dependent upon or facilitated by the use of computers and computer software programs and who is skilled in computer-aided design software, including CAD/CAM, but who is not in a computer systems analysis or programming occupation.

(v) The employee is a writer engaged in writing material, including box labels, product descriptions, documentation, promotional material, setup and installation instructions, and other similar written information, either for print or for onscreen media or who writes or provides content material intended to be read by customers, subscribers, or visitors to computer-related media such as the World Wide Web or CD-ROMs.

(vi) The employee is engaged in *any* of the activities set forth in subparagraph (h) for the purpose of creating imagery for effects used in the motion picture, television, or theatrical industry.

(C) Except as provided in Sections 1, 2, 4, 10, and 20, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.

(D) The provisions of this order shall not apply to outside salespersons.

(E) Provisions of this order shall not apply to any individual who is the parent, spouse, child, or legally adopted child of the employer.

(F) The provisions of this order shall not apply to any individual participating in a national service program, such as AmeriCorps, carried out using assistance provided under Section 12571 of Title 42 of the United States Code. (See Stats. 2000, ch. 365, amending Labor Code § 1171.)

## 2. DEFINITIONS

(A) An "alternative workweek schedule" means any regularly scheduled workweek requiring an employee to work more than eight (8) hours in a 24-hour period.

---

*Pursuant to Labor Code section 515.5, subdivision (a)(4), the Division of Labor Statistics and Research, Department of Industrial Relations, has adjusted the minimum hourly rate of pay specified in this subdivision to be $49.77, effective January 1, 2007. This hourly rate of pay is adjusted on October 1 of each year to be effective on January 1, of the following year, and may be obtained at www.dir.ca.gov/IWC or by mail from the Department of Industrial Relations.

(B) "Commission" means the Industrial Welfare Commission of the State of California.

(C) "Division" means the Division of Labor Standards Enforcement of the State of California.

(D) "Emergency" means an unpredictable or unavoidable occurrence at unscheduled intervals requiring immediate action.

(E) "Employ" means to engage, suffer, or permit to work.

(F) "Employee" means any person employed by an employer, and includes any lessee who is charged rent, or who pays rent for a chair, booth, or space and

    (1) who does not use his or her own funds to purchase requisite supplies, and

    (2) who does not maintain an appointment book separate and distinct from that of the establishment in which the space is located, and

    (3) who does not have a business license where applicable.

(G) "Employees in the Healthcare Industry" means any of the following:

    (1) Employees in the healthcare industry providing patient care; or

    (2) Employees in the healthcare industry working in a clinical or medical department, including pharmacists dispensing prescriptions in any practice setting; or

    (3) Employees in the healthcare industry working primarily or regularly as a member of a patient care delivery team

    (4) Licensed veterinarians, registered veterinary technicians and unregistered animal health technicians providing patient care.

(H) "Employer" means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.

(I) "Healthcare Emergency" consists of an unpredictable or unavoidable occurrence at unscheduled intervals relating to healthcare delivery, requiring immediate action.

(J) "Healthcare Industry" is defined as hospitals, skilled nursing facilities, intermediate care and residential care facilities, convalescent care institutions, home health agencies, clinics operating twenty-four (24) hours per day, and clinics performing surgery, urgent care, radiology, anesthesiology, pathology, neurology or dialysis.

(K) "Hours worked" means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so, and in the case of an employee who is required to reside on the employment premises, that time spent carrying out assigned duties shall be counted as hours worked. Within the health care industry, the term "hours worked" means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in accordance with the provisions of the Fair Labor Standards Act.

(L) "Minor" means, for the purpose of this Order, any person under the age of 18 years.

(M) "Outside Salesperson" means any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

(N) "Personal attendant" includes baby sitters and means any person employed by a non-profit organization covered by this order to supervise, feed or dress a child or person who by reason of advanced age, physical disability or mental deficiency needs supervision. The status of "personal attendant" shall apply when no significant amount of work other than the foregoing is required.

(O) "Primarily" as used in Section 1, Applicability, means more than one-half the employee's work time.

(P) "Public Housekeeping Industry" means any industry, business, or establishment which provides meals, housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the Commission, and includes, but is not limited to the following:

    (1) Restaurants, night clubs, taverns, bars, cocktail lounges, lunch counters, cafeterias, boarding houses, clubs, and all similar establishments where food in either solid or liquid form is prepared and served to be consumed on the premises;

    (2) Catering, banquet, box lunch service, and similar establishments which prepare food for consumption on or off the premises;

    (3) Hotels, motels, apartment houses, rooming houses, camps, clubs, trailer parks, office or loft buildings, and similar establishments offering rental of living, business, or commercial quarters;

    (4) Hospitals, sanitariums, rest homes, child nurseries, child care institutions, homes for the aged, and similar establishments offering board or lodging in addition to medical, surgical, nursing, convalescent, aged, or child care;

    (5) Private schools, colleges, or universities, and similar establishments which provide board or lodging in addition to educational facilities;

    (6) Establishments contracting for development, maintenance or cleaning of grounds; maintenance or cleaning of facilities and/or quarters of commercial units and living units; and

    (7) Establishments providing veterinary or other animal care services.

(Q) "Shift" means designated hours of work by an employee, with a designated beginning time and quitting time.

(R) "Split shift" means a work schedule which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods.

(S) "Teaching" means, for the purpose of section 1 of this Order, the profession of teaching under a certificate from the Commission for Teacher Preparation and Licensing or teaching in an accredited college or university.

(T) "Wages" include all amounts of labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.

(U) "Workday" and "day" mean any consecutive 24-hour period beginning at the same time each calendar day.

(V) "Workweek" and "week" mean any seven (7) consecutive days, starting with the same calendar day each week. "Workweek" is a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods.

# 3. HOURS AND DAYS OF WORK

(A) Daily Overtime - General Provisions

    (1) The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1½) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

        (a) One and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including twelve (12) hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

        (b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

        (c) The overtime rate of compensation required to be paid to a nonexempt full-time salaried employee shall be computed by using the employee's regular hourly salary as one fortieth (1/40) of the employee's weekly salary.

    (2) Employees with direct responsibility for children who are under 18 years of age or who are not emancipated from the foster care

—3—

system and who, in either case, are receiving 24 hour residential care, may, without violating any provision of this section, be compensated as follows:

(a) An employee who works in excess of 40 hours in a workweek shall be compensated at one and one-half (1½) times the employee's regular rate of pay for all hours over 40 hours in the workweek.

(b) An employee shall be compensated at two (2) times the employee's regular rate of pay for all hours in excess of 48 hours in the workweek.

(c) An employee shall be compensated at two (2) times the employee's regular rate of pay for all hours in excess of 16 in a workday.

(d) No employee shall work more than 24 consecutive hours until said employee receives not less than eight (8) consecutive hours off-duty immediately following the 24 consecutive hours of work. Time spent sleeping shall not be included as hours worked.

(e) Section (A)(2) above shall apply to employees of 24 hour non-medical out of home licensed residential facilities of 15 beds or fewer for the developmentally disabled, elderly, and mentally ill adults.

This section, (3)(A)(2)(e), shall sunset on July 1, 2005.

(B) Alternative Workweek Schedules

(1) No employer shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order, a regularly scheduled alternative workweek schedule of not more than ten (10) hours per day within a 40 hour workweek without the payment of an overtime rate of compensation. All work performed in any workday beyond the schedule established by the agreement up to twelve (12) hours a day or beyond 40 hours per week shall be paid at one and one-half (1½) times the employee's regular rate of pay. All work performed in excess of twelve (12) hours per day and any work in excess of eight (8) hours on those days worked beyond the regularly scheduled number of workdays established by the alternative workweek agreement shall be paid at double the employee's regular rate of pay. Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift. Nothing in this section shall prohibit an employer, at the request of the employee, to substitute one day of work for another day of the same length in the shift provided by the alternative workweek agreement on an occasional basis to meet the personal needs of the employee without the payment of overtime. No hours paid at either one and one-half (1½) or double the regular rate of pay shall be included in determining when 40 hours have been worked for the purpose of computing overtime compensation.

(2) If an employer, whose employees have adopted an alternative workweek agreement permitted by this order requires an employee to work fewer hours than those that are regularly scheduled by the agreement, the employer shall pay the employee overtime compensation at a rate of one and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours, and double the employee's regular rate of pay for all hours worked in excess of 12 hours for the day the employee is required to work the reduced hours.

(3) An employer shall not reduce an employee's regular rate of hourly pay as a result of the adoption, repeal or nullification of an alternative workweek schedule.

(4) An employer shall explore any available reasonable alternative means of accommodating the religious belief or observance of an affected employee that conflicts with an adopted alternative workweek schedule, in the manner provided by subdivision (j) of Section 12940 of the Government Code.

(5) An employer shall make a reasonable effort to find a work schedule not to exceed eight (8) hours in a workday, in order to accommodate any affected employee who was eligible to vote in an election authorized by this Section and who is unable to work the alternative workweek schedule established as the result of that election.

(6) An employer shall be permitted, but not required, to provide a work schedule not to exceed eight (8) hours in a workday to accommodate any employee who is hired after the date of the election and who is unable to work the alternative workweek schedule established by the election.

(7) Arrangements adopted in a secret ballot election held pursuant to this order prior to 1998, or under the rules in effect prior to 1998, and before the performance of the work, shall remain valid after July 1, 2000 provided that the results of the election are reported by the employer to the Division of Labor Statistics and Research by January 1, 2001, in accordance with the requirements of Section C below (Election Procedures). If an employee was voluntarily working an alternative workweek schedule of not more than ten (10) hours a day as of July 1, 1999, that alternative workweek was based on an individual agreement made after January 1, 1998 between the employee and employer, and the employee submitted, and the employer approved, a written request on or before May 30, 2000 to continue the agreement, the employee may continue to work that alternative workweek schedule without payment of an overtime rate of compensation for the hours provided in the agreement. An employee may revoke his or her voluntary authorization to continue such a schedule with 30 days written notice to the employer. New arrangements can only be entered into pursuant to the provisions of this section. Notwithstanding the foregoing, if a health care industry employer implemented a reduced rate for 12 hour shift employees in the last quarter of 1999 and desires to re-implement a flexible work arrangement that includes 12 hour shifts at straight time for the same work unit, the employer must pay a base rate to each affected employee in the work unit that is no less than that employee's base rate in 1999 immediately prior to the date of the rate reduction.

(8) Notwithstanding the above provisions regarding alternative workweek schedules, no employer of employees in the healthcare industry shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order a regularly scheduled alternative workweek schedule that includes work days exceeding ten (10) hours but not more than 12 hours within a 40-hour workweek without the payment of overtime compensation, provided that:

(a) An employee who works beyond 12 hours in a workday shall be compensated at double the employee's regular rate of pay for all hours in excess of (12);

(b) An employee who works in excess of 40 hours in a workweek shall be compensated at one and one-half (1½) times the employee's regular rate of pay for all hours over 40 hours in the workweek.

(c) Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift.

(d) The same overtime standards shall apply to employees who are temporarily assigned to a work unit covered by this subsection;

(e) Any employer who instituted an alternative workweek schedule pursuant to this subsection shall make a reasonable effort to find another work assignment for any employee who participated in a valid election prior to 1998 pursuant to the provisions of Wage Orders 4 and 5 and who is unable to work the alternative workweek schedule established.

(f) An employer engaged in the operation of a licensed hospital or providing personnel for the operation of a licensed hospital who institutes, pursuant to a valid order of the Commission, a regularly scheduled alternative workweek that includes no more than three (3) 12-hour workdays, shall make a reasonable effort to find another work assignment for any employee who participated in the vote which authorized the schedule and is unable to work the 12-hour shifts. An employer shall not be required to offer a different work assignment to an employee if such a work assignment is not available or if the employee was hired after the adoption of the 12 hour, three (3) day alternative workweek schedule.

(9) No employee assigned to work a 12 hour shift established pursuant to this Order shall be required to work more than 12 hours in any 24 hour period unless the Chief Nursing Officer or authorized executive declares that:

(a) A "healthcare emergency", as defined, exists in this Order, and

—4—

(b) All reasonable steps have been taken to provide required staffing, and

(c) Considering overall operational status needs, continued overtime is necessary to provide required staffing.

(10) Provided further that no employee shall be required to work more than 16 hours in a 24-hour period unless by voluntary mutual agreement of the employee and employer, and no employee shall work more than 24 consecutive hours until said employee receives not less than eight (8) consecutive hours off-duty immediately following the 24 consecutive hours of work.

(11) Notwithstanding subsection (B)(9) above, an employee may be required to work up to 13 hours in any 24-hour period if the employee scheduled to relieve the subject employee does not report for duty as scheduled and does not inform the employer more than two (2) hours in advance of that scheduled shift that he/she will not be appearing for duty as scheduled.

(C) Election Procedures

Election procedures for the adoption and repeal of alternative workweek schedules require the following:

(1) Each proposal for an alternative workweek schedule shall be in the form of a written agreement proposed by the employer. The proposed agreement must designate a regularly scheduled alternative workweek in which the specified number of work days and work hours are regularly recurring. The actual days worked within that alternative workweek schedule need not be specified. The employer may propose a single work schedule that would become the standard schedule for workers in the work unit, or a menu of work schedule options, from which each employee in the unit would be entitled to choose. If the employer proposes a menu of work schedule options, the employee may, with the approval of the employer, move from one menu option to another.

(2) In order to be valid, the proposed alternative workweek schedule must be adopted in a secret ballot election, before the performance of work, by at least a two-thirds (2/3) vote of the affected employees in the work unit. The election shall be held during regular working hours at the employees' work site. For purposes of this subsection, "affected employees in the work unit" may include all employees in a readily identifiable work unit, such as a division, a department, a job classification, a shift, a separate physical location, or a recognized subdivision of any such work unit. A work unit may consist of an individual employee as long as the criteria for an identifiable work unit in this subsection is met.

(3) Prior to the secret ballot vote, any employer who proposed to institute an alternative workweek schedule shall have made a disclosure in writing to the affected employees, including the effects of the proposed arrangement on the employees' wages, hours, and benefits. Such a disclosure shall include meeting(s), duly noticed, held at least fourteen (14) days prior to voting, for the specific purpose of discussing the effects of the alternative workweek schedule. An employer shall provide that disclosure in a non-English language, as well as in English, if at least five (5) percent of the affected employees primarily speak that non-English language. The employer shall mail the written disclosure to employees who do not attend the meeting. Failure to comply with this paragraph shall make the election null and void.

(4) Any election to establish or repeal an alternative workweek schedule shall be held at the work site of the affected employees. The employer shall bear the costs of conducting any election held pursuant to this section. Upon a complaint by an affected employee, and after an investigation by the Labor Commissioner, the Labor Commissioner may require the employer to select a neutral third party to conduct the election.

(5) Any type of alternative workweek schedule that is authorized by the Labor Code may be repealed by the affected employees. Upon a petition of one-third (1/3) of the affected employees, a new secret ballot election shall be held and a two-thirds (2/3) vote of the affected employees shall be required to reverse the alternative workweek schedule. The election to repeal the alternative workweek schedule shall be held not more than 30 days after the petition is submitted to the employer, except that the election shall be held not less than 12 months after the date that the same group of employees voted in an election held to adopt or repeal an alternative workweek schedule. However, where an alternative workweek schedule was adopted between October 1, 1999 and October 1, 2000, a new secret ballot election to repeal that alternative workweek schedule shall not be subject to the 12-month interval between elections. The election shall take place during regular working hours at the employees' work site. If the alternative workweek schedule is revoked, the employer shall comply within 60 days. Upon proper showing of undue hardship, the Division of Labor Standards Enforcement may grant an extension of time for compliance.

(6) Only secret ballots may be cast by affected employees in the work unit at any election held pursuant to this section. The results of any election conducted pursuant to this section shall be reported by the employer to the Division of Labor Statistics and Research within 30 days after the results are final, and the report of election results shall be a public document. The report shall include the final tally of the vote, the size of the unit, and the nature of the business of the employer.

(7) Employees affected by a change in the work hours resulting from the adoption of an alternative workweek schedule may not be required to work those new work hours for at least 30 days after the announcement of the final results of the election.

(8) Employers shall not intimidate or coerce employees to vote either in support of or in opposition to a proposed alternative workweek. No employees shall be discharged or discriminated against for expressing opinions concerning the alternative workweek election or for opposing or supporting its adoption or repeal. However, nothing in this section shall prohibit an employer from expressing his/her position concerning that alternative workweek to the affected employees. A violation of this subsection shall be subject to Labor Code section 98 et seq.

(D) No employer engaged in the operation of a hospital or an establishment which is an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises shall be deemed to have violated any provision of this section if, pursuant to an agreement or understanding arrived at between the employer and employee before performance of work, a work period of 14 consecutive days is accepted in lieu of the workweek of seven (7) consecutive days for purposes of overtime computation and if, for any employment in excess of 80 hours in such 14 day period, the employee receives compensation at a rate not less than one and one-half (1½) times the regular rate at which the employee is employed.

(E) This section does not apply to organized camp counselors who are not employed more than 54 hours and not more than six (6) days in any workweek except under the conditions set forth below. This section shall also not apply to personal attendants as defined in Section 2 (N), nor to resident managers of homes for the aged having less than eight (8) beds; provided that persons employed in such occupations shall not be employed more than 40 hours nor more than six (6) days in any workweek, except under the following conditions:

In the case of emergency, employees may be employed in excess of forty (40) hours or six (6) days in any workweek provided the employee is compensated for all hours in excess of 40 hours and days in excess of six (6) days in the workweek at not less than one and one-half (1½) times the employee's regular rate of pay. However, regarding organized camp counselors, in case of emergency they may be employed in excess of 54 hours or six (6) days, provided that they are compensated at not less than one and one-half (1½) times the employee's regular rate of pay for all hours worked in excess of 54 hours and six (6) days in the workweek.

(F) One and one-half (1½) times a minor's regular rate of pay shall be paid for all work over 40 hours in any workweek except where minors 16 or 17 years old who are not required by law to attend school and may therefore be employed for the same hours as an adult are subject to subsection (A), (B), (C), or (D) above.

(VIOLATIONS OF CHILD LABOR LAWS are subject to civil penalties of from $500 to $10,000 as well as to criminal penalties. Refer to California Labor Code sections 1285 to 1312 and 1390 to 1399 for additional restrictions on the employment of minors and for descriptions of criminal and civil penalties for violation of the child labor laws. Employers should ask school districts about any required work permits.)

(G) An employee may be employed on seven (7) workdays in a workweek when the total hours of employment during such workweek do not exceed 30 and the total hours of employment in any one workday thereof do not exceed six (6).

(H) If a meal period occurs on a shift beginning or ending at or between the hours of 10 p.m. and 6 a.m., facilities shall be available for securing hot food and drink or for heating food or drink, and a suitable sheltered place shall be provided in which to consume such food or drink.

(I) The provisions of this section are not applicable to employees whose hours of service are regulated by:

(1) The United States Department of Transportation Code of Federal Regulations, title 49, sections 395.1 to 395.13, Hours of Service of Drivers, or

(2) Title 13 of the California Code of Regulations, subchapter 6.5, section 1200 and following sections, regulating hours or drivers.

(J) The daily overtime provisions of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for 24 hours shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule.

(K) The provisions of Labor Code Sections 551 and 552 regarding one (1) day's rest in seven (7) shall not be construed to prevent an accumulation of days of rest when the nature of the employment reasonably requires the employee to work seven (7) or more consecutive days; provided, however, that in each calendar month, the employee shall receive the equivalent of one (1) day's rest in seven (7).

(L) Except as provided in subsections (F) and (K), this section shall not apply to any employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

(M) Notwithstanding subsection (L) above, where the employer and a labor organization representing employees of the employer have entered into a valid collective bargaining agreement pertaining to the hours of work of the employees, the requirement regarding the equivalent of one (1) day's rest in seven (7) (see subsection (K) above) shall apply, unless the agreement expressly provides otherwise.

(N) If an employer approves a written request of an employee to make up work time that is or would be lost as a result of a personal obligation of the employee, the hours of that make up work time, if performed in the same workweek in which the work time was lost, may not be counted toward computing the total number of hours worked in a day for purposes of the overtime requirements, except for hours in excess of 11 hours of work in one (1) day or 40 hours of work in one (1) workweek. If an employee knows in advance that he or she will be requesting make up work time for a personal obligation that will recur at a fixed time over a succession of weeks, the employee may request to make up work time for up to four (4) weeks in advance; provided, however, that the make up work must be performed in the same week that the work time was lost. An employee shall provide a signed written request for each occasion that the employee makes a request to make up work time pursuant to this Section. While an employer may inform an employee of this make up time option, the employer is prohibited from encouraging or otherwise soliciting an employee to request the employer's approval to take personal time off and make up the work hours within the same workweek pursuant to this Section.

## 4. MINIMUM WAGES

(A) Every employer shall pay to each employee wages not less than seven dollars and fifty cents ($7.50) per hour for all hours worked, effective January 1, 2007, and not less than eight dollars ($8.00) per hour for all hours worked, effective January 1, 2008, except:

LEARNERS. Employees during their first one hundred and sixty (160) hours of employment in occupations in which they have no previous similar or related experience, may be paid not less than 85 percent of the minimum wage rounded to the nearest nickel.

(B) Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.

(C) When an employee works a split shift, one hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment.

(D) The provisions of this section shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

## 5. REPORTING TIME PAY

(A) Each workday an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

(B) If an employee is required to report for work a second time in any one workday and is furnished less than two hours of work on the second reporting, said employee shall be paid for two hours at the employee's regular rate of pay, which shall not be less than the minimum wage.

(C) The foregoing reporting time pay provisions are not applicable when:

(1) Operations cannot commence or continue due to threats to employees or property; or when recommended by civil authorities; or

(2) Public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or

(3) The interruption of work is caused by an Act of God or other cause not within the employer's control.

(D) This section shall not apply to an employee on paid standby status who is called to perform assigned work at a time other than the employee's scheduled reporting time.

## 6. LICENSES FOR DISABLED WORKERS

(A) A license may be issued by the Division authorizing employment of a person whose earning capacity is impaired by physical disability or mental deficiency at less than the minimum wage. Such licenses shall be granted only upon joint application of employer and employee and employee's representative if any.

(B) A special license may be issued to a nonprofit organization such as a sheltered workshop or rehabilitation facility fixing special minimum rates to enable the employment of such persons without requiring individual licenses of such employees.

(C) All such licenses and special licenses shall be renewed on a yearly basis or more frequently at the discretion of the Division. (See California Labor Code, Sections 1191 and 1191.5.)

## 7. RECORDS

(A) Every employer shall keep accurate information with respect to each employee including the following:

(1) Full name, home address, occupation and social security number.

(2) Birth date, if under 18 years, and designation as a minor.

(3) Time records showing when the employee begins and ends each work period. Meal periods, split shift intervals and total daily hours worked shall also be recorded. Meal periods during which operations cease and authorized rest periods need not be recorded.

(4) Total wages paid each payroll period, including value of board, lodging, or other compensation actually furnished to the employee.

(5) Total hours worked in the payroll period and applicable rates of pay. This information shall be made readily available to the employee upon reasonable request.

(6) When a piece rate or incentive plan is in operation, piece rates or an explanation of the incentive plan formula shall be provided to employees. An accurate production record shall be maintained by the employer.

(B) Every employer shall semimonthly or at the time of each payment of wages furnish each employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately, an itemized statement in writing showing: (1) all deductions; (2) the inclusive dates of the period for which the employee is paid; (3) the name of the employee or the employee's social security number; and (4) the name of the employer, provided all deductions made on written orders of the employee may be aggregated and shown as one item.

(C) All required records shall be in the English language and in ink or other indelible form, properly dated, showing month, day and year, and shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California. An employee's records shall be available for inspection by the employee upon reasonable request.

(D) Clocks shall be provided in all major work areas or within reasonable distance thereto insofar as practicable.

## 8. CASH SHORTAGE AND BREAKAGE

No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

## 9. UNIFORMS AND EQUIPMENT

(A) When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer. The term "uniform" includes wearing apparel and accessories of distinctive design or color.

**NOTE:** This section shall not apply to protective apparel regulated by the Occupational Safety and Health Standards Board.

(B) When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft. Notwithstanding any other provision of this section, employees in beauty salons, schools of beauty culture offering beauty care to the public for a fee, and barber shops may be required to furnish their own manicure implements, curling irons, rollers, clips, haircutting scissors, combs, blowers, razors, and eyebrow tweezers. This subsection (B) shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

**NOTE:** This section shall not apply to protective equipment and safety devices on tools regulated by the Occupational Safety and Health Standards Board.

(C) A reasonable deposit may be required as security for the return of the items furnished by the employer under provisions of subsections (A) and (B) of this section upon issuance of a receipt to the employee for such deposit. Such deposits shall be made pursuant to Section 400 and following of the Labor Code or an employer with the prior written authorization of the employee may deduct from the employee's last check the cost of an item furnished pursuant to (A) and (B) above in the event said item is not returned. No deduction shall be made at any time for normal wear and tear. All items furnished by the employer shall be returned by the employee upon completion of the job.

## 10. MEALS AND LODGING

(A) "Meal" means an adequate, well-balanced serving of a variety of wholesome, nutritious foods.

(B) "Lodging" means living accommodations available to the employee for full-time occupancy which are adequate, decent, and sanitary according to usual and customary standards. Employees shall not be required to share a bed.

(C) Meals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee. When credit for meals or lodging is used to meet part of the employer's minimum wage obligation, the amounts so credited may not be more than the following:

|  | Effective January 1, 2007 | Effective January 1, 2008 |
|---|---|---|
| **Lodging:** | | |
| Room occupied alone ................................................ | $35.27 per week | $37.63 per week |
| Room shared ........................................................... | $29.11 per week | $31.06 per week |
| Apartment—two-thirds (2/3) of the ordinary rental value, and in no event more than ........................................... | $423.51 per month | $451.89 per month |
| Where a couple are both employed by the employer, two-thirds (2/3) of the ordinary rental value, and in no event more than ...................................................... | $626.49 per month | $668.46 per month |
| **Meals:** | | |
| Breakfast ............................................................. | $2.72 | $2.90 |
| Lunch................................................................... | $3.72 | $3.97 |
| Dinner.................................................................. | $5.00 | $5.34 |

(D) Meals evaluated, as part of the minimum wage, must be bona fide meals consistent with the employee's work shift. Deductions shall not be made for meals not received nor lodging not used.

(E) If, as a condition of employment, the employee must live at the place of employment or occupy quarters owned or under the control of the employer, then the employer may not charge rent in excess of the values listed herein.

## 11. MEAL PERIODS

(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall

be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the meal period is not provided.

(C) In all places of employment where employees are required to eat on the premises, a suitable place for that purpose shall be designated.

(D) Notwithstanding any other provision of this order, employees in the health care industry who work shifts in excess of eight (8) total hours in a workday may voluntarily waive their right to one of their two meal periods. In order to be valid, any such waiver must be documented in a written agreement that is voluntarily signed by both the employee and the employer. The employee may revoke the waiver at any time by providing the employer at least one day's written notice. The employee shall be fully compensated for all working time, including any on-the-job meal period, while such a waiver is in effect.

(E) Employees with direct responsibility for children who are under 18 years of age or who are not emancipated from the foster care system and who, in either case, are receiving 24 hour residential care, and employees of 24 hour residential care facilities for the elderly, blind or developmentally disabled individuals may be required to work on-duty meal periods without penalty when necessary to meet regulatory or approved program standards and one of the following two conditions is met:

(1)  (a) The residential care employees eats with residents during residents' meals and the employer provides the same meal at no charge to the employee; or

(b) The employee is in sole charge of the resident(s) and , on the day shift, the employer provides a meal at no charge to the employee.

(2) An employee, except for the night shift, may exercise the right to have an off-duty meal period upon 30 days' notice to the employer for each instance where an off-duty meal is desired, provided that, there shall be no more than one off-duty meal period every two weeks.

## 12. REST PERIODS

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3½) hours. Authorized rest period time shall be counted, as hours worked, for which there shall be no deduction from wages.

(B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this Order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the rest period is not provided.

(C) However, employees with direct responsibility for children who are under 18 years of age or who are not emancipated from the foster care system and who, in either case, are receiving 24 hour residential care and employees of 24 hour residential care facilities for elderly, blind or developmentally disabled individuals may, without penalty, require an employee to remain on the premises and maintain general supervision of residents during rest periods if the employee is in sole charge of residents. Another rest period shall be authorized and permitted by the employer when an employee is affirmatively required to interrupt his/her break to respond to the needs of residents.

## 13. CHANGE ROOMS AND RESTING FACILITIES

(A) Employers shall provide suitable lockers, closets, or equivalent for the safekeeping of employees' outer clothing during working hours, and when required, for their work clothing during non-working hours. When the occupation requires a change of clothing, change rooms or equivalent space shall be provided in order that employees may change their clothing in reasonable privacy and comfort. These rooms or spaces may be adjacent to but shall be separate from toilet rooms and shall be kept clean.

**NOTE:** This section shall not apply to change rooms and storage facilities regulated by the Occupational Safety and Health Standards Board.

(B) Suitable resting facilities shall be provided in an area separate from the toilet rooms and shall be available to employees during work hours.

## 14. SEATS

(A) All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats.

(B) When employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties.

## 15. TEMPERATURE

(A) The temperature maintained in each work area shall provide reasonable comfort consistent with industry-wide standards for the nature of the process and the work performed.

(B) If excessive heat or humidity is created by the work process, the employer shall take all feasible means to reduce such excessive heat or humidity to a degree providing reasonable comfort. Where the nature of the employment requires a temperature of less than 60° F., a heated room shall be provided to which employees may retire for warmth, and such room shall be maintained at not less than 68°.

(C) A temperature of not less than 68° shall be maintained in the toilet rooms, resting rooms, and change rooms during hours of use.

(D) Federal and State energy guidelines shall prevail over any conflicting provision of this section.

## 16. ELEVATORS

Adequate elevator, escalator or similar service consistent with industry-wide standards for the nature of the process and the work performed shall be provided when employees are employed four floors or more above or below ground level.

## 17. EXEMPTIONS

If, in the opinion of the Division after due investigation, it is found that the enforcement of any provision contained in Section 7, Records; Section 12, Rest Periods; Section 13, Change Rooms and Resting Facilities; Section 14, Seats; Section 15, Temperature; or Section 16, Elevators, would not materially affect the welfare or comfort of employees and would work an undue hardship on the employer, exemption may be made at the discretion of the Division. Such exemptions shall be in writing to be effective and may be revoked after reasonable notice is given in writing. Application for exemption shall be made by the employer or by the employee and/or the employee's representative to the Division in writing. A copy of the application shall be posted at the place of employment at the time the application is filed with the Division.

## 18. FILING REPORTS
(See California Labor Code, Section 1174(a))

## 19. INSPECTION
(See California Labor Code, Section 1174)

## 20. PENALTIES
(See Labor Code, Section 1199)

(A) In addition to any other civil penalties provided by law, any employer or any other person acting on behalf of the employer who violates, or causes to be violated, the provisions of this order, shall be subject to the civil penalty of:

(1) Initial Violation — $50.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to the amount which is sufficient to recover unpaid wages.

(2) Subsequent Violations — $100.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to an amount which is sufficient to recover unpaid wages.

(3) The affected employee shall receive payment of all wages recovered.

(B) The Labor Commissioner may also issue citations pursuant to Labor Code § 1197.1 for non-payment of wages for overtime work in violation of this order.

## 21. SEPARABILITY
If the application of any provision of this Order, or any section, subsection, subdivision, sentence, clause, phrase, word, or portion of this Order should be held invalid or unconstitutional or unauthorized or prohibited by statute, the remaining provisions thereof shall not be affected thereby, but shall continue to be given full force and effect as if the part so held invalid or unconstitutional had not been included herein.

## 22. POSTING OF ORDER
Every employer shall keep a copy of this Order posted in an area frequented by employees where it may be easily read during the workday. Where the location of work or other conditions make this impractical, every employer shall keep a copy of this Order and make it available to every employee upon request.

**QUESTIONS ABOUT ENFORCEMENT** of the Industrial Welfare Commission orders and reports of violations should be directed to the Division of Labor Standards Enforcement. A listing of the DLSE offices is on the back of this wage order. Look in the white pages of your telephone directory under CALIFORNIA, State of, Industrial Relations for the address and telephone number of the office nearest you. The Division has offices in the following cities: Bakersfield, El Centro, Fresno, Long Beach, Los Angeles, Oakland, Redding, Sacramento, Salinas, San Bernardino, San Diego, San Francisco, San Jose, Santa Ana, Santa Barbara, Santa Rosa, Stockton, Van Nuys.

### SUMMARIES IN OTHER LANGUAGES
The Department of Industrial Relations will make summaries of wage and hour requirements in this Order available in Spanish, Chinese and certain other languages when it is feasible to do so. Mail your request for such summaries to the Department at: P.O. Box 420603, San Francisco, CA 94142-0603.

### RESUMEN EN OTROS IDIOMAS
El Departamento de Relaciones Industriales confeccionara un resumen sobre los requisitos de salario y horario de esta Disposicion en español, chino y algunos otros idiomas cuando sea posible hacerlo. Envie por correo su pedido por dichos resumenes al Departamento a: P.O. Box 420603, San Francisco, CA 94142-0603.

### 其它文字的摘錄
工業關係處將摘錄本規則中有關工資和工時的規定，用西班牙文、中文印出。其它文字如有需要，也將同樣辦理。如果您有需要，可以來信索取。請寄到： Department of Industrial Relations
P.O. Box 420603
San Francisco, CA 94142-0603

All complaints are handled confidentially. For further information or to file your complaints, contact the State of California at the following department offices:

**Division of Labor Standards Enforcement (DLSE)**
For labor law information and assistance for your area call the pre-recorded information lines in **bold** below. If the information you need is not provided in the pre-recorded message, please call the general office number listed.

**BAKERSFIELD**
Division of Labor Standards Enforcement
7718 Meany Ave.
Bakersfield, CA  93308
661-587-3060
**661-859-2462**

**EL CENTRO**
Division of Labor Standards Enforcement
1550 W. Main St.
El Centro, CA  92643
760-353-0607
**760-353-2544**

**EUREKA – office closed 2/2010 – see:**
Division of Labor Standards Enforcement
2115 Civic Center Drive, Room 17
Redding, CA  96001
530-225-2655
**530-229-0565**

**FRESNO**
Division of Labor Standards Enforcement
770 E. Shaw Ave., Suite 222
Fresno, CA  93710
559-244-5340
**559-248-8398**

**LONG BEACH**
Division of Labor Standards Enforcement
300 Oceangate, 3rd Floor
Long Beach, CA  90802
562-590-5048
**562-491-0160**

**LOS ANGELES**
Division of Labor Standards Enforcement
320 W. Fourth St, Suite 450
Los Angeles, CA  90013
213-620-6330
**213-576-6227**

**OAKLAND**
Division of Labor Standards Enforcement
1515 Clay Street, Room 801
Oakland, CA  94612
510-622-3273
**510-622-2660**

**REDDING**
Division of Labor Standards Enforcement
2115 Civic Center Drive, Room 17
Redding, CA  96001
530-225-2655
**530-229-0565**

**SACRAMENTO**
Division of Labor Standards Enforcement
2031 Howe Ave, Suite 100
Sacramento, CA  95825
916-263-1811
**916-263-5378**

**SALINAS**
Division of Labor Standards Enforcement
1870 N. Main Street, Suite 150
Salinas, CA  93906
831-443-3041
**831-443-3029**

**SAN BERNARDINO**
Division of Labor Standards Enforcement
464 West 4th Street, Room 348
San Bernardino, CA  92401
909-383-4334
**909-889-8120**

**SAN DIEGO**
Division of Labor Standards Enforcement
7575 Metropolitan, Room 210
San Diego, CA  92108
619-220-5451
**619-682-7221**

**SAN FRANCISCO**
Division of Labor Standards Enforcement
455 Golden Gate Ave. 10th Floor
San Francisco, CA  94102
415-703-5300
**415-703-5444**

**SAN FRANCISCO – HEADQUARTERS**
Division of Labor Standards Enforcement
455 Golden Gate Ave. 9th Floor
San Francisco, CA  94102
415-703-4810

**SAN JOSE**
Division of Labor Standards Enforcement
100 Paseo De San Antonio, Room 120
San Jose, CA  95113
408-277-1266
**408-277-3711**

**SANTA ANA**
Division of Labor Standards Enforcement
605 West Santa Ana Blvd., Bldg. 28, Room 625
Santa Ana, CA  92701
714-558-4910
**714-558-4574**

**SANTA BARBARA**
Division of Labor Standards Enforcement
411 E. Canon Perdido, Room 3
Santa Barbara, CA  93101
805-568-1222
**805-965-7214**

**SANTA ROSA**
Division of Labor Standards Enforcement
50 "D" Street, Suite 360
Santa Rosa, CA  95404
707-576-2362
**707-576-2459**

**STOCKTON**
Division of Labor Standards Enforcement
31 E. Channel Street, Room 317
Stockton, CA 95202
209-948-7771
**209-941-1906**

**VAN NUYS**
Division of Labor Standards Enforcement
6150 Van Nuys Boulevard, Room 206
Van Nuys, CA 91401
818-901-5315
**818-908-4556**

EMPLOYERS:   Do not send copies of your alternative workweek elec-
tion ballots or election procedures.

Only the results of the alternative workweek election
shall be mailed to:

Department of Industrial Relations
Division of Labor Statistics and Research
P.O. Box 420603
San Francisco, CA  94142-0603
(415) 703-4780

Prevailing Wage Hotline (415) 703-4774

# EXHIBIT B

1 of 3 DOCUMENTS

LEXIS PUBLISHING'S CODE OF FEDERAL REGULATIONS
Copyright © 2001, LEXIS Publishing

TITLE 29 -- LABOR
REVISED AS OF JULY 1, 2001
SUBTITLE B -- REGULATIONS RELATING TO LABOR
CHAPTER V -- WAGE AND HOUR DIVISION, DEPARTMENT OF LABOR
SUBCHAPTER A -- REGULATIONS
PART 541 -- DEFINING AND DELIMITING THE TERMS "ANY EMPLOYEE EMPLOYED IN A BONA FIDE
EXECUTIVE, ADMINISTRATIVE, OR PROFESSIONAL CAPACITY (INCLUDING ANY EMPLOYEE
EMPLOYED IN THE CAPACITY OF ACADEMIC ADMINISTRATIVE PERSONNEL OR TEACHER IN
ELEMENTARY OR SECONDARY SCHOOLS), OR IN THE CAPACITY OF OUTSIDE SALESMAN"
SUBPART B -- INTERPRETATIONS
EMPLOYEE EMPLOYED IN A BONA FIDE EXECUTIVE CAPACITY

*29 CFR 541.106*

§ 541.106 Authority to hire or fire.

   Section 541.1 requires that an exempt executive employee have the authority to hire or fire other employees or that his suggestions and recommendations as to hiring or firing and as to advancement and promotion or any other change of status of the employees who he supervises will be given particular weight. Thus, no employee, whether high or low in the hierarchy of management, can be considered as employed in a bona fide executive capacity unless he is directly concerned either with the hiring or the firing and other change of status of the employees under his supervision, whether by direct action or by recommendation to those to who the hiring and firing functions are delegated.

2 of 3 DOCUMENTS

LEXIS PUBLISHING'S CODE OF FEDERAL REGULATIONS
Copyright © 2001, LEXIS Publishing

TITLE 29 -- LABOR
REVISED AS OF JULY 1, 2001
SUBTITLE B -- REGULATIONS RELATING TO LABOR
CHAPTER V -- WAGE AND HOUR DIVISION, DEPARTMENT OF LABOR
SUBCHAPTER A -- REGULATIONS
PART 541 -- DEFINING AND DELIMITING THE TERMS "ANY EMPLOYEE EMPLOYED IN A BONA FIDE
EXECUTIVE, ADMINISTRATIVE, OR PROFESSIONAL CAPACITY (INCLUDING ANY EMPLOYEE
EMPLOYED IN THE CAPACITY OF ACADEMIC ADMINISTRATIVE PERSONNEL OR TEACHER IN
ELEMENTARY OR SECONDARY SCHOOLS), OR IN THE CAPACITY OF OUTSIDE SALESMAN"
SUBPART B -- INTERPRETATIONS
EMPLOYEE EMPLOYED IN A BONA FIDE EXECUTIVE CAPACITY

*29 CFR 541.108*

§ 541.108 Work directly and closely related.

(a) This phrase brings within the category of exempt work not only the actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of the duties involved in such managerial and supervisory functions or responsibilities. The supervision of employees and the management of a department include a great many directly and closely related tasks which are different from the work performed by subordinates and are commonly performed by supervisors because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible. Frequently such exempt work is of a kind which in establishments that are organized differently or which are larger and have greater specialization of function, may be performed by a nonexempt employee hired especially for that purpose. Illustration will serve to make clear the meaning to be given the phrase "directly and closely related".

(b) Keeping basic records of working time, for example, is frequently performed by a timekeeper employed for that purpose. In such cases the work is clearly not exempt in nature. In other establishments which are not large enough to employ a timekeeper, or in which the timekeeping function has been decentralized, the supervisor of each department keeps the basic time records of his own subordinates. In these instances, as indicated above, the timekeeping is directly related to the function of managing the particular department and supervising its employees. However, the preparation of a payroll by a supervisor, even the payroll of the employees under his supervision, cannot be considered to be exempt work, since the preparation of a payroll does not aid in the supervision of the employees or the management of the department. Similarly, the keeping by a supervisor of production or sales records of his own subordinates for use in supervision or control would be exempt work, while the maintenance of production records of employees not under his direction would not be exempt work.

(c) Another example of work which may be directly and closely related to the performance of management duties is the distribution of materials or merchandise and supplies. Maintaining control of the flow of materials or merchandise and supplies in a department is ordinarily a responsibility of the managerial employee in charge. In many nonmercantile establishments the actual distribution of materials is performed by nonexempt employees under the supervisor's direction. In other establishments it is not uncommon to leave the actual distribution of materials and supplies in the hands of the supervisor. In such cases it is exempt work since it is directly and closely related to the managerial

responsibility of maintaining the flow of materials. In a large retail establishment, however, where the replenishing of stocks of merchandise on the sales floor is customarily assigned to a nonexempt employee, the performance of such work by the manager or buyer of the department is nonexempt. The amount of time the manager or buyer spends in such work must be offset against the statutory tolerance for nonexempt work. The supervision and control of a flow of merchandise to the sales floor, of course, is directly and closely related to the managerial responsibility of the manager or buyer.

(d) Setup work is another illustration of work which may be exempt under certain circumstances if performed by a supervisor. The nature of setup work differs in various industries and for different operations. Some setup work is typically performed by the same employees who perform the "production" work; that is, the employee who operates the machine also "sets it up" or adjusts it for the particular job at hand. Such setup work is part of the production operation and is not exempt. In other instances the setting up of the work is a highly skilled operation which the ordinary production worker or machine tender typically does not perform. In some plants, particularly large ones, such setup work may be performed by employees whose duties are not supervisory in nature. In other plants, however, particularly small plants, such work is a regular duty of the executive and is directly and closely related to his responsibility for the work performance of his subordinates and for the adequacy of the final product. Under such circumstances it is exempt work. In the data processing field the work of a supervisor when he performs the more complex or more responsible work in a program utilizing several computer programers or computer operators would be exempt activity.

(e) Similarly, a supervisor who spot checks and examines the work of his subordinates to determine whether they are performing their duties properly, and whether the product is satisfactory, is performing work which is directly and closely related to his managerial and supervisory functions. However, this kind of examining and checking must be distinguished from the kind which is normally performed by an "examiner," "checker," or "inspector," and which is really a production operation rather than a part of the supervisory function. Likewise, a department manager or buyer in a retail or service establishment who goes about the sales floor observing the work of sales personnel under his supervision to determine the effectiveness of their sales techniques, checking on the quality of customer service being given, or observing customer preferences and reactions to the lines, styles, types, colors, and quality of the merchandise offered, is performing work which is directly and closely related to his managerial and supervisory functions. His actual participation, except for supervisory training or demonstration purposes, in such activities as making sales to customers, replenishing stocks of merchandise on the sales floor, removing merchandise from fitting rooms and returning to stock or shelves, however, is not. The amount of time a manager or buyer spends in the performance of such activities must be included in computing the percentage limitation on nonexempt work.

(f) Watching machines is another duty which may be exempt when performed by a supervisor under proper circumstances. Obviously the mere watching of machines in operation cannot be considered exempt work where, as in certain industries in which the machinery is largely automatic, it is an ordinary production function. Thus, an employee who watches machines for the purpose of seeing that they operate properly or for the purpose of making repairs or adjustments is performing nonexempt work. On the other hand, a supervisor who watches the operation of the machinery in his department in the sense that he "keeps an eye out for trouble" is performing work which is directly and closely related to his managerial responsibilities. Making an occasional adjustment in the machinery under such circumstances is also exempt work.

(g) A word of caution is necessary in connection with these illustrations. The recordkeeping, material distributing, setup work, machine watching and adjusting, and inspecting, examining, observing and checking referred to in the examples of exempt work are presumably the kind which are supervisory and managerial functions rather than merely "production" work. Frequently it is difficult to distinguish the managerial type from the type which is a production operation. In deciding such difficult cases it should be borne in mind that it is one of the objectives of § 541.1 to exclude from the definition foremen who hold "dual" or combination jobs. (See discussion of working foremen in § 541.115.) Thus, if work of this kind takes up a large part of the employee's time it would be evidence that management of the department is not the primary duty of the employee, that such work is a production operation rather than a function directly and closely related to the supervisory or managerial duties, and that the employee is in reality a

29 CFR 541.108

combination foreman-"setup" man, foreman-machine adjuster (or mechanic), or foreman-examiner, floorman-salesperson, etc., rather than a bona fide executive.

Case 3:11-cv-01272-WHA   Document 197   Filed 09/24/12   Page 29 of 67
Case3:11-cv-01272-WHA   Document182-1   Filed08/23/12   Page18 of 50

Page 1



BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright (c) 2012 by Barclays Law Publishers
All rights reserved

\* This document is current through Register 2012, No. 31, August 3, 2012 \*

TITLE 8.  INDUSTRIAL RELATIONS
DIVISION 1.  DEPARTMENT OF INDUSTRIAL RELATIONS
CHAPTER 5.  INDUSTRIAL WELFARE COMMISSION
GROUP 2.  INDUSTRY AND OCCUPATION ORDERS
ARTICLE 5.  PUBLIC HOUSEKEEPING INDUSTRY (WAGE ORDER 5-2001, EFFECTIVE 1-1-2001)

*8 CCR 11050*  (2012)

§ 11050.  Order Regulating Wages, Hours, and Working Conditions in the Public Housekeeping Industry

1. Applicability of Order This order shall apply to all persons employed in the public housekeeping industry whether paid on a time, piece rate, commission, or other basis, except that:

(A) Except as provided in Sections 1, 2, 4, 10, and 20, the provisions of this order shall not apply to student nurses in a school accredited by the California Board of Registered Nursing or by the Board of Vocational Nurse and Psychiatric Technician Examiners or exempted by the provisions of *Sections 2789 or 2884 of the Business and Professions Code*;

(B) Provisions of Sections 3 through 12 shall not apply to persons employed in administrative, executive, or professional capacities. The following requirements shall apply in determining whether an employee's duties meet the test to qualify for an exemption from those sections:

(1) Executive Exemption A person employed in an executive capacity means any employee:

(a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretion and independent judgment; and

(e) Who is primarily engaged in duties which meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: *29 C.F.R. Sections 541.102,*

8 CCR 11050

541.104-111, and 541.115-116. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement.

(f) Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in *Labor Code Section 515(c)* as 40 hours per week.

(2) Administrative Exemption A person employed in an administrative capacity means any employee:

(a) Whose duties and responsibilities involve either:

(i) The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his/her employer's customers; or

(ii) The performance of functions in the administration of a school system, or educational establishment or institution, or of a department or subdivision thereof, in work directly related to the academic instruction or training carried on therein; and

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined for purposes of this section); or

(d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or

(e) Who executes under only general supervision special assignments and tasks; and

(f) Who is primarily engaged in duties that meet the test of the exemption. The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-205, 541.207-208, 541.210, and 541.215. Exempt work shall include, for example, all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions. The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement; and

(g) Such employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in *Labor Code Section 515(c)* as 40 hours per week.

(3) Professional Exemption A person employed in a professional capacity means any employee who meets all of the following requirements:

(a) Who is licensed or certified by the State of California and is primarily engaged in the practice of one of the following recognized professions: law, medicine, dentistry, optometry, architecture, engineering, teaching, or accounting; or

(b) Who is primarily engaged in an occupation commonly recognized as a learned or artistic profession. For the purposes of this subsection, "learned or artistic profession" means an employee who is primarily engaged in the performance of:

Case 3:11-cv-01272-WHA  Document 197  Filed 09/24/12  Page 31 of 67
Case3:11-cv-01272-WHA  Document182-1  Filed08/23/12  Page20 of 50

Page 3
8 CCR 11050

(i) Work requiring knowledge of an advanced type in a field or science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, or work that is an essential part of or necessarily incident to any of the above work; or

(ii) Work that is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee or work that is an essential part of or necessarily incident to any of the above work; and

(iii) Whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such character that the output produced or the result accomplished cannot be standardized in relation to a given period of time.

(c) Who customarily and regularly exercises discretion and independent judgment in the performance of duties set forth in subparagraph (a).

(d) Who earns a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment. Full-time employment is defined in *Labor Code Section 515(c)* as 40 hours per week.

(e) Subparagraph (b) above is intended to be construed in accordance with the following provisions of federal law as they existed as of the date of this Wage Order: 29 C.F.R. Sections 541.207, *541.301(a)*-(d), 541.302, 541.306, 541.307, 541.308, and 541.310.

(f) Notwithstanding the provisions of this subparagraph, pharmacists employed to engage in the practice of pharmacy, and registered nurses employed to engage in the practice of nursing, shall not be considered exempt professional employees, nor shall they be considered exempt from coverage for the purposes of this subparagraph unless they individually meet the criteria established for exemption as executive or administrative employees.

(g) Subparagraph (f) above shall not apply to the following advanced practice nurses:

(i) Certified nurse midwives who are primarily engaged in performing duties for which certification is required pursuant to Article 2.5 (commencing with *Section 2746) of Chapter 6 of Division 2 of the Business and Professions Code.*

(ii) Certified nurse anesthetists who are primarily engaged in performing duties for which certification is required pursuant to Article 7 (commencing with *Section 2825) of Chapter 6 of Division 2 of the Business and Professions Code.*

(iii) Certified nurse practitioners who are primarily engaged in performing duties for which certification is required pursuant to Article 8 (commencing with *Section 2834) of Chapter 6 of Division 2 of the Business and Professions Code.*

(iv) Nothing in this subparagraph shall exempt the occupations set forth in clauses (i), (ii), and (iii) from meeting the requirements of subsection 1(B)(3)(a)-(d) above.

(h) Except, as provided in subparagraph (i), an employee in the computer software field who is paid on an hourly basis shall be exempt, if all of the following apply:

(i) The employee is primarily engaged in work that is intellectual or creative and that requires the exercise of discretion and independent judgment.

(ii) The employee is primarily engaged in duties that consist of one or more of the following:

-- The application of systems analysis techniques and procedures, including consulting with users, to determine

Page 4

8 CCR 11050

hardware, software, or system functional specifications.

-- The design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications.

-- The documentation, testing, creation, or modification of computer programs related to the design of software or hardware for computer operating systems.

(iii) The employee is highly skilled and is proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering. A job title shall not be determinative of the applicability of this exemption.

(iv) The employee's hourly rate of pay is not less than forty-two dollars and sixty four cents ($ 42.64). The Division of Labor Statistics and Research shall adjust this pay rate on October 1 of each year to be effective on January 1 of the following year by an amount equal to the percentage increase in the California Consumer Price Index for Urban Wage Earners and Clerical Workers.

(i) The exemption provided in subparagraph (h) does not apply to an employee if any of the following apply:

(I) The employee is a trainee or employee in an entry-level position who is learning to become proficient in the theoretical and practical application of highly specialized information to computer systems analysis, programming, and software engineering.

(II) The employee is in a computer-related occupation but has not attained the level of skill and expertise necessary to work independently and without close supervision.

(iii) The employee is engaged in the operation of computers or in the manufacture, repair, or maintenance of computer hardware and related equipment.

(iv) The employee is an engineer, drafter, machinist, or other professional whose work is highly dependent upon or facilitated by the use of computers and computer software programs and who is skilled in computer-aided design software, including CAD/CAM, but who is not in a computer systems analysis or programming occupation.

(v) The employee is a writer engaged in writing material, including box labels, product descriptions, documentation, promotional material, setup and installation instructions, and other similar written information, either for print or for on screen media or who writes or provides content material intended to be read by customers, subscribers, or visitors to computer-related media such as the World Wide Web or CD-ROMs.

(vi) The employee is engaged in any of the activities set forth in subparagraph (h) for the purpose of creating imagery for effects used in the motion picture, television, or theatrical industry.

(C) Except as provided in Sections 1, 2, 4, 10, and 20, the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district.

(D) The provisions of this order shall not apply to outside salespersons.

(E) The provisions of this order shall not apply to any individual who is the parent, spouse, child, or legally adopted child of the employer.

(F) The provisions of this order shall not apply to any individual participating in a national service program, such as AmeriCorps, carried out using assistance provided under Section 12571 of Title 42 of the United States Code. (See Stats. 2000, ch. 365, amending *Labor Code § 1171*.)

Case 3:11-cv-01272-WHA   Document 197   Filed 09/24/12   Page 33 of 67
Case3:11-cv-01272-WHA   Document182-1   Filed08/23/12   Page22 of 50

Page 5

8 CCR 11050

2. Definitions

(A) An "alternative workweek schedule" means any regularly scheduled workweek requiring an employee to work more than eight (8) hours in a 24-hour period.

(B) "Commission" means the Industrial Welfare Commission of the State of California.

(C) "Division" means the Division of Labor Standards Enforcement of the State of California.

(D) "Emergency" means an unpredictable or unavoidable occurrence at unscheduled intervals requiring immediate action.

(E) "Employ" means to engage, suffer, or permit to work.

(F) "Employee" means any person employed by an employer, and includes any lessee who is charged rent, or who pays rent for a chair, booth, or space; and

(1) Who does not use his or her own funds to purchase requisite supplies; and

(2) Who does not maintain an appointment book separate and distinct from that of the establishment in which the space is located; and

(3) Who does not have a business license where applicable.

(G) "Employees in the health care industry" means any of the following:

(1) Employees in the health care industry providing patient care; or

(2) Employees in the health care industry working in a clinical or medical department, including pharmacists dispensing prescriptions in any practice setting; or

(3) Employees in the health care industry working primarily or regularly as a member of a patient care delivery team; or

(4) Licensed veterinarians, registered veterinary technicians and unregistered animal health technicians providing patient care.

(H) "Employer" means any person as defined in *Section 18 of the Labor Code*, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.

(I) "Health care emergency" consists of an unpredictable or unavoidable occurrence at unscheduled intervals relating to healthcare delivery, requiring immediate action.

(J) "Health care industry" is defined as hospitals, skilled nursing facilities, intermediate care and residential care facilities, convalescent care institutions, home health agencies, clinics operating 24 hours per day, and clinics performing surgery, urgent care, radiology, anesthesiology, pathology, neurology or dialysis.

(K) "Hours worked" means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so, and in the case of an employee who is required to reside on the employment premises, that time spent carrying out assigned duties shall be counted as hours worked. Within the health care industry, the term "hours worked" means the time during which an employee is suffered or permitted to work for the employer, whether or not required to do so, as interpreted in

8 CCR 11050

accordance with the provisions of the Fair Labor Standards Act.

(L) "Minor" means, for the purpose of this order, any person under the age of 18 years.

(M) "Outside salesperson" means any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

(N) "Personal attendant" includes baby sitters and means any person employed by a non-profit organization covered by this order to supervise, feed or dress a child or person who by reason of advanced age, physical disability or mental deficiency needs supervision. The status of "personal attendant" shall apply when no significant amount of work other than the foregoing is required.

(O) "Primarily" as used in Section 1, Applicability, means more than one-half the employee's work time.

(P) "Public Housekeeping Industry" means any industry, business, or establishment which provides meals, housing, or maintenance services whether operated as a primary business or when incidental to other operations in an establishment not covered by an industry order of the Commission, and includes, but is not limited to the following:

(1) Restaurants, night clubs, taverns, bars, cocktail lounges, lunch counters, cafeterias, boarding houses, clubs, and all similar establishments where food in either solid or liquid form is prepared and served to be consumed on the premises;

(2) Catering, banquet, box lunch service, and similar establishments which prepare food for consumption on or off the premises;

(3) Hotels, motels, apartment houses, rooming houses, camps, clubs, trailer parks, office or loft buildings, and similar establishments offering rental of living, business, or commercial quarters;

(4) Hospitals, sanitariums, rest homes, child nurseries, child care institutions, homes for the aged, and similar establishments offering board or lodging in addition to medical, surgical, nursing, convalescent, aged, or child care;

(5) Private schools, colleges, or universities, and similar establishments which provide board or lodging in addition to educational facilities;

(6) Establishments contracting for development, maintenance or cleaning of grounds; maintenance or cleaning of facilities and/or quarters of commercial units and living units; and

(7) Establishments providing veterinary or other animal care services.

(Q) "Shift" means designated hours of work by an employee, with a designated beginning time and quitting time.

(R) "Split shift" means a work schedule, which is interrupted by non-paid non-working periods established by the employer, other than bona fide rest or meal periods.

(S) "Teaching" means, for the purpose of Section 1 of this order, the profession of teaching under a certificate from the Commission for Teacher Preparation and Licensing or teaching in an accredited college or university.

(T) "Wages" includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.

(U) "Workday" and "day" mean any consecutive 24-hour period beginning at the same time each calendar day.

Case 3:11-cv-01272-WHA   Document 197   Filed 09/24/12   Page 35 of 67
Case3:11-cv-01272-WHA   Document182-1   Filed08/23/12   Page24 of 50

8 CCR 11050                                                              Page 7

(V) "Workweek" and "week" mean any seven (7) consecutive days, starting with the same calendar day each week. "Workweek" is a fixed and regularly recurring period of 168 hours, seven (7) consecutive 24-hour periods.

3. Hours and Days of Work

(A) Daily Overtime-General Provisions

(1) The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1 1/2) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than:

(a) One and one-half (1 1/2) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and

(b) Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

(c) The overtime rate of compensation required to be paid to a nonexempt full-time salaried employee shall be computed by using the employee's regular hourly salary as one-fortieth (1/40) of the employee's weekly salary.

(B) Alternative Workweek Schedules

(1) No employer shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order, a regularly scheduled alternative workweek schedule of not more than ten (10) hours per day within a 40 hour workweek without the payment of an overtime rate of compensation. All work performed in any workday over the schedule established by the agreement up to 12 hours a day or beyond 40 hours per week shall be paid at one and one-half (1 1/2) times the employee's regular rate of pay. All work performed in excess of 12 hours per day and any work in excess of eight (8) hours on those days worked beyond the regularly scheduled number of workdays established by the alternative workweek agreement shall be paid at double the employee's regular rate of pay. Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift. Nothing in this section shall prohibit an employer, at the request of the employee, to substitute one day of work for another day of the same length in the shift provided by the alternative workweek agreement on an occasional basis to meet the personal needs of the employee without the payment of overtime. No hours paid at either one and one-half (1 1/2) or double the regular rate of pay shall be included in determining when 40 hours have been worked for the purpose of computing overtime compensation.

(2) If an employer whose employees have adopted an alternative workweek agreement permitted by this order requires an employee to work fewer hours than those that are regularly scheduled by the agreement, the employer shall pay the employee overtime compensation at a rate of one and one-half (1 1/2) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours, and double the employee's regular rate of pay for all hours worked in excess of 12 hours for the day the employee is required to work the reduced hours.

(3) An employer shall not reduce an employee's regular rate of hourly pay as a result of the adoption, repeal or nullification of an alternative workweek schedule.

(4) An employer shall explore any available reasonable alternative means of accommodating the religious belief or observance of an affected employee that conflicts with an adopted alternative workweek schedule, in the manner

8 CCR 11050

provided by subdivision (j) of *Section 12940 of the Government Code.*

(5) An employer shall make a reasonable effort to find a work schedule not to exceed eight (8) hours in a workday, in order to accommodate any affected employee who was eligible to vote in an election authorized by this section and who is unable to work the alternative workweek schedule established as the result of that election.

(6) An employer shall be permitted, but not required, to provide a work schedule not to exceed eight (8) hours in a workday to accommodate any employee who is hired after the date of the election and who is unable to work the alternative workweek schedule established by the election.

(7) Arrangements adopted in a secret ballot election held pursuant to this order prior to 1998, or under the rules in effect prior to 1998, and before the performance of the work, shall remain valid after July 1, 2000 provided that the results of the election are reported by the employer to the Division of Labor Statistics and Research by January 1, 2001, in accordance with the requirements of subsection (C) below (Election Procedures). If an employee was voluntarily working an alternative workweek schedule of not more than ten (10) hours a day as of July 1, 1999, that alternative workweek schedule was based on an individual agreement made after January 1, 1998 between the employee and employer, and the employee submitted, and the employer approved, a written request on or before May 30, 2000 to continue the agreement, the employee may continue to work that alternative workweek schedule without payment of an overtime rate of compensation for the hours provided in the agreement. The employee may revoke his/her voluntary authorization to continue such a schedule with 30 days written notice to the employer. New arrangements can only be entered into pursuant to the provisions of this section. Notwithstanding the foregoing, if a health care industry employer implemented a reduced rate for 12-hour shift employees in the last quarter of 1999 and desires to re-implement a flexible work arrangement that includes 12-hour shifts at straight time for the same work unit, the employer must pay a base rate to each affected employee in the work unit that is no less than that employee's base rate in 1999 immediately prior to the date of the rate reduction.

(8) Notwithstanding the above provisions regarding alternative workweek schedules, no employer of employees in the health care industry shall be deemed to have violated the daily overtime provisions by instituting, pursuant to the election procedures set forth in this wage order a regularly scheduled alternative workweek schedule that includes work days exceeding ten (10) hours but not more than 12 hours within a 40 hour workweek without the payment of overtime compensation, provided that:

(a) An employee who works beyond 12 hours in a workday shall be compensated at double the employee's regular rate of pay for all hours in excess of (12);

(b) An employee who works in excess of 40 hours in a workweek shall be compensated at one and one-half (11/2) times the employee's regular rate of pay for all hours over 40 hours in the workweek;

(c) Any alternative workweek agreement adopted pursuant to this section shall provide for not less than four (4) hours of work in any shift;

(d) The same overtime standards shall apply to employees who are temporarily assigned to a work unit covered by this subsection;

(e) Any employer who instituted an alternative workweek schedule pursuant to this subsection shall make a reasonable effort to find another work assignment for any employee who participated in a valid election prior to 1998 pursuant to the provisions of Wage Orders 4 and 5 and who is unable to work the alternative workweek schedule established;

(f) An employer engaged in the operation of a licensed hospital or in providing personnel for the operation of a licensed hospital who institutes, pursuant to a valid order of the Commission, a regularly scheduled alternative workweek that includes no more than three (3) 12-hour workdays, shall make a reasonable effort to find another work

Case 3:11-cv-01272-WHA   Document 197   Filed 09/24/12   Page 37 of 67
Case3:11-cv-01272-WHA   Document182-1   Filed08/23/12   Page26 of 50

Page 9

8 CCR 11050

assignment for any employee who participated in the vote which authorized the schedule and is unable to work the 12-hour shifts. An employer shall not be required to offer a different work assignment to an employee if such a work assignment is not available or if the employee was hired after the adoption of the 12 hour, three (3) day alternative workweek schedule.

(9) No employee assigned to work a 12-hour shift established pursuant to this order shall be required to work more than 12 hours in any 24-hour period unless the Chief Nursing Officer or authorized executive declares that:

(a) A "healthcare emergency", as defined above exists in this order; and

(b) All reasonable steps have been taken to provide required staffing; and

(c) Considering overall operational status needs, continued overtime is necessary to provide required staffing.

(10) Provided further that no employee shall be required to work more than 16 hours in a 24-hour period unless by voluntary mutual agreement of the employee and the employer, and no employee shall work more than 24 consecutive hours until said employee receives not less than eight (8) consecutive hours off duty immediately following the 24 consecutive hours of work.

(11) Notwithstanding subsection (B)(9) above, an employee may be required to work up to 13 hours in any 24-hour period if the employee scheduled to relieve the subject employee does not report for duty as scheduled and does not inform the employer more than two (2) hours in advance of that scheduled shift that he/she will not be appearing for duty as scheduled.

(C) Election Procedures

Election procedures for the adoption and repeal of alternative workweek schedules require the following:

(1) Each proposal for an alternative workweek schedule shall be in the form of a written agreement proposed by the employer. The proposed agreement must designate a regularly scheduled alternative workweek in which the specified number of workdays and work hours are regularly recurring. The actual days worked within that alternative workweek schedule need not be specified. The employer may propose a single work schedule that would become the standard schedule for workers in the work unit, or a menu of work schedule options, from which each employee in the unit would be entitled to choose. If the employer proposes a menu of work schedule options, the employee may, with the approval of the employer, move from one menu option to another.

(2) In order to be valid, the proposed alternative workweek schedule must be adopted in a secret ballot election, before the performance of the work, by at least a two-thirds (2/3) vote of the affected employees in the work unit. The election shall be held during regular working hours at the employees' work site. For purposes of this subsection, "affected employees in the work unit" may include all employees in a readily identifiable work unit, such as a division, a department, a job classification, a shift, a separate physical location, or a recognized subdivision of any such work unit. A work unit may consist of an individual employee as long as the criteria for an identifiable work unit in this subsection are met.

(3) Prior to the secret ballot vote, any employer who proposed to institute an alternative workweek schedule shall have made a disclosure in writing to the affected employees, including the effects of the proposed arrangement on the employees' wages, hours, and benefits. Such a disclosure shall include meeting(s), duly noticed, held at least 14 days prior to voting, for the specific purpose of discussing the effects of the alternative workweek schedule. An employer shall provide that disclosure in a non-English language, as well as in English, if at least five (5) percent of the affected employees primarily speak that non-English language. The employer shall mail the written disclosure to employees who do not attend the meeting. Failure to comply with this paragraph shall make the election null and void.

8 CCR 11050

(4) Any election to establish or repeal an alternative workweek schedule shall be held at the work site of the affected employees. The employer shall bear the costs of conducting any election held pursuant to this section. Upon a complaint by an affected employee, and after an investigation by the labor commissioner, the labor commissioner may require the employer to select a neutral third party to conduct the election.

(5) Any type of alternative workweek schedule that is authorized by the Labor Code may be repealed by the affected employees. Upon a petition of one-third (1/3) of the affected employees, a new secret ballot election shall be held and a two-thirds (2/3) vote of the affected employees shall be required to reverse the alternative workweek schedule. The election to repeal the alternative workweek schedule shall be held not more than 30 days after the petition is submitted to the employer, except that the election shall be held not less than 12 months after the date that the same group of employees voted in an election held to adopt or repeal an alternative workweek schedule. However, where an alternative workweek schedule was adopted between October 1, 1999 and October 1, 2000, a new secret ballot election to repeal the alternative workweek schedule shall not be subject to the 12-month interval between elections. The election shall take place during regular working hours at the employees' work site. If the alternative workweek schedule is revoked, the employer shall comply within 60 days. Upon proper showing of undue hardship, the Division of Labor Standards Enforcement may grant an extension of time for compliance.

(6) Only secret ballots may be cast by affected employees in the work unit at any election held pursuant to this section. The results of any election conducted pursuant to this section shall be reported by the employer to the Division of Labor Statistics and Research within 30 days after the results are final, and the report of election results shall be a public document. The report shall include the final tally of the vote, the size of the unit, and the nature of the business of the employer.

(7) Employees affected by a change in the work hours resulting from the adoption of an alternative workweek schedule may not be required to work those new work hours for at least 30 days after the announcement of the final results of the election.

(8) Employers shall not intimidate or coerce employees to vote either in support of or in opposition to a proposed alternative workweek. No employees shall be discharged or discriminated against for expressing opinions concerning the alternative workweek election or for opposing or supporting its adoption or repeal. However, nothing in this section shall prohibit an employer from expressing his/her position concerning that alternative workweek to the affected employees. A violation of this subparagraph shall be subject to *Labor Code Section 98* et seq.

(D) No employer engaged in the operation of a hospital or an establishment which is an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises shall be deemed to have violated any provision of this section if, pursuant to an agreement or understanding arrived at between the employer and employee before performance of work, a work period of 14 consecutive days is accepted in lieu of the workweek of seven (7) consecutive days for purposes of overtime computation and if, for any employment in excess of 80 hours in such 14 day period, the employee receives compensation at a rate not less than one and one-half (1 1/2) times the regular rate at which the employee is employed.

(E)(1) This section does not apply to organized camp counselors who are not employed more than 54 hours and not more than six (6) days in any workweek except under the conditions set forth below. This section shall also not apply to personal attendants as defined in Section 2 (N), nor to resident managers of homes for the aged having less than eight (8) beds; provided that persons employed in such occupations shall not be employed more than 40 hours nor more than six (6) days in any workweek, except under the following conditions:

In the case of emergency, employees may be employed in excess of 40 hours or six (6) days in any workweek provided the employee is compensated for all hours in excess of 40 hours and days in excess of six (6) days in the workweek at not less than one and one-half (1 1/2) times the employee's regular rate of pay. However, regarding organized camp counselors, in case of emergency they may be employed in excess of 54 hours or six (6) days, provided

8 CCR 11050

that they are compensated at not less than one and one-half (1 1/2) times the employee's regular rate of pay for all hours worked in excess of 54 hours and six (6) days in the workweek.

(2) Employees with direct responsibility for children who are under 18 years of age or who are not emancipated from the foster care system and who, in either case, are receiving 24 hour residential care, may, without violating any provision of this section, be compensated as follows:

(a) An employee who works in excess of 40 hours in a workweek shall be compensated at one and one-half (1 1/2) times the employee's regular rate of pay for all hours over 40 hours in the workweek.

(b) An employee shall be compensated at two (2) times the employee's regular rate of pay for all hours in excess of 48 hours in the workweek.

(c) An employee shall be compensated at two (2) times the employee's regular rate of pay for all hours in excess of 16 in a workday.

(d) No employee shall work more than 24 consecutive hours until said employee receives not less than eight (8) consecutive hours off-duty immediately following the 24 consecutive hours of work. Time spent sleeping shall not be included as hours worked.

(F) One and one-half (1 1/2) times a minor's regular rate of pay shall be paid for all work over 40 hours in any workweek except minors sixteen (16) or 17 years old who are not required by law to attend school and may therefore be employed for the same hours as an adult are subject to subsection (A), (B), (C), or (D) above.

(VIOLATIONS OF CHILD LABOR LAWS are subject to civil penalties of from $ 500 to $ 10,000 as well as to criminal penalties. Refer to California *Labor Code sections 1285* to *1312* and *1390* to *1399* for additional restrictions on the employment of minors and for descriptions of criminal and civil penalties for violation of the child labor laws. Employers should ask school districts about any required work permits.)

(G) An employee may be employed on seven (7) workdays in one workweek when the total hours of employment during such workweek do not exceed 30 and the total hours of employment in any one workday thereof do not exceed six (6).

(H) If a meal period occurs on a shift beginning or ending at or between the hours of 10 p.m. and 6 a.m., facilities shall be available for securing hot food and drink or for heating food or drink, and a suitable sheltered place shall be provided in which to consume such food or drink.

(I) The provisions of this section are not applicable to employees whose hours of service are regulated by:

(1) The United States Department of Transportation *Code of Federal Regulations, Title 49, Sections 395.1* to *395.13*, Hours of Service of Drivers; or

(2) Title 13 of the California Code of Regulations, subchapter 6.5, Section 1200 and following sections, regulating hours of drivers.

(J) The daily overtime provisions of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for 24-hours shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one (1) hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule.

(K) The provisions of *Labor Code Sections 551* and *552* regarding one (1) day's rest in seven (7) shall not be construed to prevent an accumulation of days of rest when the nature of the employment reasonably requires the

8 CCR 11050

employee to work seven (7) or more consecutive days; provided, however, that in each calendar month, the employee shall receive the equivalent of one (1) day's rest in seven (7).

(L) Except as provided in subsections (F) and (K), this section shall not apply to any employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees, and if the agreement provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage.

(M) Notwithstanding subsection (L) above, where the employer and a labor organization representing employees of the employer have entered into a valid collective bargaining agreement pertaining to the hours of work of the employees, the requirement regarding the equivalent of one (1) day's rest in seven (7) (see subsection (K) above) shall apply, unless the agreement expressly provides otherwise.

(N) If an employer approves a written request of an employee to make up work time that is or would be lost as a result of a personal obligation of the employee, the hours of that makeup work time, if performed in the same workweek in which the work time was lost, may not be counted toward computing the total number of hours worked in a day for purposes of the overtime requirements, except for hours in excess of 11 hours of work in one (1) day or 40 hours of work in one (1) workweek. If an employee knows in advance that he/she will be requesting makeup time for a personal obligation that will recur at a fixed time over a succession of weeks, the employee may request to make up work time for up to four (4) weeks in advance; provided, however, that the makeup work must be performed in the same week that the work time was lost. An employee shall provide a signed written request for each occasion that the employee makes a request to make up work time pursuant to this subsection. While an employer may inform an employee of this makeup time option, the employer is prohibited from encouraging or otherwise soliciting an employee to request the employer's approval to take personal time off and make up the work hours within the same workweek pursuant to this subsection.

4. Minimum Wages

(A) Every employer shall pay to each employee wages not less than six dollars and twenty-five cents ($ 6.25) per hour for all hours worked, effective January 1, 2001, and not less than six dollars and seventy-five cents ($ 6.75) per hour for all hours worked, effective January 1, 2002, except:

LEARNERS: Employees during their 160 hours of employment in occupations in which they have no previous similar or related experience, may be paid not less than 85 per cent of the minimum wage rounded to the nearest nickel.

(B) Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.

(C) When an employee works a split shift, one (1) hour's pay at the minimum wage shall be paid in addition to the minimum wage for that workday, except when the employee resides at the place of employment.

(D) The provisions of this section shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

5. Reporting Time Pay

(A) Each workday an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

(B) If an employee is required to report for work a second time in any one workday and is furnished less than two

8 CCR 11050

(2) hours of work on the second reporting, said employee shall be paid for two (2) hours at the employee's regular rate of pay, which shall not be less than the minimum wage.

(C) The foregoing reporting time pay provisions are not applicable when:

(1) Operations cannot commence or continue due to threats to employees or property; or when recommended by civil authorities; or

(2) Public utilities fail to supply electricity, water, or gas, or there is a failure in the public utilities, or sewer system; or

(3) The interruption of work is caused by an Act of God or other cause not within the employer's control.

(D) This section shall not apply to an employee on paid standby status who is called to perform assigned work at a time other than the employee's scheduled reporting time.

6. Licenses for Disabled Workers

(A) A license may be issued by the Division authorizing employment of a person whose earning capacity is impaired by physical disability or mental deficiency at less than the minimum wage. Such licenses shall be granted only upon joint application of employer and employee and employee's representative if any.

(B) A special license may be issued to a nonprofit organization such as a sheltered workshop or rehabilitation facility fixing special minimum rates to enable the employment of such persons without requiring individual licenses of such employees.

(C) All such licenses and special licenses shall be renewed on a yearly basis or more frequently at the discretion of the Division. (See California *Labor Code, Sections 1191* and *1191.5*)

7. Records

(A) Every employer shall keep accurate information with respect to each employee including the following:

(1) Full name, home address, occupation and social security number.

(2) Birth date, if under 18 years, and designation as a minor.

(3) Time records showing when the employee begins and ends each work period. Meal periods, split shift intervals and total daily hours worked shall also be recorded. Meal periods during which operations cease and authorized rest periods need not be recorded.

(4) Total wages paid each payroll period, including value of board, lodging, or other compensation actually furnished to the employee.

(5) Total hours worked in the payroll period and applicable rates of pay. This information shall be made readily available to the employee upon reasonable request.

(6) When a piece rate or incentive plan is in operation, piece rates or an explanation of the incentive plan formula shall be provided to employees. An accurate production record shall be maintained by the employer.

(B) Every employer shall semimonthly or at the time of each payment of wages furnish each employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately, an itemized statement in writing showing: (1) all deductions; (2) the inclusive dates of the period for which the employee is paid; (3) the name of

8 CCR 11050

the employee or the employee's social security number; and (4) the name of the employer, provided all deductions made on written orders of the employee may be aggregated and shown as one item.

(C) All required records shall be in the English language and in ink or other indelible form, properly dated, showing month, day and year, and shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California. An employee's records shall be available for inspection by the employee upon reasonable request.

(D) Clocks shall be provided in all major work areas or within reasonable distance thereto insofar as practicable.

8. Cash Shortage and Breakage

No employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee.

9. Uniforms and Equipment

(A) When uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer. The term "uniform" includes wearing apparel and accessories of distinctive design or color.

NOTE: This section shall not apply to protective apparel regulated by the Occupational Safety and Health Standards Board.

(B) When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft. This subsection (B) shall not apply to apprentices regularly indentured under the State Division of Apprenticeship Standards.

NOTE: This section shall not apply to protective equipment and safety devices on tools regulated by the Occupational Safety and Health Standards Board.

(C) A reasonable deposit may be required as security for the return of the items furnished by the employer under provisions of subsections (A) and (B) of this section upon issuance of a receipt to the employee for such deposit. Such deposits shall be made pursuant to Section 400 and following of the Labor Code or an employer with the prior written authorization of the employee may deduct from the employee's last check the cost of an item furnished pursuant to (A) and (B) above in the event said item is not returned. No deduction shall be made at any time for normal wear and tear. All items furnished by the employer shall be returned by the employee upon completion of the job.

10. Meals and Lodging

(A) "Meal" means an adequate, well-balanced serving of a variety of wholesome, nutritious foods.

(B) "Lodging" means living accommodations available to the employee for full-time occupancy which are adequate, decent, and sanitary according to usual and customary standards. Employees shall not be required to share a bed.

(C) Meals or lodging may not be credited against the minimum wage without a voluntary written agreement between the employer and the employee. When credit for meals or lodging is used to meet part of the employer's minimum wage obligation, the amounts so credited may not be more than the following:

| Effective Dates: | January 1, 2001 | January 1, 2002 |
|---|---|---|

8 CCR 11050

| | | |
|---|---|---|
| **Lodging:** | | |
| Room occupied alone | $ 29.40 per week | $ 31.75 per week |
| Room shared | $ 24.25 per week | $ 26.20 per week |
| Apartment-two thirds (2/3) of the ordinary rental value, and in no event more than | $ 352.95 per month | $ 381.20 per month |
| Where a couple are both employed by the employer, two-thirds (2/3) of the ordinary rental value, and in no event more than | $ 522.10 per month | $ 563.90 per month |
| **Meals:** | | |
| Breakfast | $ 2.25 | $ 2.45 |
| Lunch | $ 3.10 | $ 3.35 |
| Dinner | $ 4.15 | $ 4.50 |

(D) Meals evaluated as part of the minimum wage must be bona fide meals consistent with the employee's work shift. Deductions shall not be made for meals not received or lodging not used.

(E) If, as a condition of employment, the employee must live at the place of employment or occupy quarters owned or under the control of the employer, then the employer may not charge rent in excess of the values listed herein.

11. Meal Periods

(A) No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to. The written agreement shall state that the employee may, in writing, revoke the agreement at any time.

(B) If an employer fails to provide an employee a meal period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided.

(C) In all places of employment where employees are required to eat on the premises, a suitable place for that

8 CCR 11050

purpose shall be designated.

(D) Notwithstanding any other provision of this order, employees in the health care industry who work shifts in excess of eight (8) total hours in a workday may voluntarily waive their right to one of their two meal periods. In order to be valid, any such waiver must be documented in a written agreement that is voluntarily signed by both the employee and the employer. The employee may revoke the waiver at any time by providing the employer at least one (1) day's written notice. The employee shall be fully compensated for all working time, including any on-the-job meal period, while such a waiver is in effect.

(E) Employees with direct responsibility for children who are under 18 years of age or who are not emancipated from the foster care system and who, in either case, are receiving 24 hour residential care, and employees of 24 hour residential care facilities for the elderly, blind or developmentally disabled individuals may be required to work on-duty meal periods without penalty when necessary to meet regulatory or approved program standards and one of the following two conditions is met:

(1)(a) The residential care employees eats with residents during residents' meals and the employer provides the same meal at no charge to the employee; or

(b) The employee is in sole charge of the resident(s) and , on the day shift, the employer provides a meal at no charge to the employee.

(2) An employee, except for the night shift, may exercise the right to have an off-duty meal period upon 30 days' notice to the employer for each instance where an off-duty meal is desired, provided that, there shall be no more than one off-duty meal period every two weeks.

12. Rest Periods

(A) Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted, as hours worked, for which there shall be no deduction from wages.

(B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

(C) However, employees with direct responsibility for children who are under 18 years of age or who are not emancipated from the foster care system and who, in either case, are receiving 24 hour residential care and employees of 24 hour residential care facilities for elderly, blind or developmentally disabled individuals may, without penalty, require an employee to remain on the premises and maintain general supervision of residents during rest periods if the employee is in sole charge of residents. Another rest period shall be authorized and permitted by the employer when an employee is affirmatively required to interrupt his/her break to respond to the needs of residents.

13. Change Rooms and Resting Facilities

(A) Employers shall provide suitable lockers, closets, or equivalent for the safekeeping of employees' outer clothing during working hours, and when required, for their work clothing during non-working hours. When the occupation requires a change of clothing, change rooms or equivalent space shall be provided in order that employees may change their clothing in reasonable privacy and comfort. These rooms or spaces may be adjacent to but shall be separate from toilet rooms and shall be kept clean.

8 CCR 11050

NOTE: This section shall not apply to change rooms and storage facilities regulated by the Occupational Safety and Health Standards Board.

(B) Suitable resting facilities shall be provided in an area separate from the toilet rooms and shall be available to employees during work hours.

14. Seats

(A) All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats.

(B) When employees are not engaged in the active duties of their employment and the nature of the work requires standing, an adequate number of suitable seats shall be placed in reasonable proximity to the work area and employees shall be permitted to use such seats when it does not interfere with the performance of their duties.

15. Temperature

(A) The temperature maintained in each work area shall provide reasonable comfort consistent with industry-wide standards for the nature of the process and the work performed.

(B) If excessive heat or humidity is created by the work process, the employer shall take all feasible means to reduce such excessive heat or humidity to a degree providing reasonable comfort. Where the nature of the employment requires a temperature of less than 60o F., a heated room shall be provided to which employees may retire for warmth, and such room shall be maintained at not less than 68o.

(C) A temperature of not less than 68o shall be maintained in the toilet rooms, resting rooms, and change rooms during hours of use.

(C) Federal and State energy guidelines shall prevail over any conflicting provision of this section.

16. Elevators

Adequate elevator, escalator or similar service consistent with industry-wide standards for the nature of the process and the work performed shall be provided when employees are employed four floors or more above or below ground level.

17. Exemptions

If, in the opinion of the Division after due investigation, it is found that the enforcement of any provision contained in Section 7, Records; Section 12, Rest Periods; Section 13, Change Rooms and Resting Facilities; Section 14, Seats; Section 15, Temperature; or Section 16, Elevators, would not materially affect the welfare or comfort of employees and would work an undue hardship on the employer, exemption may be made at the discretion of the Division. Such exemptions shall be in writing to be effective and may be revoked after reasonable notice is given in writing. Application for exemption shall be made by the employer or by the employee and/or the employee's representative to the Division in writing. A copy of the application shall be posted at the place of employment at the time the application is filed with the Division.

18. Filing Reports (See California *Labor Code, Section 1174(a)*)

19. Inspection (See California *Labor Code, Section 1174*)

20. Penalties (See California *Labor Code, Section 1199*)

8 CCR 11050

(A) In addition to any other civil penalties provided by law, any employer or any other person acting on behalf of the employer who violates, or causes to be violated, the provisions of this order, shall be subject to the civil penalty of:

(1) Initial Violation -- $ 50. 00 for each underpaid employee for each pay period during which the employee was underpaid in addition to the amount which is sufficient to recover unpaid wages.

(2) Subsequent Violations -- $ 100.00 for each underpaid employee for each pay period during which the employee was underpaid in addition to an amount which is sufficient to recover unpaid wages.

(3) The affected employee shall receive payment of all wages recovered.

(B) The labor commissioner may also issue citations pursuant to California *Labor Code Section 1197.1* for payment of wages for overtime work in violation of this order.

21. Separability

If the application of any provision of this order, or any section, subsection, subdivision, sentence, clause, phrase, word, or portion of this order should be held invalid or unconstitutional or unauthorized or prohibited by statute, the remaining provisions thereof shall not be affected thereby, but shall continue to be given full force and effect as if the part so held invalid or unconstitutional had not been included herein.

22. Posting of Order

Every employer shall keep a copy of this order posted in an area frequented by employees where it may be easily read during the workday. Where the location of work or other conditions make this impractical, every employer shall keep a copy of this order and make it available to every employee upon request.

AUTHORITY:

Note: Authority cited: *Sections 1173 and 1182.7, Labor Code*; and *California Constitution, Article XIV, Section 1*. Reference: *Sections 1182 and 1184, Labor Code*.

HISTORY:

1. Amendment of Article 5 heading and new subsection 3(K) filed 3-21-86; designated effective 4-2-86 (Register 86, No. 12).

2. Amendment filed 4-22-88; operative 7-1-88 (Register 88, No. 19).

3. Repealer of subsection 4(3) filed 1-11-89; operative 1-11-89 (Register 89, No. 4).

4. Amendment of subsections 1 and 3 filed 2-28-89; operative 7-1-89 (Register 89, No. 10).

5. Change without regulatory effect pursuant to *section 100, title 1, California Code of Regulations* repealing subsection 8 (last sentence only) filed 4-24-89 (Register 89, No. 17).

6. Editorial correction of printing errors (Register 91, No. 32).

7. Amendment of subsection 2.(H) and 2.(L), repealer and new subsection 3.(C), repealer of subsections 3.(K)-3.(K)(3) and new subsections 3.(K)-(L) and 11.(C) filed 8-5-93; operative 8-21-93. Submitted to OAL for printing only pursuant to *Labor Code section 1185* (Register 93, No. 32).

8 CCR 11050

8. Amendment of subsection 4.(A) filed 9-19-96; operative 10-1-96. Submitted to OAL for printing only (Register 96, No. 38).

9. Amendment of subsection 4.(A) filed 1-14-97; operative 3-1-97. Submitted to OAL for printing only (Register 97, No. 3).

10. Amendment of parenthetical information below article heading and amendment of section filed 7-31-97; operative 1-1-98. Submitted to OAL for printing only pursuant to *Labor Code section 1185* (Register 97, No. 31).

11. Repealer and new section filed 2-22-2002; operative 1-1-2001. Supplemental filing providing parenthetical information below article heading filed 4-15-2002. Submitted to OAL for printing only pursuant to *Labor Code section 517* (Register 2002, No. 16).

# EXHIBIT C

State of California

DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT

PETE WILSON, Governor

*Headquarters*
55 Golden Gate Avenue, Room 3194
San Francisco, CA 94102
(415) 703-4750



Victoria L. Bradshaw
*State Labor Commissioner*

July 6, 1993

James N. Adler, Esq.
Irell & Manella
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276

Dear Mr. Adler:

Thank you for your letter dated June 14, 1993 requesting an administrative opinion concerning the executive exemption under Section 1 of the various Industrial Welfare Commission (IWC) Wage Orders.

Since, in part, your letter deals with the applicability of federal caselaw interpreting the Fair Labor Standards Act's (FLSA) administrative, managerial and professional exemptions to the IWC Wage Orders, we think it would be helpful to first outline how federal law differs from state law, and how those differences impact the Division of Labor Standards Enforcement's (DLSE) policies.

## DIFFERENCES BETWEEN FEDERAL AND STATE LAW

The federal FLSA provides that the minimum wage and overtime provisions of the Act do not apply with respect to:

"Any employee employed in a bona fide executive, administrative or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of an outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor], subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service

**1993.07.06**

James N. Adler
July 6, 1993
Page 2

establishment shall not be excluded from the definition of
employee employed in a bona fide executive or
administrative capacity because of the number of hours in
his workweek which he devotes to activities not directly
or closely related to the performance of executive or
administrative activities, if less than 40 per centum of his
hours worked in the workweek are devoted to such
activities)...."

Section 1 of the California IWC Wage Orders provides the
following exemption for administrative, executive and professional
employees:

"(A) Provisions of Section 3 through 12 shall not apply to
persons employed in administrative, executive, or
professional capacities. No person shall be considered to
be employed in an administrative, executive, or
professional capacity unless one of the following
conditions prevails:

(1) The employee is <u>engaged in work</u> which is primarily
intellectual, managerial, or creative, and which requires
exercise of discretion and independent judgment, and for
which the remuneration is not less than $900 [1]  per
month....."

As you can see, the language of the FLSA differs substantially
from that of the IWC Wage Orders. The FLSA simply requires that the
employee be "employed in the capacity" of an executive, while the IWC Wage
Orders require that (in addition to the remuneration test) the person be
"<u>engaged in work</u>" which is primarily [2] intellectual, managerial, or creative,
and which requires exercise of discretion and independent judgment."
However, probably the most important feature of the FLSA which sets it apart
from the IWC Wage Orders is the fact that Congress allowed the Secretary of
Labor to "define and delimit" the terms "executive, administrative and
professional."  In California, on the other hand, the IWC, and not the

---

[1]  Some of the Wage Orders require a remuneration level of $1150 per month.

[2]  Section 2 of the Wage Orders defines the word "primarily" to mean "more than one-
half." While the word "primarily" is also used in the federal regulations, it is not
defined. For the purposes of the federal regulations, the federal courts have interpreted
"primary" according to its dictionary definition as "principal" or "chief" and have
declined to establish a time criterion such as "more than one-half."

1993.07.06

James N. Adler
July 6, 1993
Page 3

Division, has the responsibility for defining these key terms in the Wage Orders.

In response to the directive of Congress, the Department of Labor has promulgated regulations which "define and delimit" the terms executive, administrative and professional. For instance, the federal regulations begin by describing an individual "employed in a bona fide executive.....capacity" as one:

"(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department of (sic.) subdivision thereof;..."

The federal regulations contain both a "long test" and a "short test" for determining the exempt status of workers. The "long test" has a threshold salary requirement ($155.00 per week) and has three additional requirements:  (1) the employee must have authority to hire or fire (or his or her recommendation in this regard must be given weight); (2) the employee must customarily and regularly exercise discretionary powers; and (3) the employee must not devote more than 40 per cent of his or her time to activities not "closely related" to management duties.  The "short test" looks initially to an enhanced salary requirement (at least $250.00 per week) and then requires only that (1) the "primary duty" of the employee be managerial; and (2) the employee must regularly direct the work of at least two other employees.  Under this "short test," the allocation of the employee's time is not in issue.

The use of the differing criteria in the "long test" and "short test" depending on the amount of the salary paid was a decision made by the DOL based upon enforcement costs.  On the other hand, the IWC has no salary test (only a "remuneration" test) in the Wage Orders, and the DLSE has not been given the discretion to set a salary test as has the Department of Labor. Therefore, it is not feasible to utilize the federal regulations to determine whether one is exempt under the IWC Wage Orders.  However, even if we were not faced with the problem of the salary test to determine the appropriate criteria to be used, the primary consideration under either the federal "long test" or "short test" is the "primary duty" of the worker; under the IWC Wage Orders, the emphasis is upon the type of work the employee is "engaged in."

The "primary duty" test as defined by the federal courts is best summed up by the language in *Donovan v. Burger King*, 675 F2d 516 (2nd

James N. Adler
July 6, 1993
Page 4

Cir. 1983) which held that "an employee can manage while performing other work, and [that] this other work does not negate the conclusion that his primary duty is management." That same court stated that "one can still be 'managing' if one is in charge, even while physically doing something else."

Unlike the federal regulations which look to the "primary duty" of the employee, the IWC Wage Orders emphasize the type of work the employee is "primarily engaged in." In addition, the IWC adopted a definition of the word "primarily" to mean "more than one-half the employee's work time." While the IWC did not define the term "engaged in," the dictionary definition is: "[T]o involve oneself or become occupied" (American Heritage Dictionary, New College ed., p. 433). Thus, the term "primary duty" used by the federal government in the enforcement of the Fair Labor Standards Act has little relationship to the term "engaged in work which is primarily" used by the DLSE in enforcing the IWC Wage Orders.

As the federal courts have pointed out, an employee whose "primary duty" is management may manage "even while physically doing something else" and such an arrangement would not be inconsistent with the federal regulations. The IWC Wage Orders, on the other hand, require the Division to ascertain the type of work the individual is actually doing or "engaged in" (e.g., "managerial" or "production or sales") and count the time on either side of the exempt/nonexempt ledger. The DLSE policy is to give credit for all time spent in managerial work: but not to credit time toward managerial time when the actual work the employee is "engaged in" at the moment is production or sales work.

DIVISION ENFORCEMENT POLICY

The Division takes the position that any time related to management which may be logically separated from production or sales time must be counted towards the managerial duties of the employee. Managerial duties must include the supervision of at least two other employees with either the concomitant right to hire and fire or the right to recommend hiring and firing where such recommendation is given serious consideration. The "management" employee must regularly exercise discretion and, unlike the federal regulations, must also exercise independent judgment. [3]

---

[3] The federal regulations require the exercise of "independent judgment" in order to qualify for exemption as an administrative employee, but, unlike the IWC Wage Orders,

1993.07.06

James N. Adler
July 6, 1993
Page 5

Discretion implies that one has a choice to make but does not mean that exempt employees must enjoy the right to deviate from an employer's policies or procedures which allow for some discretion. However, if those policies and procedures so tightly restrict the manager's ability to make an independent judgment on matters of any consequence, the manager will not be exempt.

Management duties may vary in specifics depending on the industry or the job classification, but must include the above cited minimums. Some examples of management duties which DLSE will accept include:

Interviewing and selecting employees; training employees; setting of rates of pay and hours of work; directing the work of employees; maintaining production or sales records; appraising work performance; recommending changes in status; handling complaints; disciplining employees; planning work schedules; determining techniques to be used; apportioning work among workers; determining the type of materials, supplies, machinery or tools to be used; controlling the flow and distribution of materials, merchandise or supplies; controlling revenue and expense; and providing for the safety of employees and property.

The above list is not inclusive or exclusive. It must also be noted that one may be employed to perform some of the above, while not employed as a manager or supervisor. For instance, some of the duties described above may be done by employees with no supervisory authority. While those employees may (or may not) meet the criteria for exemption as administrative employees, they would not be exempt under the executive classification.

Any time taken away from production or sales work and devoted to any managerial work (no matter how short the time span may be) is considered managerial work and must be counted as exempt work. However, the employee may not be "engaged in" two jobs at once. The question asked in your letter is basically how does one determine what

---

there is no requirement that the employee exercise "independent judgment" to qualify for the executive (managerial) exemption.

1993.07.06

James N. Adler
July 6, 1993
Page 6

activity an employee is "engaged in" when two activities are performed simultaneously.

One of the examples you give in your letter involves an employee whose work includes composing letters, etc., but the employee uses a word processor to accomplish it. You state "although the mechanical work of operating the word processor would be considered to be non-exempt work if performed by a secretary or a employee whose duties were limited to word processing, all of the time spent operating a word processor by an otherwise exempt employee should be considered to be exempt time if the exempt employee is composing or editing a document sufficiently related to his exempt duties."

In this particular example, the employee would be "engaged in" the work of composing or editing the document. The activity of word processing would be incidental to the primary activity that the employee is engaged in at the time.

The second example that you give involves a manager who may be waiting for customers, but for a substantial portion of the time is not actually making or attempting to make sales or performing service activities. You state that "during that time it is also his job to consider such matters as how he can cause his establishment to perform more efficiently and more profitably; how he can motivate or otherwise assist his complement of four or more service employees to perform their functions more effectively; how he can resolve any employee or other problems which have arisen; whether each of these employees is doing his or her job in an adequate manner; how corrective action can be taken with regard to any such employee who is not adequately performing; and whether his inventory is proper."

Once again this employee is "engaged in" work that is exempt. The fact that he also may be waiting for customers is incidental to the work that he is "engaged in." During the times between customers, the manager uses his or her discretion and independent judgment to decide what other exempt work must be done. Of course, if the employer required employees to do specific nonexempt work (such as stock work, dusting counters, etc.) during the times between customers, the nonexempt work would be considered just that... nonexempt work, and would be counted as such.

A more striking example would be if the manager sent his sales staff to lunch because he knew it would be a slow time, preferring to have the sales staff at the store during the peak sales period. During the time that the

1993.07.06

James N. Adler
July 6, 1993
Page 7

sales staff is out to lunch, the manager is the only employee who can wait on customers when they come into the store.   Assuming that the manager satisfies all of the other exemption requirements, it would not be assumed that this time between customers would be considered nonexempt.  The manager used independent judgment to determine the best use of staff time and would be engaged in other exempt activities during the time there are no customers to be waited on.  While the actual time spent selling may be considered nonexempt, the assumption should not be that all other time between customers is also automatically nonexempt.

The determination of what activity an employee is "engaged in" is dependent on the facts of the individual situation.  One activity can be nonexempt under one set of facts and exempt under another.  For example, a manager's immediate supervisor is flying into town.  The manager makes the decision to drive to the airport and pick up his supervisor so that they can talk privately on the way back to the office.  If the manager had sent a clerk to pick up the supervisor, the clerk would be "engaged in" the nonexempt activity of driving to the airport and picking up the supervisor.  On the other hand, the manager decided the best use of his time was to drive to the airport so that he could spend time with his supervisor discussing the business.  The presumption would have to be that the manager was "engaged in" exempt activities related to the planning and evaluation of his business.  The fact that he was driving to and from the airport was incidental.

In terms of enforcement, the Division takes the position that if an employee fulfills all of the other requirements of the managerial or executive exemption, the presumption is that the activity the employee is "engaged in" is probably exempt, unless the facts prove to the contrary.  This presumption is logical if one considers that an employer is not going to allow an employee to supervise two or more workers and exercise discretion and independent judgment on matters of consequence, and then allow that employee to do primarily nonexempt work.  This would not only be illogical, it would also be unrealistic.

Since the determination as to whether an employee is exempt or nonexempt is done on a case-by-case basis depending on the specific facts involved in each situation, the Division does not give blanket approvals or opinions concerning the exemption status of a group of employees.  We will, however, provide the criteria for evaluating the exemption status so that employers can realistically assess whether an employee is exempt or nonexempt.  I hope that this letter clarifies the Division's policy concerning the determination of what activity an employee is "primarily engaged in"

1993.07.06

James N. Adler
July 6, 1993
Page 8

when evaluating the exempt status of that employee under the managerial or
executive exemption provided in the IWC Wage Orders.

Very Truly Yours,

*Victoria L. Bradshaw*

Victoria L. Bradshaw
*State Labor Commissioner*

cc:    Regional Managers
       √Senior Deputy Labor Commissioners
       H. Thomas Cadell, Chief Counsel
       Simon Reyes, Assistant Chief
       Karla Yates, Executive Director, IWC

**1993.07.06**

IRELL & MANELLA
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

1800 AVENUE OF THE STARS  SUITE 900

LOS ANGELES, CALIFORNIA 90067-4276

TELEPHONE (310) 277-1010

CABLE ADDRESS: IRELLA LSA

TELEX 181974    FACSIMILE (310) 203-7199

A SOUTH HOPE STREET, SUITE 3300
LOS ANGELES, CALIFORNIA 90071-3042
TELEPHONE (213) 620-1555
FACSIMILE (213) 229-0515

JAMES N. ADLER
A PROFESSIONAL CORPORATION

840 NEWPORT CENTER DRIVE, SUITE 500
NEWPORT BEACH, CALIFORNIA 92660-6324
TELEPHONE (714) 760-0991
FACSIMILE (714) 760-0721

WRITER'S DIRECT DIAL NUMBER
(310) 203-7503

June 14, 1993

**VIA FEDERAL EXPRESS**

Ms. Victoria L. Bradshaw
State Labor Commissioner
State of California
455 Golden Gate Avenue
San Francisco, CA 94102

　　　Re:  Managerial Exemption

Dear Ms. Bradshaw:

I.

Introduction

　　　We are writing on behalf of a client to request an
opinion with regard to a particular aspect of the executive
exemption under Section 1 of the various Industrial Welfare
Commissioner orders.  More particularly, our question concerns
the manner in which this exemption is to be applied to the
managerial employees of certain retail service establishments.
Typically such establishments are managed by a manager and an
assistant manager and employ four to ten service employees
whose work is supervised by the manager and assistant manager.

　　　The work of the service employees is largely manual and,
except when a manager or assistant manager lends a hand, is
totally different in nature from the work of the manager and
assistant manager.  Because establishments of the type at
issue are generally open more than eight hours a day, seven
days a week, there are a number of whole or partial days each
week when the assistant manager is in sole charge of the
operations of the establishment.  In addition to managing the
establishment and supervising its service employees, such

ADER061C.WP

**1993.07.06**

IRELL & MANELLA
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Ms. Victoria L. Bradshaw
June 14, 1993
Page 2

managerial and assistant mangers are responsible for the sale
of the establishment's good and services.

The particular question which is the focus of this
letter concerns how "primarily", as used in Section 1 of the
Industrial Welfare Commission Order, is to be applied in
accounting for the activities of managers and assistant
managers of retail service establishments of the type
discussed in this letter. The starting point for our analysis
has been Section 10.61 of the Division's Guidelines, which
provides in pertinent part:

An executive is one who is in charge of a
unit with permanent status and function
and who ordinarily supervises the
activities of others.  In order for an
employee to be exempt as a bona fide
executive, all the following tests must be
met:

(a)  The primary duty must be
management of the enterprise, or of a
customarily recognized department or
subdivision;

(b)  In most cases, the employee must
customarily and regularly direct the work of at
least two or more other employees therein;

(c)  The employee must have the authority to
hire and fire, or to command particularly
serious attention to his or her recommendations
on such actions affecting employees;

(d)  The employee must customarily and
regularly exercise discretionary power;

(e)  The employee must devote less than 50
percent of work time to activities not directly
and closely related to managerial duties.  This
test must be met even if the employee is in
"sole charge" of an establishment.

ADER061C.WP

1993.07.06

IRELL & MANELLA
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Ms. Victoria L. Bradshaw
June 14, 1993
Page 3


## II.
## Facts

Our particular question arises in the context of managers
and assistant managers who are responsible for the management
and profitability of their stores and who in carrying out
these responsibilities, direct the work of two or more other
employees; interview potential new employees and make
meaningful recommendations with regard thereto; evaluate the
performance of current employees; entertain and resolve
employee complaints; suspend, terminate or discipline
employees or make meaningful recommendations in this regard;
plan, determine and distribute work; conduct safety meetings
and train employees with respect to safety and other issues;
send employees home early as a management tool to control
payroll costs where the manager or assistant manager projects
insufficient need for their services; authorize overtime work;
ensure that the appearance of their store is maintained;
ensure that their store's machinery operates in a safe manner;
and ensure that their store maintains adequate product
inventory, materials, and tools.  In addition, the manager and
assistant manager are responsible for making sales of their
stores goods and services and for ensuring that the company's
customers are satisfied.  Some managers and assistant managers
also spend some of their time performing service functions of
the type performed by the stores' service employees.  For
purposes of this letter we will assume that all managers and
assistant managers work an eleven hour day, of which a
cumulative total of four hours are spent making or attempting
to make sales of the establishment's products and services or
performing service and other functions.[1]  All managers and

---

[1]In fact these amounts will vary somewhat.  The work day
will generally range from nine to eleven hours in length and
the time spent making or attempting to make sales will
generally vary from one to three hours per day with the time
spent performing service and ministerial functions varying
inversely from three hours to one.  We believe, however, that
the numbers we have presented in the text fairly present the
legal issue addressed in this letter.

ADER061C.WP

1993.07.06

IRELL & MANELLA
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Ms. Victoria L. Bradshaw
June 14, 1993
Page 4

assistant managers[2] are paid substantially more than $1,150 per month.

## III.
### Discussion and Refinement of Specific Issue

With the exception of making sales and performing service functions, the duties set forth above have all been recognized by the Division as managerial and there are many decisions, including many reported federal decisions, which recognize that managers and assistant managers who perform these duties are performing exempt work essential to the successful operation of their establishments.

In California, however, a particular issue arises by virtue of the definition of "primary" and the statement in Section 10.61 that "making sales" is an example of a non-exempt duty. Although it is our belief that in many instances making sales and performing some service and other functions require sufficient discretion and independent judgment and are sufficiently related to managerial work so as properly to be classified as exempt, for purposes of this letter we are not challenging the fact that time actually spent in these activities will normally be classified by your Deputy Labor Commissioners as non-exempt.

Because it is the responsibility of the managers and assistant managers to be concerned with the operation and profitability of their store at all times and to be sure at all times that the other employees are properly performing their work, we believe that all of their hours should be recognized as hours spent performing exempt work for purposes of applying the fifty percent/"primarily" test even if some of this same time is also spent performing work which would otherwise be considered to be non-exempt. After all, it is readily apparent, as has been recognized under the Fair Labor Standards Act, that except and non-exempt work can be carried

---

[2]The assistant manager is generally in charge of the store for two or more days out of every week as well as being responsible for the store during periods of time when the manager is on vacation or ill. In addition, the assistant manager works with the manager as part of a management team; it is the responsibility of both to ensure that all management functions, including employee supervision and customer satisfaction, are consistently performed.

ADER061C.WP

1993.07.06

IRELL & MANELLA
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Ms. Victoria L. Bradshaw
June 14, 1993
Page 5

out simultaneously.  See, for example, Donovan v. Burger King, 675 F.2d 516, 521 (2d Cir. 1982) ("much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work"); Paddy v. Smith, 20 W.H. Case 1176, 1177 (W.D. La. 1973) ("Even during the time in which he was engaged in some menial capacity, his supervisory responsibility for the store and its employees continued").

A good example of why this is so is provided by an employee whose work includes composing on a word processor. Although the mechanical work of operating the word processor would be considered to be non-exempt work if performed by a secretary or an employee whose duties were limited to word processing, all of the time spent operating a word processor by an otherwise exempt employee should be considered to be exempt time if the exempt employee is composing or editing a document sufficiently related to his exempt duties.

This same result should apply to our hypothetical situation.  Even when a manager or assistant manager is engaged in sales or service activities, he remains responsible for the operation and management of his store.  Moreover, as he performs such activities he can simultaneously perform such clearly managerial work as observing and evaluating his employees and the operation of his store.

Even if your Division should not recognize that a managerial employee may be observing and evaluating how employees are performing their duties or may be thinking of how to better operate his store and thus be performing exempt work while he is making or attempting to make sales or performing service activities, it would still be necessary, under the hypothetical we are discussing, to find that the managers and assistant managers in question are exempt employees because they are engaged in work which your division has considered to be non-exempt for only four of their eleven hours.  This result should follow, moreover, even if such a manager or assistant manager is waiting for customers during a substantial portion of the time he is not actually making or attempting to make sales or performing service activities, for during that time it is also his job to consider such matters as how he can cause his establishment to perform more efficiently and more profitably; how he can motivate or otherwise assist his compliment of four or more service employees to perform their functions more effectively; how he can resolve any employee or other problems which have arisen; whether each of these employees is doing his or her job in an

ADER061C.WP

1993.07.06

IRELL & MANELLA
A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Ms. Victoria L. Bradshaw
June 14, 1993
Page 6

adequate manner; how corrective action can be taken with
regard to any such employee who is not adequately performing;
and whether his inventory is proper. Each of these
responsibilities, of course, involves performing exempt work.

In sum, under the circumstances, it is our opinion that
all time on the job (and a great deal of time off the job as
well) spent by the managers and assistant managers described
in this letter, including time when the managers or assistant
managers may also be waiting for customers, must be found to
exempt time for purposes of applying the fifty
percent/"primarily" test.  Moreover, even if time actually
spent in sales or service activities is considered as being
time spent only in non-exempt activities, the managers and
assistant managers in our hypothetical would nevertheless be
properly classified and paid as exempt executives employees,
for in the specific hypothetical discussed in our letter, no
less than seven hours each day would be considered to be time
spent in exempt activities and no more than four hours each
day could be considered as non-exempt time.

It is our opinions in this regard which we are asking you
to confirm.  We believe our analysis and conclusions are not
only consistent with the Industrial Welfare Commissioner
Orders and with reality, but also important to our State and
its communities, for it is essential for the effective
operation of many small retail service establishments that
their managers and assistant managers function, and think of
themselves, as exempt members of management.

If we can be of further assistance to you by providing
additional information or analysis, please let us know.  We
are most anxious to have the Division recognize the exempt
status of managers and assistant managers of the type
discussed here.

Sincerely,

James N. Adler

JNA:dsb

ADER061C.WP

1993.07.06

# EXHIBIT D

1

2                          **Jury Instruction No. 7.2**
                          **(Special Jury Instruction)**
3                **Primarily Engaged In Managerial Duties**
            **Executive (Managerial) Exempt/Non-Exempt Work**
4

5
          In making the determination of whether Plaintiffs were primarily engaged in executive
6
(managerial) work, you should consider the following tasks to be exempt (managerial) or non-
7
exempt (non-managerial).  This list is a guide; it does not list all non-exempt and exempt tasks that
8
Plaintiffs may have performed:
9
          <u>Exempt or managerial tasks can include:</u>
10
          (1)     Providing leadership and direction to restaurant staff;
11
          (2)     Overseeing guest service;
12
          (3)     Directing guest service;
13
          (4)     Directing the work of restaurant employees and managing personnel.  This
14
                  includes, but is not limited to:
15
                          (a)     Assigning tasks to employees and following up to ensure that
16
                                  assigned tasks are completed;
17
                          (b)     Coaching employees on delivering superior service;
18
                          (c)     Directing the activities of employees on the restaurant floor;
19
                          (e)     Overseeing food preparation and recipe execution; and
20
                          (f)     Motivating employees to perform their functions more
21
                                  effectively;
22
          (5)     Planning and overseeing the daily activities of the restaurant;
23
          (6)     Supervising employees;
24
          (7)     Controlling the scheduling of restaurant employees;
25
          (8)     Monitoring restaurant sales and adjusting schedules to ensure compliance with
26
                  the payroll budget;
27
          (9)     Apportioning work among workers;;
28
          (10)    Managing store performance and profitability;

JTTLER MENDELSON, P.C.
650 California Street
20th Floor
in Francisco, CA 94108.2693
415.433.1940

CASE NO.  3:11-CV-01272 WHA

DEFENDANT'S [PROPOSED] JURY INSTRUCTIONS

(11)   Recruiting, interviewing, selecting and/or hiring restaurant employees;

(12)   Setting rates of pay and hours worked;

(13)   Evaluating, motivating, counseling, coaching, disciplining, and/or discharging restaurant employees;

(14)   Inspecting and reviewing the work of restaurant employees, including monitoring employee productivity;

(15)   Appraising work performance;

(16)   Training and development of restaurant staff.  Training may at times include performing the job function that is the subject of the training for the purposes of demonstrating the proper performance of that function;

(17)   Handling employee and customer complaints and grievances;

(18)   Assessing, evaluating, and controlling inventory, determining the product to be ordered, evaluating cash handling procedures, auditing inventory levels to make this determination and placing orders;

(19)   Controlling the flow and distribution of materials, supplies, machinery or tools to be used or supplies to be bought;

(20)   Monitoring and inspecting restaurant conditions;

(21)   Overseeing facility maintenance;

(22)   Determining the amount of food to be prepared;

(23)   Determining techniques to be used;

(24)   Performing activities to provide for the safety of the employees and property, including sanitation and food safety precautions;

(25)   Cash handling and preventing loss;

(26)   Reviewing employees' time and attendance records;

(27)   Maintaining production or sales records;

(28)   Ensuring that employees comply with Benihana policies and procedures.

Non-Exempt or Non-Managerial tasks can include:

ITTLER MENDELSON, P.C.
650 California Street
20th Floor
n Francisco, CA 94108.2693
415.433.1940

CASE NO.  3:11-CV-01272 WHA

DEFENDANT'S [PROPOSED] JURY INSTRUCTIONS

(1)    Serving guests;

(2)    Stocking produce, cooking supplies and other inventory;

(3)    Cleaning, mopping, and sweeping floors;

(4)    Bussing tables;

(5)    Unloading trucks and unpacking food;

(6)    Preparing tables for meals;

(7)    Replenishing salt, pepper or condiment containers;

(8)    Escorting customers to their tables;

(9)    Processing inventory;

(10)   Processing payments;

(11)   Preparing food;

(12)   Cleaning and maintaining facility and equipment.

In making your decision, you may consider whether each Plaintiff did work of the same nature as work routinely done by hourly paid employees.  The fact that a Restaurant Manager performs non-exempt work during the workweek does not render him or her non-exempt.  Each Plaintiff can perform non-exempt work up to 50% of the time he or she is at work, or Benihana must prove that Plaintiffs were expected to spend the majority (*e.g.,* more than 50% of the time) of their work time performing exempt tasks, and that Benihana's expectations were realistic, in order to qualify for the exemption.

In determining whether each Plaintiff was "primarily engaged" in exempt work or non-exempt work, you should consider first and foremost, how Plaintiffs actually spent their time.

You should also consider Benihana's expectations for the Restaurant Manager position.  If you find that Benihana expected Plaintiffs to perform exempt work more than 50% of the time, then you should also consider whether those expectations were realistic based on the requirements of the job.  If Benihana proves that its expectations were realistic based on the requirements of the job and you find that a Plaintiff did not perform his or her job in accordance with Benihana's expectations, you may also consider whether that Plaintiff's practice diverged from Benihana's realistic expectations.  An employee cannot evade the exemption by ignoring Benihana's

3.

realistic expectations for his or her position and by performing non-exempt work during the majority of the workweek.

[Authority: 8 Cal. Code Regs. § 11070(1)(A)(e) & (2)(K); *Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal. 4th 785, 797; 29 C.F.R. § 541.102(b); *Whiteway v. Fedex Kinkos Office and Print Services, Inc.,* 2010 U.S. Dist. LEXIS 56124 at *3 (N.D. Cal. May 17, 2010); *Donovan v. Burger King Corp.,* 672 F.2d 221, 226 (1st Cir. 1982) (supervision of associates); *Donavan v. Burger King Corp,* 675 F.2d 516, 521 (2d Cir. 1982) (*determining* amounts of food prepared, scheduling, inventory, assigning jobs); *Murray v. Stuckey's,* 50 F.3d 564 (8th Cir. 1995) (Oversee daily activities, ordering, customer service); *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104 (9th Cir. 2001) (scheduling, providing leadership, reviewing employees' work, evaluating and disciplining employees, training, ensure customer and associate safety, ensuring compliance with company policies and procedures); *Wilbur v. Silgan Containers Corp.,* 2008 U.S. Dist. LEXIS 72804 (E.D. Cal. 2008) (monitoring store sales and scheduling, directing employees); DLSE Opinion Letter 1993.07.06 at p. 5 (directing employees, interviewing, apportioning work, controlling flow and distribution of supplies, etc.); *Mims v. Starbucks Corp.,* 2007 U.S. Dist. LEXIS 9 (S.D. Tex. 2007) (monitoring conditions and cleanliness, recruiting, interviewing, hiring, preparing reports, monitoring inventory levels); *Guinup v. Petr-All Petroleum Corp.,* 2010 U.S. Dist. LEXIS 86280, *10 (N.D.N.Y. Aug. 23, 2010) (protecting company assets); *Mitchell v. Abercrombie & Fitch, Co.,* 428 F. Supp. 2d 725, 742 (S.D. Ohio 2006) (handling customer complaints).]

GIVEN:          _____

REFUSED:        _____

MODIFIED:       _____

WITHDRAWN:      _____

ITTLER MENDELSON, P.C.
650 California Street
20th Floor
n Francisco, CA 94108.2693
415.433.1940

CASE NO.  3:11-CV-01272 WHA

DEFENDANT'S [PROPOSED] JURY INSTRUCTIONS