Pages 1 - 76

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

TETSUO AKAOSUGI, HIEU NGUYEN, and   )
RINKO DONAHUE,                       )
                                     )
             Plaintiffs,             )
                                     )
  VS.                                )  No. C 11-1272 WHA
                                     )
BENIHANA NATIONAL CORPORATION,       )
                                     )  San Francisco, California
             Defendant.              )  Tuesday
_____)  October 9, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**        MINAMI TAMAKI LLP
                           360 Post Street, 8th Floor
                           San Francisco, California 94108
                      BY:  **KEVIN R. ALLEN, ESQUIRE**
                           **GLICEL E. SUMAGAYSAY, ESQUIRE**


**For Defendant:**         LITTLER MENDELSON
                           650 California Street, 20th Floor
                           San Francisco, California 94108-2693
                      BY:  **MARGARET HART EDWARDS, ESQUIRE**
                           **ROBERT LOUIS ZALETEL, ESQUIRE**


**Reported By:**     *Katherine Powell Sullivan, CSR #5812*
                     *Official Reporter - U.S. District Court*

1                  **P R O C E E D I N G S**

2   **OCTOBER 9, 2012**                                **7:32 A.M.**

3              **THE CLERK:**  Civil 11-1272, Akaosugi versus Benihana

4   Inc.

5         Counsel, please state your appearances.

6              **MR. ALLEN:**  Good morning, Your Honor.  Kevin Allen for

7   the plaintiffs.

8              **THE COURT:**  Say your last name.

9              **MR. ALLEN:**  Allen, A-l-l-e-n.

10             **THE COURT:**  Allen.

11             **MR. ALLEN:**  Yes, Your Honor.

12             **MS. SUMAGAYSAY:**  Good morning.  Glicel Sumagaysay for

13  the plaintiffs.

14             **THE COURT:**  How do you spell your last name?

15             **MS. SUMAGAYSAY:**  S-u-m-a-g-a-s-a-y.

16             **THE COURT:**  Say it slowly for me.

17             **MS. SUMAGAYSAY:**  S-u-m-a-g-a-y-s-a-y.

18             **THE COURT:**  Sumagaysay.  Great.  Anyone else?

19        Okay.  And over here?

20             **MS. EDWARDS:**  Good morning, Your Honor.  Margaret Hart

21  Edwards for defendant Benihana National Corp.  Also with me is

22  Robert Zaletel, and Lucas Muñoz.

23             **THE COURT:**  Who?

24             **MS. EDWARDS:**  Lucas Meñoz, an associate in our office.

25             **MR. MUNOZ:**  Good morning, Your Honor.

PROCEEDINGS

```
 1              THE COURT:  How do you spell Zaletel?

 2              MR. ZALETEL:  Z-a-l-e-t-e-l.

 3              THE COURT:  Z-a-l-e-t-e-l?

 4              MR. ZALETEL:  That's right.

 5              THE COURT:  Zaletel?

 6              MR. ZALETEL:  Zaletel.

 7              THE COURT:  Great.  Anyone else?

 8              MS. EDWARDS:  We have with us Christina Mendoza, who

 9  is general counsel for Benihana.

10              THE COURT:  Welcome.

11              MS. MENDOZA:  Thank you.

12              THE COURT:  So we are here for trial.  Great.

13         Anything I can help you with before we get started?

14              MR. ALLEN:  Yes, Your Honor.

15         We met and conferred on a joint statement for the jury,

16  and were unable to agree on a single statement.  So I believe

17  both sides have a proposed statement that slightly differs from

18  the other one.

19              THE COURT:  This does not look good for the future, if

20  you can't agree on something that simple.  Hand up to me your

21  versions.

22         And the Court of Appeals will please understand that I am

23  having to do this without the assistance of counsel, and so

24  don't hold it too much against me if the lawyers don't like

25  what I say to the jury about what the case is about.
```

```
 1        Okay.  What else can I help you with?
 2            MS. EDWARDS:  Your Honor also requested a list of
 3   players.  And the parties were able to agree on that, I'm happy
 4   to say.  This is to read to the jury.
 5            THE COURT:  Fine.
 6            MS. EDWARDS:  And --
 7            THE CLERK:  Do you have an extra?
 8            MS. EDWARDS:  Yes, I do.
 9            THE COURT:  All right.
10            MS. EDWARDS:  Also, we brought the -- you had
11   requested that we bring what we consider to be the top
12   exhibits.
13            THE COURT:  Sure.  Is this from both sides now?
14            MS. EDWARDS:  This is from the defense side.
15            THE COURT:  Does the plaintiff have a group you want
16   me to look at?
17            MR. ALLEN:  Your Honor, we'll pull that for you.
18            THE COURT:  Fine.  Okay.  What else?
19            MS. EDWARDS:  We also have an amended exhibit list.
20   You already have a copy of that.  How many copies do you need?
21            THE COURT:  I would like to have one.
22            THE CLERK:  Three.  Thanks.  Thanks.
23            MR. ALLEN:  Your Honor, we would object to the amended
24   list.  It was served --
25            THE COURT:  What?
```

PROCEEDINGS

1          MR. ALLEN:  This was served at 6:00 or 7:00 o'clock

2    last night.  There is additional exhibits which weren't

3    included on the prior exhibit list.

4          THE COURT:  Those will just have to be taken up at the

5    right time.

6       But I want to just say to both sides, you cannot sneak new

7    exhibits in.  If you didn't disclose them earlier, too bad for

8    you.  They will not be allowed unless there is a good reason.

9          MS. EDWARDS:  All of these exhibits have been

10   disclosed earlier.  They are all things that are within the

11   knowledge of the parties.  The only thing that is arguably new

12   is a copy of an envelope in Mr. --

13         THE COURT:  One second.  Somebody is over here making

14   noise.

15         MS. SUMAGAYSAY:  Sorry, Your Honor.

16         THE COURT:  You can't make noise.  I can't hear the

17   lawyers talk.  Just hold what you're doing over there until I

18   hear Ms. Edwards.

19      Go ahead.

20         MS. EDWARDS:  Okay.  Is a copy of an envelope in

21   Mr. Nguyen's handwriting.  And this is the envelope that

22   Mr. Nguyen handwrote on to send in the USB stick.

23      The envelope was in the possession of Anton Litchfield,

24   who was the computer forensics person who had examined the USB

25   stick.  And we were only able to obtain a copy very recently.

PROCEEDINGS

```
1        And Mr. Nguyen's deposition was taken over the weekend, on

2   damages, and he was asked to authenticate this particular

3   envelope.  He authenticated the envelope.  This is in

4   connection with his deletion of data before he sent the USB

5   stick.

6            THE COURT:  What's wrong with letting them use the

7   envelope?

8            MR. ALLEN:  They're just disclosing it at 7 o'clock,

9   the day before trial, Your Honor.  We already have all of our

10  trial documents and everything lined up.

11       This was not the only change they had.  They also took

12  two --

13            THE COURT:  I'm just sticking on the envelope for a

14  moment.  It's your client who sent the envelope, right?

15            MR. ALLEN:  Yes, my client sent the envelope, Your

16  Honor.

17            THE COURT:  I'm going to let them use that one, and

18  you will get equivalent latitude on documents that you failed

19  to designate when the time comes.

20       All right.  Now, if there are other ones, we are going to

21  take them up when we get to them.  But we're not going -- I'm

22  not going to start ruling on them one by one now.  They will

23  just have to be ruled on when they become important.

24            MR. ALLEN:  Fair enough, Your Honor.

25            THE COURT:  What else do you have for me?
```

PROCEEDINGS

```
 1              MS. EDWARDS:  I believe that's it, Your Honor.

 2              MR. ALLEN:  I agree, Your Honor.

 3              THE COURT:  Have you got any objections to each

 4  other's opening statements?

 5              MR. ALLEN:  I've not been informed they are using any

 6  kind of visuals or anything of that sort.

 7              THE COURT:  Are you using any visuals?

 8              MS. EDWARDS:  No, Your Honor.

 9        Are you?

10              MR. ALLEN:  I was planning on taping up Exhibit 151,

11  which was the Taka Yoshimoto memo.

12              THE COURT:  Who?

13              MR. ALLEN:  There is a memo from their senior

14  operations.

15              THE COURT:  Is it in evidence yet?

16              MR. ALLEN:  It has not been introduced.

17              THE COURT:  I don't know if there is an objection.

18              MS. EDWARDS:  We would object to the use of that

19  exhibit.

20              THE COURT:  I don't think you should be showing the

21  jury anything that inflammatory until it's actually in

22  evidence.  You may not ever get it in evidence.

23        Now, it's true that I ruled that the -- the objections

24  that were made, I overruled those.  But that still begs the

25  question of whether or not you can lay the foundation to get it
```

1   in evidence.

2       So that's too important a document for you to start

3   showing it to the jury in the opening statement.

4           **MR. ALLEN:**  Okay.

5           **THE COURT:**  You can -- you can generally refer to it.

6   That's okay.  You cannot actually show it to them.  That's

7   publishing it to the jury before it gets into evidence.  And

8   something that inflammatory, I think, should not be shown to

9   the jury until it's actually in evidence.

10          **MR. ALLEN:**  Okay.  Thank you, Your Honor.

11          **THE COURT:**  Anything else in that category?

12          **MS. EDWARDS:**  Well, Your Honor, you will recall that

13  we had a motion in limine where the plaintiffs asked that you

14  rule that we not be allowed to mention the summary judgment

15  that was granted as to five of the six elements of the test for

16  exempt executive.

17      And my plan, in opening, is to refer to the fact that the

18  five of the six have been established.

19          **THE COURT:**  No.  You just say the only issue for the

20  jury, the only issue you have to decide is X.  And that -- you

21  can say, As a result of prior rulings in the case, this issue

22  has to be tried to the jury.  But I don't think you should be

23  trying to make it look like you've already won most of the

24  case.  So I think you don't need to do that.

25      Now, later on I am going to have to explain to the jury

PROCEEDINGS

1  the test, and what elements are met and so forth.  But you can

2  achieve your purposes by simply saying there have been prior

3  rulings in the case and the Court has ruled we have to have a

4  trial on this issue; describe what that issue is.

5      All right.

6          **MS. EDWARDS:**  Okay.

7          **MR. ALLEN:**  Your Honor, I guess there's two other

8  issues.

9      One is just, I want to make sure witnesses are being

10  excluded from the courtroom when other witnesses are

11  testifying.

12          **THE COURT:**  Unless they are corporate representatives

13  or a party to the case, that's correct, they have to be

14  excluded.

15          **MR. ALLEN:**  Okay.

16          **THE COURT:**  Now, sometimes we make an exception for

17  experts.  That's the only possible exception.  If somebody

18  wants their expert in the courtroom, they have to tell me.

19          **MS. EDWARDS:**  Your Honor, we would like to have the

20  ability to have our expert, Dr. Christina Banks, present in the

21  courtroom during the time that the plaintiffs are testifying.

22          **MR. ALLEN:**  Your Honor, I would object.  She only

23  observed -- her son observed plaintiff Rinko Donahue during the

24  observation.  She has never, to my knowledge, ever observed Ted

25  or Hieu.

 1       Also, the observation occurred last year, so I'm not sure

 2  what purpose her witnessing their testimony during trial would

 3  serve, especially, if she's going to be sitting in prior to her

 4  testifying.  Obviously, I wouldn't have any problem if she sits

 5  in after they testify.

 6       **THE COURT:**  There's a -- this is a somewhat

 7  complicated problem because for the direct testimony the expert

 8  is strictly limited to what's in the report.

 9       You can't let them sit in the courtroom and then start

10  embellishing their direct testimony with things that they saw

11  during direct examination, before they go on the witness stand.

12  So that's just -- that's Rule 26.  Limited to what they --

13  Banks is limited to what's in her report, period, four corners

14  of the report, on direct.

15       Now, here's where it gets a little complicated.  On

16  cross-examination, it's fair game for the expert to go beyond

17  what's in the report.  You know, in other words, if Mr. Allen

18  opens the door to some testimony that wasn't in the report, so

19  be it.  So there is where sometimes what the witness has

20  observed, expert witness has observed in the courtroom is fair

21  game.

22       So most judges allow experts to watch the trial.  I go

23  with the normal thing.  This is an expert who can sit in,

24  and -- if it turns out that something is relevant to

25  cross-examination and, for that matter, have redirect.

1    But what you cannot do is try to work it in on direct

2  examination.  Or on redirect examination where it's, in effect,

3  not even responsive to something that counsel brought up.

4    So, okay.  So you can let her sit in on the whole case,

5  including opening statements.

6         MS. EDWARDS:  Thank you, Your Honor.

7         MR. ALLEN:  Your Honor, the last thing is just, the

8  parties did have some stipulated facts that need to be read to

9  the jury.  I don't know if it makes sense to read those at the

10  very beginning.

11         THE COURT:  It's up to you.  You, as the plaintiffs'

12  lawyer, can read them all.  It comes out of your time now.

13    So you can read them all, if you want.  You can read the

14  ones you're interested in.  You can wait until the right

15  moment, whenever it's important.  And then you can read them to

16  the jury right then, with the witness on the stand.  You can do

17  it.

18         MR. ALLEN:  Okay.

19         THE COURT:  You choose the time that you want to read

20  it to the jury.

21         MS. EDWARDS:  Your Honor, since we're going first in

22  this, because we have the burden of proof, it was my plan to

23  actually read some, if not all, of the stipulated facts to the

24  jury.

25         THE COURT:  It's up to you to decide.

PROCEEDINGS

1          Same thing applies to you.

2              **MS. EDWARDS:**  Sure.

3              **THE COURT:**  That's right.  I forgot you were going

4    first.  All right.

5              **MR. ALLEN:**  I think that's all, Your Honor.

6              **THE COURT:**  Let's see if the venire is present and

7    ready to go.

8         You can now make the noise over there, if you would like.

9    I'm sorry I interrupted you but, again, this falls in the

10   category when the lawyers are talking we have to give them our

11   undivided attention.

12        Yes, did you say something?

13             **THE CLERK:**  The jurors are not ready.  David is down

14   there by himself.  And he sent me a message and said I need to

15   wait until 8:00.

16             **THE COURT:**  We do, uhm?

17             **THE CLERK:**  Yes.

18             **THE COURT:**  We'll take a short break until we can --

19   I'll review your individual statements.  And as soon as the

20   jury is present come get me and we'll get started.

21             **MR. ZALETEL:**  Excuse me, Your Honor, one other thing.

22        We filed a request for the Court to take judicial notice

23   of the fact that the complaint in this action was filed by

24   Mr. Akaosugi and Nguyen on February 14, 2011.

25             **THE COURT:**  Is there an objection to taking judicial

PROCEEDINGS

```
 1  notice of that?

 2          MR. ALLEN:  The fact that the complaint was filed on a

 3  certain date?

 4          THE COURT:  Correct.

 5          MR. ALLEN:  No, Your Honor.

 6          THE COURT:  All right.  Then we'll do that.  Whenever

 7  you want that to be read to the jury, you tell me, and I'll

 8  read it to the jury.

 9          MS. EDWARDS:  Thank you, Your Honor.

10          MR. ZALETEL:  Thank you, Your Honor.

11          THE COURT:  Just like a stipulation.

12      I want to just say to both sides, I know the lawyers know

13  this, but the individual plaintiffs and the court

14  representative -- where is the courtroom representative?

15      All right.  There should be absolutely no talking to the

16  possible members of the jury.  You will run into them in the

17  hallways, the bathrooms.  You will run into them in various

18  places.  No talking to the venire or the prospective members of

19  the jury.

20      So, I want the lawyers to make sure that their clients

21  understand that.  Okay.

22          MR. ALLEN:  Your Honor, one thing is the judicial

23  notice.  I haven't actually seen the judicial notice document,

24  so could I review that two seconds?

25          THE COURT:  You already gave up on that.
```

PROCEEDINGS

1         **MS. EDWARDS:**  It was served yesterday.  Go ahead.

2  Read it right now.

3         **MR. ALLEN:**  That's fine.

4         **THE COURT:**  Thank you.

5         **MR. ALLEN:**  Thank you, Your Honor.

6      (Recess taken at 7:47 a.m.)

7      (Jury voir dire held from 8:20 to 11:25 a.m., which was

8  reported but not transcribed.)

9         **THE COURT:**  Now, I'm going to ask the -- those of you

10  to consolidate.  What's the word?  Close ranks.  But,

11  Ms. Treible, would you go to the back row.  Do you mind going

12  around there so it will be four and four.  These will be your

13  new seats.

14      Look, this is an almost all female jury.  Almost.

15      (Laughter)

16         **JUROR MR. IKI:**  Excuse me.

17         **THE COURT:**  There we go.  In some cases I have where

18  it's been all women or almost all men.  Always, it's kind of

19  half and half.  But this time it's seven and one.  That's fine.

20  That's the system.  And welcome aboard to all of you.

21      So, here's what we're going to do.  I'm going to ask you

22  to stand in a moment and take the oath.  This is an important

23  step.  What this means is that you are -- just like I take an

24  oath to do my job and to follow the law, you will be taking an

25  oath to do the same thing in this case, when I tell you what

PROCEEDINGS

 1  the law is, and to be fair and impartial to both sides, which I
 2  know you will be.
 3      And the jury system is one of the greatest things America
 4  has ever come up with, and you are it.  And I'm very proud to
 5  be the judge to be presiding in this case with you.
 6      So please stand and raise your right hand.
 7      (Oath administered to the jury.)
 8          **THE CLERK:**  Okay.
 9          **THE COURT:**  Thank you.  Please, be seated.
10      Here's what's going to happen next.  Dawn Toland, our
11  expert deputy clerk, is going to escort you back behind the
12  secret door.  But, now you're going to know the secret back
13  there.  And that's the jury room back there.
14      You will find your new home away from home.  I'm going to
15  make sure that every morning we get good coffee in there and
16  good federal doughnuts to eat --
17      (Laughter)
18          **THE COURT:**  -- and to welcome you here each morning.
19      And Dawn is going to take you back there and give you your
20  badge and a notepad, if you would like to take notes, a few
21  just ground rules about where to park and, I guess.  Things
22  like that.
23      But, very quickly, we're going to be back out here and
24  we're going to hear the opening statements today, maybe even
25  get to the first witness today.  So then you will understand

PROCEEDINGS

1   what the case is all about, and we'll be off and running.

2       I still think we're on track for the schedule that I --

3   the overall calendar that I told you.  And we will end today at

4   1:00 o'clock.  Just as I have said.

5       So, welcome aboard.

6       Dawn, at this time would you please escort the jury to the

7   jury room.

8       (Jurors out at 11:29 a.m.)

9       **THE COURT:**  Thank you.  All right.  Be seated.

10      And do you need me for anything?  Is there any way I could

11  help you?  Are you ready to jump right in and start your

12  opening statements?

13      **MR. ALLEN:**  I think we are ready to start, Your Honor.

14      **MS. EDWARDS:**  Ready, Your Honor.

15      **THE COURT:**  You have my permission to move the chart

16  there, the jury selection chart and put up whatever items you

17  need.  And I suspect in about 10 minutes we'll be ready to go.

18  So, see you then.

19      **MS. EDWARDS:**  Thank you.

20      **MR. ALLEN:**  Thank you, Your Honor.

21      (Recess taken from 11:29 to 11:41 a.m.)

22      **THE COURT:**  All set out there?

23      **MS. EDWARDS:**  Yes.

24      **MR. ALLEN:**  Yes.

25      **THE COURT:**  Dawn has stepped away.  I will bring the

PROCEEDINGS

```
 1   jury in, and we will get started.  So, just bear with me.
 2        Our jury is coming.
 3        (Jury enters at 11:42 a.m.)
 4        THE COURT:  Have a seat over there.  Welcome back.
 5   Get yourselves nice and organized.
 6        So before we do the opening statements, I need to give you
 7   a few pointers, and then we're going to hear the opening
 8   statements.
 9        What I need to say here is about five minutes.  And I need
10   to first begin by emphasizing that you, the jury, make the
11   decision in the case.
12        Sometimes jurors think, oh, the judge is going to signal
13   us how the case should come out.  No, it's not.  That's not the
14   way the case works.
15        You decide the case.  My job is to tell you what the law
16   is so you can decide it based on the law.  But, you evaluate
17   the evidence.  That's your job.
18        So that's number one.
19        Nothing that I ever say -- I'll be ruling yes or no on
20   certain items of evidence, and you'll hear all of that.  But,
21   please, don't take that ever as an indication of what I think
22   the answer is.
23        In fact, I've learned I don't even have a view of it.  I
24   try to train myself not to have a view because it's your job to
25   decide.
```

PROCEEDINGS

```
1        So, I will just rule on the evidence.  If I let some item
2   of evidence in, it's my judgment that under the rules of
3   evidence it should come in.
4        Okay.  So remember that you, the jury, it's like a
5   laboratory experiment.  There will be a certain amount of
6   evidence put in the courtroom.  We will all get to see that and
7   hear it, hear the testimony and so forth.
8        And you will, at the end of the case you will lay that
9   laboratory evidence -- or, really, it's trial evidence --
10  alongside the standard of proof and ask yourself whether the
11  party with the burden of proof has carried that burden.  If the
12  answer is yes, then that party wins on that issue.  If the
13  answer is no, then they lose on that issue.  The party with the
14  burden of proof.
15       This is so simple a statement it's really -- that's what
16  it comes down to.  On every issue, somebody has got the burden
17  of proof.  You look at the record.  Does it measure up or not,
18  under the law?
19       Okay.  Now, so what the trial evidence is going to be is
20  what the witnesses say under oath from that witness stand, and
21  also the exhibits that are put into evidence, or photographs,
22  or whatever's in evidence, received in evidence, and which you
23  have in the jury room, or what the witnesses say under oath.
24       But what is not evidence -- I'm going to say this several
25  times during the trial.  Not one word the lawyer ever says is
```

PROCEEDINGS

1    evidence.  Not one word.

2         You're going to hear them so much.  You've heard me a lot.

3    I'm going to kind of recede into the woodwork.  You're going to

4    hear these lawyers *ad infinitum*.

5         They are very good lawyers.  Not one word they ever say is

6    evidence.  Not a single word.  It's argument.  And sometimes

7    very good argument.  And you should consider it.  But it's

8    never evidence.

9         This is the single biggest way that a jury can go wrong.

10   I'll give you an example.  Let's say in a different type of

11   case, let's say that we've got a traffic case and the lawyer

12   gets up and says to a witness:

13            "Well, isn't it true that the light was red?"

14        And the witness on the stand says:

15            "I don't remember."

16        Then you may get brainwashed into thinking the light was

17   red just because the lawyer said it.  And so you get back in

18   the jury room and try to decide the case and you say, you know,

19   somebody out there in the courtroom said the light was red.  I

20   think the light was red.

21        And then I hope somebody else on the jury says, no, no,

22   that was just the lawyer talking.  That was just the lawyer

23   talking.  And that is zero evidence.

24        All that little example proved was that the witness could

25   not remember, or claims not to remember.  But what the lawyer

PROCEEDINGS

1    says is never evidence.

2          You haven't seen it yet, but you're going to hear these

3    lawyers so much that I have to repeat this every now and then

4    because it is, as I say, the single biggest way that a jury can

5    go wrong is confusing what the lawyers say with what the

6    witnesses say.

7          Now, in my example, if the witness had said, yes, that's

8    correct -- in other words:

9                "QUESTION:  Isn't it true the light was red?

10               "ANSWER:  Yes, that's correct."

11         Then, of course, that is proof because the witness has

12   agreed with the lawyer under oath.  That would be evidence.

13         Okay.  So please remember that.

14         In a few minutes, you are going to hear opening

15   statements.  Not one word of it is evidence.  Not a single word

16   of it is evidence.  But, it's important because it helps you

17   understand what the lawyers expect the case to be, and that

18   helps you understand where things are going so that as the

19   evidence does come in, you will keep it all straight.

20         All right.  One other important thing.  I said it before,

21   but you cannot do research about this case or anything having

22   to do with it.  You must let me tell you what the law is and

23   let the lawyers bring the evidence in.  But, you can't do

24   Internet research.  You can't do anything that -- any kind of

25   research.

PROCEEDINGS

```
 1        But, I know how tempting it is these days to get on your

 2   Blackberries and just Google everything.  It's wrong.  I have

 3   to hold an evidentiary hearing if I find out that's been going

 4   on.  Please, don't do that.

 5        I know you'll do it the right way.

 6        All right.  This is a civil case, not a criminal case.  So

 7   the burden of proof is 51 percent, more likely than not.  I'll

 8   remind you of this now and then, but this is not a case where

 9   you've got to prove it beyond a reasonable doubt.  That's for

10   the criminal cases.  This is a civil case.

11        So when you retire to the jury room or at the end of each

12   day, you should not talk about this case until it is your duty

13   to, which is at the end.  Then it will be your duty to talk,

14   talk, talk, deliberate, deliberate.  But not yet.

15        And the reason I say that is so that you can keep an open

16   mind.  Sometimes the most important thing you hear is the very

17   last thing you hear, because you can't put everything in all at

18   once in a trial.  It comes in one at a time.  Sometimes the

19   last thing is the very important thing.

20        So, you want to keep an open mind and not make up your

21   mind about anything until you hear the evidence, and then you

22   deliberate with each other.

23        You know, somebody over there will pick up on this piece,

24   another one will pick up on that piece.  And when you talk

25   about it, it all comes back more clearly, this focus, whenever
```

PROCEEDINGS

1   you are in the jury room.

2        So try not to make up your mind, and keep an open mind

3   until you go into the room to deliberate.

4        Okay.  Those are just some main ideas.

5        You see this wonderful court reporter?  She's done so many

6   trials.  She is excellent.  But do you think you're going to

7   get a transcript in the jury room?  No.  The jurors think

8   they're going to get a transcript.

9        This is for appeal.  The transcript is for appeal

10  purposes.  We don't have one ready to give -- we can't possibly

11  give you one.

12       But, we can give you the notepads.  If you want to take

13  notes, it's up to you.  You don't have to.  Some jurors don't

14  like to take notes.  Good for them.  Some jurors love to take

15  notes.  Good for them.  It's just up to you.  But no

16  transcript.

17       However, you will get the documents received in evidence.

18  Documents received in evidence go into the jury room because

19  they are evidence.  And you get to look at those while you do

20  your deliberations.

21       You don't have to look at them.  I mean, you can.  It's up

22  to you.  You may have seen enough of them in the courtroom to

23  know what's in there.  It's up to you.

24       It's your decision how you want to proceed once it goes

25  into the -- once you start your deliberations.

PROCEEDINGS

```
1        Okay.  So those are my main points.  I think if anything
2   else comes up, I'll just blurt it out at the time.  And now I'm
3   going to recede into the woodwork, as I said.
4        We are going to hear, first, from Ms. Edwards.  She
5   represents Benihana.
6        You might say, well, how come the defendant gets to go
7   first?  Well, because in this case the issue that she has --
8   she's got the burden of proof on it.  So the -- she's the one
9   that's got to prove by 51 percent that they were exempted
10  employees.  So, under the rules, the party with the burden of
11  proof goes first.
12       In the second phase, the plaintiff goes first because the
13  plaintiff will have the burden of proof on the second phase,
14  assuming we get to the second phase.
15       So, at this time, Ms. Edwards, the floor is yours.  I ask
16  you to please use the microphone or be sure to keep your voice
17  loud and clear.  Thank you.
18                      **OPENING STATEMENT**
19       **MS. EDWARDS:**  Thank you, Your Honor.
20       I will try to keep my voice loud and clear.
21       My name is Margaret Edwards.  I've introduced myself a
22  couple of times this morning, but bear with me.  My colleague
23  is Bob Zaletel.  And a junior colleague is Lucas Muñoz, and
24  then our paralegal, Liz Miller.  And then Christina Mendoza,
25  who is the general counsel of Benihana National.
```

1    We are honored to be here today and to be talking to you,

2    and I'm very honored to be representing Benihana National.

3    Today and for the next several days we're going to take

4    you on a little journey into what it's like to run a Benihana

5    restaurant.  So you are going to learn a great deal about how

6    people spend their time, how Benihana expects people to spend

7    their time, what actually happens in a Benihana restaurant

8    behind the scenes.

9    I dare say that after this case is closed, the next time

10   you go to a Benihana restaurant you are going to be the great

11   expert because you'll have a very different kind of

12   relationship to the dining experience.

13   The critical question, as the judge has outlined for you a

14   couple times this morning, is what did people actually do with

15   their time, and was what they were actually doing with their

16   time meeting the realistic expectations of Benihana?

17   So that is going to be front and center all the time.  And

18   most of the testimony will revolve around the details of duties

19   and how much time people were spending on the various duties

20   they had.

21   So we're going to start off by looking at what -- how the

22   restaurants work.  So let me give you a general portrait of a

23   Benihana restaurant.

24   Most Benihana restaurants actually have a lot of people

25   working at them.  And the two restaurants that are at issue in

1    this case, meaning you're going to learn all about them, are

2    the Benihana restaurant here in San Francisco and the Benihana

3    restaurant in Cupertino.  And they are both somewhat similar.

4         So the way a restaurant is constructed is, at the top of

5    the food chain, so to speak, is the general manager.  The

6    general manager is expected to have the kind of power over the

7    restaurant of essentially an owner of a business.  They're

8    responsible for everything that happens in the restaurant.

9         There are 85 to 90 people working in each of these

10   restaurants, so there is a lot to do and a lot of people to

11   manage.  And, as a consequence, there has to be a management

12   team because these restaurants are open seven days a week.  And

13   they are very busy on holidays.

14        So there's a management team.  And the management team

15   consists of managers.  So there's a general manager and there

16   are managers.  So right now in San Francisco, there's a general

17   manager and then three managers.  And in Cupertino, there's a

18   general manager and then four managers.

19        And the managers stagger their schedules so that they can

20   cover the entire week and work a, generally, five-day workweek.

21   And they also stagger the schedules in such a way as to try to

22   have two managers, at least, when the restaurants are

23   particularly busy.

24        And the restaurants are busiest in the evening and, as you

25   might expect, they're busiest on holidays and also on weekend

OPENING STATEMENT / EDWARDS

```
 1   nights.  So Friday, Saturday, very, very busy in a Benihana

 2   restaurant.

 3        The Benihana chain was actually founded in 1964, by a man

 4   who came from Japan, named Rocky Aoki.  He was quite a famous

 5   guy.  He's no longer living.  He was an Olympic wrestler from

 6   Japan, and he founded the first Benihana restaurant in

 7   New York.

 8        It's what's called a casual dining chain, which means that

 9   you don't have to dress up to go to a Benihana.

10        You know, I know some of you are familiar with the

11   concept, but most people who eat at Benihana are having their

12   food cooked right before them on a grill.  And so you sit --

13   there are about eight place settings around the grill.

14        You might be sitting with complete strangers if you're

15   going with a party smaller than eight.  And the chef comes out

16   and -- usually after you've been served your soup and salad, to

17   cook the food that you have ordered in front of you.

18        And these chefs are trained for about four months.  They

19   do very, very fancy things with knives that we would not advise

20   anyone do at home.  And they flip eggs in the air and they

21   juggle the salt and pepper shakers and do various fancy things

22   with utensils.  And they cook the steak and the chicken and the

23   lobster tails and shrimp, and so forth, for the guests.  And

24   then after that, there's an opportunity for dessert, more

25   drinks, and people leave.
```

```
 1        There are a limited number of tables in Benihana
 2  restaurants.  So in San Francisco, for example, there are 20
 3  tables, and in Cupertino there are 23.
 4        Now, if you do the math, you realize that you have to keep
 5  the service moving in a Benihana restaurant to make a Benihana
 6  restaurant profitable because, if you don't, you're not going
 7  to turn the tables; which, in the restaurant industry, is where
 8  you make the money is -- particularly on a Saturday night.  You
 9  want the turn the tables several times.
10        So what has happened is that they have come up with a
11  service sequence.  And the service sequence is a series of
12  steps to be performed by different employees in the
13  restaurants.
14        And almost all these steps are hourly work.  They're
15  performed by the host at the front desk, or a server who is
16  assigned to the table.  And it's usually two servers per
17  table -- I'm sorry, two tables per server, and a busser, and
18  then, of course, the chef who's also an hourly worker.
19        So what happens in the service sequence is it governs the
20  effort to try to quickly get people from the host stand seated.
21  They don't want people waiting for a long time.  And you do
22  want to fill up the table with eight, if possible, without
23  making people wait, and then quickly have the server bring the
24  soup and salad at the beginning, and then have the chef arrive
25  just at the right moment, when people are pretty much finishing
```

OPENING STATEMENT / EDWARDS

1    up the salad, to cook the meal.

2        And then the chef is supposed to get the whole meal cooked

3    in about 45 minutes.  And then, you know, get the rest of the

4    meal done and the table bussed as soon as the customers leave

5    and the table turned.  So this way, this service sequence is

6    critical.

7        And the managers at Benihana restaurants are supposed to

8    manage the service sequence.  They have a very specific place

9    in this service sequence.  And their place is, towards the end

10   of the meal, they are supposed to check in with the table, and

11   they're supposed to talk to the parties at the table.  So if

12   it's two parties at the table, try to talk to both parties.

13       And they're supposed to say, Hi, I'm the manager, you

14   know, tell me how your meal was today.  Was everything

15   satisfactory?  Is there anything I can get you?  Is there

16   anything that we need to fix?

17       And this is a quality control step called "table

18   touching," which is part of the service sequence, and a very

19   important part of the service sequence.

20       The rest of the time the managers are wandering, but not

21   in an aimless way at all, but they're walking through the

22   restaurant trying to make sure that everything is going

23   properly in the restaurant.

24       Now, this is not just the area where these big grill

25   tables are, called teppan tables; but, also, these two

1    restaurants have a separate room, which is a sushi bar.  And so
2    they have to make sure that things are working well in the
3    sushi area and in the bar.

4         So there is -- there's a lot of territory to cover.  And
5    they are supervising servers, bussers, hosts, kitchen helpers,
6    chefs, dishwashers and maintenance people.  So that accounts
7    for all of this big staff in a Benihana restaurant.

8         So what are they supposed to do besides manage this
9    service cycle?

10        Well, they're also HR.  They are human resources.  They do
11   the hiring.  They do the firing.  They do the performance
12   management.  They do all the coaching and correction.  They
13   have to make sure that when people show up for their shift
14   their uniform is clean and it's put together properly.

15        They have to make sure that people are not, you know,
16   talking on a cell phone or texting their friends when they're
17   supposed to be bussing.  They are doing all of that kind of
18   constant, moment-by-moment supervision throughout the workday,
19   of the hourly employees.

20        They also have a lot of administrative work that they have
21   to do, because one of the things that you have to do in running
22   a successful restaurant is you have to control costs.  And
23   there are two big costs in running a restaurant.  One of them
24   is controlling labor and the other is controlling food and
25   beverage costs.  These are the two big things.

1    So to control labor, you have to be very good at

2    scheduling, because if you don't schedule enough servers or

3    chefs or bussers, your service will not be good and you will

4    either lose customers or you will get complaints.

5    And if you schedule too many people, you lose money

6    because you have people that you don't need, standing around.

7    And so you have to be very clever about constructing the

8    schedules.

9    But, fortunately, there's a massive amount of data

10   available to the managers so that they can mine this data and

11   create really good schedules, because there's an Aloha point of

12   sale -- Aloha is a brand name -- that they can use to get

13   historical guest counts, historical sales per hour, and really

14   figure out how to do a schedule well.

15   They can also look ahead and see what reservations are

16   there or, you know, is it a big weekend in town and is there a

17   convention, like the Oracle convention recently, that makes

18   everything very busy, and they schedule accordingly.  So that's

19   labor costs.

20   Food cost, similar kind of thing.  You have to make sure

21   you know what you have on hand, so you have to do good

22   inventory.  You have to do good ordering, not over order or

23   under order.  You have to keep track -- you know, you want to

24   use the oldest stuff first, and not have a lot of waste.  You

25   want to be efficient in how you cut the meat.

```
 1        You need to also be alert.  You don't want to have the
 2   most high-priced food items or the super expensive vodka
 3   walking out the back door.  So controlling food costs is
 4   another big part of the job.
 5        Now, apart from managing those two huge budget areas, the
 6   managers are also legal compliant.  There are food safety laws
 7   and -- for all of our protection.  And the managers are in
 8   charge of these as a team.
 9        The managers are also in charge of legal compliance on,
10   you know, wage and hour law compliance for the hourly workers.
11   They're in charge of making sure that fire exits are not
12   blocked.  So there are fire department inspections.  There are
13   health department inspections.  And they have to comply with
14   all of these things as well.
15        They have to keep track of payroll information and submit
16   it for payroll, which is done back in Miami.  They have to keep
17   track of people's time punches, and punch them in if they
18   forget.  They have to keep track of time punches out, and the
19   like.
20        So there are many, many administrative tasks.  They have
21   costs of sales reports that they have to review, and a lot of
22   data.  So these are significantly difficult jobs.  And the
23   businesses that they're running, this management team is
24   running, are not small.
25        And it is important to understand that they do operate as
```

1  a team.  They essentially -- while the GM is on top, all the

2  managers have the same powers as the GM, except, you know, that

3  they can't fire each other.  But, you know, they have the same

4  powers as the GM.  And they are supposed to operate the

5  restaurant as a team.

6  These are -- the size of these businesses is important to

7  understand.  It's not just the size that I gave you in terms of

8  number of people.  But the total annual sales, for example, in

9  San Francisco runs in excess of $4 million.  And the total

10 annual sales in Cupertino runs in excess of $4 million.  So

11 these are not trivial businesses that these managers are

12 running.

13 The managers are paid on a salaried basis and they are

14 eligible for a quarterly bonus.  And their quarterly bonus can

15 be up to 15 percent of salary.  And sometimes there's a -- you

16 know, a possible year-end kicker bonus as well.

17 The bonuses are based not just on the metrics of whether

18 or not people meet their profit and loss responsibilities as a

19 management team, because the managers have this profit and loss

20 accountability, but also based on some other feedback that

21 comes from the outside.

22 To help the managers really be able to look through the

23 eyes of a guest, there is an outside reporting service called

24 Retail Eyes, which is a mystery shopper service.  So a guest

25 will show up, have a meal, and actually secretly be timing

1    everything and grading the quality, and prepare a report.  And

2    then the report comes to the managers.

3        If the score is a low score -- and a score below 90 is

4    considered a low score -- then the managers have a problem that

5    they're supposed to study the secret shopper report, figure out

6    who was on duty, go back and look at the manager diaries they

7    keep, and the other records that they have, and figure out,

8    What am I going to do to make sure that this problem doesn't

9    happen again?  So that's one source of feedback.

10       Another source of feedback is what's called a TLC.  And

11   that stands for Tender Loving Care.  And TLC is essentially

12   customer feedback.  It can come over the telephone on an 800

13   number or it can come over by e-mail.

14       And TLC reports might be, gee whiz, you know, Susan was an

15   absolutely spectacular server, we want you to know how she

16   really made our birthday party special, or it could be, Susan

17   was horrible and, what's more, I couldn't find the manager.

18   And so TLC reports are very, very important feedback that come

19   in to the managers and have to be addressed.

20       And then, last but not least, there is a third service

21   called Everclean, which comes and inspects the restaurants.

22   And Everclean is a private service.  In addition to health

23   department inspections, Everclean comes in and looks at how the

24   operation runs, looks at how the food is being stored, looks at

25   all the things that impact sanitation and safety, and provides

1  a report to managers.

2      And managers have to make sure that they get a really

3  terrific Everclean score.  If they get a bad Everclean score,

4  it's another big action item that has to be addressed.

5      Now, in this trial the first person you're going to hear

6  from is Anthony Jones.  Anthony Jones is the senior director of

7  operations of Benihana.  And he actually works in Miami.  And

8  he is going to give -- he's been working for Benihana since

9  2007.  And he's going to give you kind of the big picture of

10  what Benihana expects its managers to be doing and what -- the

11  overall ways that the pieces fit together.

12      The next witness after him will be a man named Steve Diaz.

13  Steve Diaz actually reports to Anthony Jones, and he is the

14  regional manager of the western region.  And the western region

15  includes the two restaurants, Cupertino and San Francisco.  And

16  he'll give you more the microscopic detail in terms of what the

17  managers do.  And he can also talk to you about what he

18  observes the managers doing because, as a regional manager --

19  and he has, actually, more restaurants than just those two in

20  his region -- he visits these restaurants from time to time and

21  has an opportunity to see the managers in action and provide

22  them with feedback.

23      And then we're going to also ask you to meet a woman named

24  Miki Morishita.  Miki is the director of employee enhancement,

25  which is a fancy way of saying training.  She's in charge of

1   the training department.  She founded the training department.

2   She knows all about how people are trained at Benihana and is

3   responsible for many of the training programs.  She will

4   explain how the training program works for managers.  It's

5   quite extensive.  And, they have periodic retraining.

6       So there's an enormous investment, actually, that is put

7   by Benihana in investing in the managers so that they can keep

8   the best managers and really enhance them in the success in

9   their jobs.

10      And then, after that, you will have an opportunity to hear

11  from the three plaintiffs.  And I, at this point, would like to

12  say just a few things about each of the three plaintiffs.

13      So, Mr. Akaosugi was the general manager in San Francisco,

14  and he left.  He resigned in August 2010.  Before that,

15  however, he was a regional manager.  He was, in fact,

16  Mr. Diaz's predecessor.

17      And he was the regional manager of the western region for

18  many years, but was demoted in August 2009, to the position of

19  general manager.  And he was not happy about the demotion.  And

20  you will hear that he was so unhappy that he asked that his

21  boss, Anthony Jones, be fired.  So that's Mr. Akaosugi in a

22  nutshell.

23      And then there's Mr. Nguyen.  Mr. Nguyen is the newest of

24  the managers.  He came in 2009.  However, he originally worked

25  as a server back in the 1990s.  And then he went to work for

 1  Hewlett-Packard for over a decade and, unfortunately, was laid

 2  off.

 3      I think everybody in the Bay Area knows big layoffs at

 4  Hewlett-Packard.  He lost his job in one of those layoffs.  He

 5  came back to Benihana, was rehired as a server, and then put in

 6  the management training program.

 7      He went through the management training program and became

 8  a manager, so he's not a general manager, but a manager.  And

 9  he's a present employee and he works at the Cupertino

10  restaurant.

11      You will hear some testimony about something that

12  Mr. Nguyen did right around the time that this lawsuit was

13  filed, which was that he downloaded thousands of Benihana

14  documents onto a USB stick, and then deleted those same

15  documents the day before the stick was turned over to counsel

16  for Benihana.

17      And one of the documents that was on that USB stick that

18  was deleted was a resume composed by Mr. Nguyen, in which he

19  bragged about his accomplishments as a manager.

20      And then, last of all, is Ms. Donahue.  And Ms. Donahue

21  has been with Benihana, particularly at the Cupertino location,

22  since it was founded.  She was -- she was hired as a server at

23  the time that the restaurant opened, and then was promoted to

24  manager.  And she was promoted in -- about 12 years ago, and

25  has served as a manager ever since.

```
 1        And Ms. Donahue, unfortunately, received a TLC warning
 2   last year, and after that made a decision to join this lawsuit
 3   after it was already in progress.
 4        So the three plaintiffs, as you know, are claiming that
 5   they should have been paid overtime.  And they are also
 6   claiming that they spent more than 50 percent of their time
 7   essentially engaged in the combination of busser, server and
 8   host work.  And it will be essentially your job to decide who
 9   to believe.
10        But when this case was filed, one of the things that
11   Benihana did is it wanted to find out scientifically what was
12   going on in terms of how people were spending their time as
13   managers.  So it hired an industrial psychologist named
14   Dr. Christina Banks.  And Dr. Christina Banks is a job analysis
15   expert.  And Ms. Banks did what's called a time and motion
16   study.
17        Time and motion studies have been around for a long time,
18   actually about a hundred years, and they are used to literally
19   figure out how people spend their time.
20        So in this study there were 30 different California
21   managers studied.  That was 57 percent of all of the managers
22   that exist in California Benihana restaurants.  There are 14 in
23   California.  So 57 percent of all of them, 30, were studied.
24        And the way the study works is, from the time they arrive
25   in the morning until the time they leave, literally drive out
```

OPENING STATEMENT / EDWARDS

1    of the parking lot, they are shadowed by a specially-trained

2    observer who writes down everything they do that takes ten

3    seconds or more.  So you get a very, very complete picture of

4    how people actually spend their time.

5         And the results of the study -- and you'll get an

6    opportunity to hear from Dr. Banks as a witness -- showed very

7    clearly that Benihana's expectations of its managers, that they

8    be spending more than 50 percent of their time engaged in

9    management work, was correct.  Indeed, they were spending, for

10   the most part, way, way more than 50 percent of their time

11   engaged in management work.

12        So you'll have an opportunity to hear about this study a

13   little bit later in our case.

14        And at the close of the evidence, you will have an

15   opportunity, you know, after you have heard from both sides, to

16   decide whether or not the three plaintiffs here were, in fact,

17   meeting expectations of Benihana and engaging in exempt work or

18   managerial work for more than 50 percent of their time.

19        And we will ask you to review two different exemptions,

20   because either or both could apply.  And one is called the

21   executive exemption, and the other is called the administrative

22   exemption.

23        And the judge will explain very specifically to you what

24   the elements are of those exemptions and which pieces you have

25   to decide.

```
 1        But we hope and we will ask that you decide that, indeed,
 2   these three individuals were performing exempt work more than
 3   50 percent of their time.
 4        Thank you very much.
 5        THE COURT:  All right.  Thank you, Ms. Edwards.
 6        Mr. Allen, the floor is yours.
 7                        OPENING STATEMENT
 8        MR. ALLEN:  Thank you, Your Honor.
 9        Again, I've already introduced myself a couple of times.
10   My name is Kevin Allen.  I am the attorney for the three
11   plaintiffs sitting in front of you.
12        This is my co-counsel, Glicel.  We have a paralegal here,
13   George.
14        Ms. Edwards also introduced my clients, but I'll do it
15   again.
16        This is Rinko Donahue.  If it wasn't clear, she's a
17   manager at the Cupertino location, and she works with Hieu
18   Nguyen, who's also a manager there.  You're going to be hearing
19   from -- from our side, we're going to be presenting the other
20   manager that they work with.  His name is Ernext Xu.  We're
21   also going to be presenting testimony from their general
22   manager, Kenneth Nakamoto.
23        This is Mr. Ted Akaosugi, Tetsuo Akaosugi.  Everyone calls
24   him Ted.  You're going to be hearing from him, and you're also
25   going to be hearing from one of his managers that he worked
```

1    with, Divinia Alberto.

2        I'd like to start off with, you know, why do we have

3    overtime laws?  Overtime laws are intended to protect

4    employees.

5        You know, it's not enough just to call someone a manager.

6    It's not enough just to pay them a salary.  They have to be

7    spending more than half their time doing management work.  You

8    can't get around paying employees overtime by labeling them as

9    a manager and -- while simultaneously forcing them to spend

10   more than half their time doing nonmanagement work.

11       Putting all this aside, you're going to hear a lot of

12   arguments from both sides.  You guys should be paying

13   particular attention to how are these people testifying that

14   they spend their time?

15       Benihana has to show that -- and it's their burden to

16   show -- that for any week that they didn't pay overtime, that

17   my clients spend more than half their time that week on exempt

18   tasks, specifically performing management tasks.

19       So I'm telling you, Rinko, Mr. Akaosugi, Mr. Nguyen, as

20   well as the managers they worked with, and the general

21   managers, are all going to come up here and they're going to

22   testify that they spent more than half their time doing manual

23   hourly work, that they spent more than half their time doing

24   the type of hourly work that's performed by bussers, servers

25   and -- bussers, servers and hostesses.

 1     So if you believe them, if you believe the three

 2 plaintiffs and you believe the managers that they worked with

 3 and you believe the general manager that they worked with, then

 4 they should win this case.

 5          MS. EDWARDS:  Your Honor, pardon me.

 6          THE COURT:  I'm sorry?

 7          MS. EDWARDS:  Objection.  Argument.

 8          THE COURT:  There is -- you ought to stick more to the

 9 facts, and not to arguing who should win this case.

10          MR. ALLEN:  I apologize.

11          THE COURT:  All right.

12          MR. ALLEN:  Listen -- my point being, listen to what

13 the testimony is from the managers who are actually working at

14 the restaurants.

15     You'll note that Benihana has not indicated that they're

16 going to call any managers other than the people -- these three

17 managers right here.  They're not going to call anyone that

18 actually worked with these managers.  That should be suspect to

19 you.  The meat of the issue here is, how did these plaintiffs

20 spend their time each week?

21     They're going to call a senior operations manager who

22 works in Florida, who oversees, I think, 63 locations, you

23 know, between four and five managers at each location.  And

24 he's going to testify that he had a reasonable expectation

25 regarding these particular managers at these locations.

1          They're going to call an expert witness, Dr. Christina

2    Banks.  She was retained by Benihana during this lawsuit for

3    the very purpose that you're going to see her testify here.

4    Dr. Banks -- by the way, her son was the person who performed

5    the observation.

6          Let's step back.

7          Ms. Donahue was the only person who was observed as part

8    of Dr. Banks' study, and her son performed the observation,

9    Dr. Banks' son.  And this was during one shift in which he

10   followed her around the restaurant and waited outside the

11   restroom for her, yes, timing every single second, every

12   ten-second increment facet she did.  And it made her so nervous

13   that she complained to corporate twice.

14         You also have to ask yourself, if the study is intended to

15   accurately track the amount of work, this Dr. Banks'

16   observational study, why are they only tracking tasks that took

17   more than ten seconds?  You also have to ask, you know, who

18   decided what tasks would be tracked?

19         We'll present a lot more evidence regarding why this study

20   is unreliable.  But my point is, ask yourself, why are they not

21   calling co-workers of the actual managers if how the managers

22   spent their time is the primary issue that you guys are going

23   to be listening for during this trial?

24         You know, I think it makes sense to explain a little bit

25   more about how the restaurants operate.  You know, Benihana

1    opens for lunch -- I'm giving estimates for times.  It might be

2    11:00 or 11:30 at Cupertino and San Francisco locations.  Up

3    until about a year ago, they closed for lunch around 2:00 or

4    3:00, and then they reopened for dinner around 5:00, and then

5    they were open for dinner until, you know, 11:00 or 12:00.

6         During that entire meal period, the lunch period I'm

7    talking about, and the dinner, the managers were required --

8    required to be on the floor.  If they got caught in the office

9    during those meal periods, they were in trouble.

10        Benihana referred to this as "manager in the dining room."

11   And so, you know, if somebody works a 10- or 11-hour day, just

12   by virtue of this "manager in the dining room" requirement,

13   they had to be on the floor, in the dining room, not the

14   office, for a majority of their shift, a big majority of their

15   shift.

16        What the flip side to that means -- we'll concede that,

17   you know, they performed some administrative and management

18   tasks.  They can't perform most of those tasks -- the reports,

19   scheduling -- during the dining hours.  They're on the floor.

20   They have to be on the floor.

21        So all these management tasks or administrative tasks --

22   and we'll discuss those in more detail because I think a lot of

23   the tasks which Benihana's attorney listed are not necessarily

24   squarely fitting within administrative or managerial, but a lot

25   of those tasks have to be performed in the brief one-hour

 1  window before the location opens for lunch or the hour window

 2  after the location closes after dinner, or there's sometimes

 3  like an hour window in the middle of the day.

 4      My point being is, there's no way they're spending more

 5  than half their time on administrative tasks if they have to be

 6  on the floor for almost, you know, 75 or 80 percent of their

 7  shift.

 8      Now, there's also an argument over what they did when they

 9  were on the floor.  This service sequence, this is very key.

10  This is key to both sides' evidence.  And you're going to hear

11  a lot of argument about this.

12      The service sequence sets out in great detail every single

13  event that's supposed to happen when a customer walks into a

14  Benihana.

15      So you may not know this, but when you go into Benihana

16  they have to greet you at the door, if possible.  They say

17  certain words like "welcome" in Japanese.  And when you're

18  seated, they have to pass out menus within a certain amount of

19  time.  They have to refill your water glasses within a certain

20  amount of time.  They have to pass the menus out from right to

21  left.  If you place a drink order, it has to be filled within

22  two minutes.

23      I don't remember the exact timing for all of this, but

24  there's every single event.  So when the check comes, they have

25  to come back and check within, you know, 30 seconds, or

1   whatever it is.

2        So the whole Benihana experience, that's orchestrated by

3   the service sequence.  And all of the hourly employees -- the

4   servers, the hosts, the busboys -- they know the service

5   sequence.  So do managers.

6        Now, if the managers had enough hourly staff to sit back

7   and order the servers, hosts and busboys to, you know, hey,

8   that water glass needs to be filled, go refill that, trust me,

9   they would.  They don't.

10        You know, Benihana is a business just like any other

11   business.  They want to make a profit.  And it's more

12   profitable to pay these employees a salary and allow them to

13   kind of go in and fill in as servers and hosts and bartenders

14   and busboys and hourly jobs during the meal period than it is

15   for them to have like one manager supervising a greater number

16   of servers and hosts and busboys.

17        So the managers -- and the managers will walk around, and

18   if they see a glass that needs to be refilled, if there's a

19   server there, they'll tell them, hey, refill it.  Most often,

20   there's not an extra server.  There's a reason why that glass

21   isn't filled.  The servers know the service sequence.  If there

22   was a server there, the glass would get refilled already.  So

23   the manager pitches in and refills.

24        The tables.  If the table needs cleaning, they don't have

25   enough busboys to clean the tables, you know, Benihana depends

 1   on the managers to jump in and help clean the tables.

 2        So you're going to hear very detailed testimony from each

 3   of these three plaintiffs, as well as most of the managers they

 4   worked with, all of the managers Rinko and Hieu worked with and

 5   one manager Ted worked with, that they spent most of their time

 6   performing these hourly job duties.

 7        You're going to hear testimony that they did this not out

 8   of choice, but out of need.  There was not enough labor, not

 9   enough hourly staffing beneath them for them to sit back and

10   act like a general and just delegate.  That's not Benihana's

11   way.

12        So, you know, this is also an important issue, and I

13   apologize.  This case is also about labels, right, and this is

14   our --

15             **THE COURT:**  About what?  It's about what?

16             **MR. ALLEN:**  Labels.

17             **THE COURT:**  Labels.

18             **MR. ALLEN:**  Labels.

19        You know, the fact that Hieu and Rinko were called

20   managers doesn't -- you'll see it, but at some previous point

21   they were called associate managers and assistant managers.

22   Ted was called a general manager.  And then they decided to

23   switch -- or a manager, and then they decided to call it a

24   general manager.

25        There was another position at the Benihana location, an

1    hourly position, that was called a dining captain.  And the

2    dining captain -- we'll show that this hourly job did the same

3    exact thing the managers did during the meal periods.

4        You know, regardless of what the manager label is, what

5    the label is, you know, you have to look and see was this

6    person spending more than half their time doing hourly jobs,

7    hourly work?

8        There's also hourly managers out there.  You know, just by

9    virtue of them being called a manager does not mean that they

10   should not get paid overtime.

11       So some of the hourly job duties they performed during

12   lunch and dinner, you know, everything from greeting customers

13   to seating customers to refilling water glasses to taking

14   orders to, you know, asking customers how was your meal, you

15   know, that's something servers do.

16       You know, bussing the tables, pre-bussing the tables, this

17   is how they spent, also, all of their time in the dining room.

18   You know, in the dining room the servers and the host and the

19   bussers know the service sequence.  They follow the service

20   sequence, you know, provided there's a number of them to do it.

21   And the managers have to jump in.

22       Now, you know, you may be asking, how does Benihana know

23   whether the service sequence is followed?  They have a -- you

24   know, I believe Ms. Edwards covered this a little bit, but they

25   have this thing called a Retail Eyes report.  It's a mystery

1    shopper program.

2        So they'll send somebody undercover to the restaurant, and

3    they have a list of questions.  And it's the exact timing

4    requirements from the service sequence.  You know, what did

5    somebody say when you walked in?  Did they use the greeting

6    that we make them use?  You know, when your water glass got

7    empty, how long did it take to refill it?  You know, how long

8    after you were done with your meal was your plate carted off?

9    You know, how long did your check come?  How long before they

10   picked up your check?  How long before -- every single item on

11   this service sequence.  And this mystery shopper checks all

12   these boxes and says, you know, whether it was followed or not.

13       Now, you know, this is something very important here.  It

14   doesn't matter -- you know, if this mystery shopper score is

15   poor, the managers are punished.  It doesn't matter whether the

16   hourly employee does the tasks on the service sequence.

17       You know, it's no excuse that, you know what, I'm so sorry

18   the water glass wasn't refilled for the mystery shopper,

19   there's just not enough servers.  I would have delegated.  You

20   know, so it's the managers who get punished if the service

21   sequence doesn't get followed.

22       There's testimony -- and she told you Anthony Jones is

23   going to be testifying, you know, senior operations in Benihana

24   in Florida.  There's also Steven Diaz, the regional manager.

25   You know, he'll indicate that it doesn't matter who performs

1  the tasks on the service sequence, as long as the service

2  sequence is followed.  That's what's important.  It's the

3  customers' experience that's important.

4      And it's -- you know, Benihana chose to have it the way

5  that's the model here.  They didn't have to have four or five

6  managers for a single restaurant, you know, have more than one

7  manager -- most of the time, two managers working during

8  shifts.

9      They could have had one manager and they could have had

10  more busboys, more servers, more people to delegate to.  But,

11  no, they decided to take that management job.

12      And we admit they do perform some management job, but it's

13  split up amongst so many managers that it doesn't take up a

14  majority of their day.

15      You know, when you have to do hiring for one location, you

16  know, and all these different reports and tasks, when it's

17  split up amongst so many managers, it takes up a small fraction

18  of their time.  And that's especially true since the managers

19  have to be on the floor all day.  You know, they can't be

20  performing these tasks like running reports and interviewing

21  during the meal periods.

22      But, you know, Mr. Diaz and Mr. Jones will testify it

23  doesn't matter who performs the service sequence as long as it

24  gets done.

25      As far as expectations, you know, I want you to pay

1   attention to how they're testifying how they actually spent

2   their time each week.

3       You know, it's Benihana's burden to show they spent more

4   of their time -- more than half of their time on exempt tasks

5   each week that they weren't paid overtime.

6       This realistic expectations thing, I want you to hone out

7   and figure out, if I was working at Benihana, you know, is it

8   realistic for them to have expected me to spend more than half

9   my time on these exempt tasks?

10      You know, given the labor problem, given the labor tasks,

11  you know, Mr. Diaz -- the reason --

12          **MS. EDWARDS:**  Your Honor, this is straight a long way

13  into argument.

14          **THE COURT:**  It's okay to have argument as long as it's

15  at the closing.  That's why it's called closing argument.  But

16  right now you're supposed to be sticking to just what the

17  witnesses will say, what the evidence is going to show, and

18  save the argument for the proper time.  So try to keep that in

19  mind.

20      Go ahead.

21          **MR. ALLEN:**  Thank you, Your Honor.

22      Mr. Diaz will testify that he didn't have any expectation

23  regarding how they spent their time as long as they maintained

24  under labor budget, as long as they maintained their labor

25  budget, and there weren't any customer complaints.

 1          Anthony Jones will testify -- or has testified that he

 2     didn't care how they spend their time as long as the -- there's

 3     no customer complaints and the customers are being taken care

 4     of.  I believe the quote is, they could be spending their time

 5     by the dumpster.

 6          So as far as realistic expectations, you know, I want you

 7     to listen to the testimony from Mr. Jones and all of them.  And

 8     they're not going to testify that they ever told anyone, you

 9     know, not to spend a majority of their time on hourly job

10     duties.  You're not going to see any documents telling the

11     managers not to spend their time on hourly job duties.

12          On the contrary, you're going to see documents and

13     evidence that, you know, there was a limited amount of labor,

14     and these managers were held accountable to meet the service

15     sequence regardless of the labor budget.

16          Benihana may present testimony from one manager.  It's a

17     manager, David Leon, who did not work with any of the

18     plaintiffs.  He worked under a different regional manager down

19     in Anaheim.  You know, he's expected to testify that he thought

20     everything that a manager did was management work, regardless

21     of what it was.

22          So anything from host -- you know, if you're directing a

23     host to seat customers, you know, managers do that, but hosts

24     also direct hosts to seat customers.

25          So I would just, you know, in closing just say, pay

```
 1  attention.  Pay attention to what the witnesses are actually
 2  testifying to the job duties they're performing each week.
 3      Pay attention to whether the other people who're
 4  testifying, like Florida management -- Benihana's management in
 5  Florida, have any basis for figuring out how these people spent
 6  their time.
 7      And as far as the realistic expectations, you know, pay
 8  attention to that "realistic" word.  You know, were these
 9  realistic expectations?  Were they communicated to plaintiff?
10      You know, if they're not communicated to plaintiff, I'm
11  not sure how plaintiffs would know that that was being expected
12  of them.  If they weren't being provided the labor, how would
13  the plaintiffs have realistically intending to spend more than
14  half their time on management work?
15      As far as the administrative exemption, again, the
16  managers are spending three-quarters of their day on the floor,
17  out in the dining room.  That's not administrative work.  This
18  is manual work they're doing out there.  And it's the same
19  stuff that bussers, hosts and servers are performing.
20      Benihana is also -- well, there is a job description for
21  the manager, you know.  And the job description doesn't say how
22  much time they spend on any particular task.  You'll see the
23  job description has all these very generalized concepts of, you
24  know, keep employees happy, and these things that don't
25  necessarily boil down to any particular time on tasks.
```

 1      You know, pay attention to the job description for what it
 2 is.  A job description does not show that any realistic
 3 expectations of the manager would be spending more than half
 4 their time.
 5      You know, that realistic expectations requirement that
 6 Benihana has to prove, you know, that has to be that they were
 7 spending more than half their time.  Not that they were going
 8 to perform management work.  Again, we know they performed
 9 management work.  We're just saying it was less than half of
10 their time each week.
11      All right.  So in closing, I would just say, please don't
12 let Benihana get away with avoiding the same wage and hour laws
13 in California that all of the other employers have to comply
14 with just by virtue of mislabeling these people and focusing on
15 management work that they did for a portion of their week.
16      Thank you.
17          THE COURT:  Ms. Edwards, you may call your first
18 witness.
19          MS. EDWARDS:  Yes.  We'd like to call Anthony Jones.
20          THE COURT:  All right.
21      All right.  Are you Mr. Jones?
22          THE WITNESS:  I am, sir.
23          THE COURT:  Welcome.  Please stand right there and
24 raise your right hand.
25

PROCEEDINGS

1                      **ANTHONY JONES**,

2 called as a witness for the Defendant herein, having been first

3 duly sworn, was examined and testified as follows:

4            **THE WITNESS:**  I do.  I do.

5            **THE CLERK:**  Okay.  Thank you.

6            **THE COURT:**  Thank you.  Have a seat.  And you need

7 to -- the microphone will move all around.  It needs to be

8 about this close so we can all hear you.  So why don't you say

9 your name.

10           **THE WITNESS:**  Do I push first?

11           **THE COURT:**  I don't know, I guess you do.  It's got to

12 be on red.  Say your name.

13           **THE WITNESS:**  Hello.

14           **THE COURT:**  Do you mind using --

15           **THE CLERK:**  Hold on.

16           **THE COURT:**  Let's use the portable mike.

17           **THE WITNESS:**  I can speak loud as well.

18           **THE COURT:**  We'll resort to that only if we have to.

19 Try it now.

20           **THE WITNESS:**  Test, test.

21           **MS. EDWARDS:**  Yes, Your Honor.

22           **THE COURT:**  Good.  Move it a little closer to you.

23 All right.  Okay.

24      Counsel go ahead.

25           **MS. EDWARDS:**  Thank you, Your Honor.

JONES - DIRECT / EDWARDS

1                    **<u>DIRECT EXAMINATION</u>**

2    **BY MS. EDWARDS:**

3    **Q.**   Good morning.

4    **A.**   Good morning.

5    **Q.**   Would you tell us your name and position, please.

6    **A.**   Sure.  My name is Anthony Jones, I'm the senior director

7    of operations for Benihana.

8    **Q.**   And how long have you worked for Benihana?

9    **A.**   April 9th, 2007, a little over five years.

10            **THE COURT:**  You need to move the mic more toward you.

11   There.  That's good.

12   **BY MS. EDWARDS:**

13   **Q.**   Would you tell us who you report to?

14   **A.**   I report to my COO, Chris Haynes.

15   **Q.**   And COO stands for chief operations officer?

16   **A.**   Chief operating officer, correct.

17   **Q.**   Okay.  And who reports to you?

18   **A.**   I have ten regional managers that report up to me.

19   **Q.**   Where is your office?

20   **A.**   In Durel, Florida.

21   **Q.**   Is that near Miami?

22   **A.**   Yes, ma'am.

23   **Q.**   Would you describe generally what your responsibilities

24   are as the senior director of operations?

25   **A.**   I'm responsible for the operation of 62 restaurants,

JONES - DIRECT / EDWARDS

```
 1  guiding, leading and directing regional managers, who in turn
 2  guide, lead and direct the managers of each of the restaurants.
 3  Q.   Have you ever testified in court before?
 4  A.   No, ma'am.  First time.
 5  Q.   Okay.  Would you tell us a little bit about what you did
 6  before you came to work for Benihana.
 7  A.   Prior to Benihana, I worked for Darden Restaurants, Red
 8  Lobster and Olive Garden, in a variety of roles.  I started as
 9  a manager, moved my way up to director of operations, which is
10  what we call a regional manager for us.
11       I was there for 13 years.  I worked on the Red Lobster
12  side for ten and then three years for the Olive Garden side.
13  Q.   And did you work in the restaurant industry before going
14  to Darden?
15  A.   Yes, ma'am.  My family opened a franchise of KFCs.  I want
16  to say the first one started back in 1969 in Michigan City,
17  Indiana.  One restaurant turned into 35.  So you could say it's
18  in my blood.
19  Q.   Did you actually work as a manager of a KFC while you were
20  in college?
21  A.   Uhm, off and on.
22  Q.   So would you tell us what your responsibilities are,
23  please.
24  A.   Responsibilities currently?
25  Q.   Yes.
```

JONES - DIRECT / EDWARDS

1   **A.**   I am currently responsible for directing, leading and

2   guiding ten regional managers, who in turn guide, lead and

3   direct managers of 62 Benihana restaurants.

4   **Q.**   Okay.  And could you tell us a little bit about the

5   history of Benihana.

6   **A.**   Sure.  Benihana started back in 1964.  First restaurant

7   was in New York.  One restaurant turned into -- over the course

8   of time, we're up to 68 restaurants over many, many years.

9   **Q.**   And is there a particular way that service is supposed to

10  work at Benihana restaurants?

11  **A.**   Yes, there is.  We are slightly different than a

12  conventional casual dining restaurant, which you consider the

13  Olive Garden or Red Lobster, in the sense that it is communal

14  dining.  So guests come in.  If it is not a party of eight,

15  which is what our typical size of our table, then you could

16  have four separate parties of two that have never met each

17  other.  So it makes it very unique, very exciting, very fun.

18  **Q.**   And is the food prepared at the table?

19  **A.**   Food is prepared at the table, that's correct.  Servers

20  come and take the orders, deliver the beverages, deliver the

21  soups, the salads.  And then the chefs come out and take over

22  and put on a show.

23  **Q.**   And are there particular kinds of operating standards that

24  have been set up for the restaurants to meet?

25  **A.**   Yes, there are.  Food standards, obviously it's important

1   that we're cooking the food to the guests' spec and that it's

2   safe.  We have safety requirements in our restaurant that we

3   have to follow to provide safe food, safe environment.

4         There are service standards.  There are busser standards.

5   There are manager standards.  Standards for everyone, everyone

6   that works in the restaurant.

7   **Q.**   And how do you go about making sure that the restaurants

8   are meeting these standards?

9   **A.**   It is up to -- from a restaurant level, it's up to the

10  managers to ensure that our hourly employees are following the

11  guidelines.  Their role is to guide, teach, coach, train and

12  redirect.

13        As far as the managers are concerned, the regional

14  managers are responsible to visit the restaurant at least once

15  per month; primarily, spending two to three days in the

16  restaurant doing the very thing:  Making observations,

17  providing guidance and direction and redirecting, interacting

18  with guests.

19        And, typically, at the end of the visit they'll sit down

20  with a manager and do what we call download and share their --

21  all of their positives and some of their challenges.

22  **Q.**   And have you, yourself, visited the San Francisco and

23  Cupertino restaurants?

24  **A.**   I have.

25  **Q.**   Why did you visit them?

```
 1   A.   I like to visit, if possible.  Sometimes it's challenging,

 2   but I like to visit at least once a year each restaurant.  I've

 3   been out here several times though.  We've done several

 4   remodels, Cupertino being one of them.  And then we just

 5   recently did a bar remodel in San Francisco.

 6        So just coming out to validate that it was done to our

 7   specifications and then spend time with the regional managers

 8   as well.

 9   Q.   How many Benihana restaurants are there in California?

10   A.   There are 14.

11   Q.   And could you describe what the management structure is

12   inside a Benihana restaurant.

13   A.   Sure.  So you have a regional manager and then below them

14   is a general manager.  And then each of our restaurants will

15   have anywhere from two to four restaurant managers that report

16   up to the general manager.

17   Q.   So does -- who reports to the regional manager?

18   A.   Uhm, all of the managers do.  But the general manager is

19   the one that has the most interface time with the regional

20   manager.

21   Q.   Okay.  And how many restaurants do the regional managers

22   usually have?

23   A.   That varies anywhere from six all the way up to nine.

24   Q.   And do the regional managers actually have an office in a

25   restaurant?
```

1    **A.**    In the past that was the case.  Each regional manager had

2    what we called a base unit.  But now it's -- they primarily

3    work out of -- or office out of their cars, sometimes at home.

4    **Q.**    Okay.  And I believe you described what the regional

5    managers are generally expected to do.

6         At this time I'd like you to take a look at what has been

7    previously marked as Exhibit 336.

8              **THE CLERK:**  To the witness.

9              **MS. EDWARDS:**  May I approach the bench?

10   **BY MS. EDWARDS:**

11   **Q.**    Mr. Jones, I've shown you exhibit -- what's been

12   previously marked as Exhibit 336.  Would you tell me what that

13   is, please.

14   **A.**    This is a regional manager job description.

15   **Q.**    Okay.  And did you participate in the preparation of this

16   job description?

17   **A.**    Yes, I did.

18   **Q.**    And does it accurately describe what the regional managers

19   are supposed to do?

20   **A.**    Yes, it does.

21   **Q.**    Okay.

22             **MS. EDWARDS:**  Your Honor, we would move it into

23   evidence.

24             **THE COURT:**  Any objection?

25             **MR. ALLEN:**  No, Your Honor.

JONES - DIRECT / EDWARDS

```
 1          THE COURT:  336 received in evidence.
 2       (Trial Exhibit 336 received in evidence.)
 3          THE COURT:  Show it to the jury if you wish.  Is it on
 4  the computer?
 5          MS. MILLER:  Yes, it is.
 6          THE COURT:  Let's try our system out.  Do you want it
 7  shown to the jury?
 8          MS. EDWARDS:  Yes.
 9          THE COURT:  All right.  Let's see.  Is there something
10  coming through in the jury box?
11       No?  They say no.  Let's click the right button to get it
12  on in there.  We'll get this down, debug the system right now.
13       Dawn, is it our fault or counsel's fault?
14          THE CLERK:  We're on.  It's on the right screen.
15       (Document displayed.)
16          MS. EDWARDS:  It just popped up.
17          THE COURT:  All right.  There we go.  Is that 336?
18          MS. EDWARDS:  It's the first page of 336, yes.  I
19  don't know if it's possible to magnify it or not.
20          THE WITNESS:  Yeah, it's hard to see on the screen.
21          THE COURT:  All right.  Well, you -- your equipment at
22  counsel's table probably has the ability to highlight and blow
23  up.
24          MS. EDWARDS:  Okay.  Liz, would you highlight the
25  portion that says "overall responsibility," please.  Make that
```

1  a little bit more legible.

2          THE COURT:  Something is blown up, but it's not what

3  you asked for.

4          MS. EDWARDS:  No, that's the keys to success.  Overall

5  responsibility further down, please.

6          THE COURT:  Okay.  Something is on the screen now that

7  says that.  Is that what you want?

8          MS. EDWARDS:  Yes.  Thank you.

9          THE COURT:  Please go ahead.

10         MS. EDWARDS:  Thank you.

11  BY MS. EDWARDS:

12  Q.   So focusing for a moment, Mr. Jones, on what is blown up

13  on the screen, one of the things that it says is that the

14  regional manager is supposed to develop managers for their

15  respective job responsibilities.

16      What does that mean?

17  A.   The regional manager, again, one of their primary roles is

18  to come in and direct and guide and lead and teach.  We have a

19  comprehensive management training program which lasts eight

20  weeks.  After eight weeks, then a respective manager is placed

21  in their home restaurant.  But their training doesn't stop

22  there.  It's just a very beginning.

23      Our concept is very unique, especially if we have a

24  manager coming from a different casual dining restaurant, so

25  there's a bit of a learning curve.  So that regional manager

1   and that general manager are there to provide support and

2   assistance and help create a smooth transition so that we set

3   them up for success and they're able to hit the ground running.

4   **Q.**   Was Mr. Akaosugi a regional manager?

5   **A.**   He was.

6   **Q.**   Did he report to you?

7   **A.**   He did.

8   **Q.**   And would you tell us briefly about Mr. Akaosugi's

9   performance as a regional manager?

10  **A.**   His performance was sub par.   I can give you an example of

11  that.

12  **Q.**   Please.

13  **A.**   We had an instance where the restaurant was actually shut

14  down for a couple of days because someone did not wash their

15  hands and fecal matter actually got into the lettuce and it was

16  confirmed that somebody got sick.

17      So the Contra Costa County Health Department, which is,

18  ironically, right down the street from us, came down and shut

19  us down and we had to go through a complete retraining, a

20  certification if you will, by them before we were able to open

21  our doors.

22      It can be very damaging to a brand, especially if it hits

23  the newspaper and all the social media that we have today.   And

24  so I jumped on a plane and went out and helped with damage

25  control and we put some systems in process to retrain.

 1        The health department came in and spent -- if memory

 2    serves, it was a four-hour class.  Obviously, the restaurant

 3    had to be recleaned before we were able to reopen our doors.

 4    And, unfortunately, it happened over the course of a weekend.

 5    So that's just one example.

 6        Many of his restaurants that he was responsible for were

 7    also dirty.  They were not following systems and processes.  We

 8    had challenges in Sacramento during our renewal period that

 9    there were expectations that our managers were to wear white

10    shirts and black trousers.  And they were permitted to wear a

11    coat, if they'd like, as well as a tie.

12        The GM elected not to follow that.  He's no longer with

13    us.  And our CEO and our EVP at the time, Taka Yoshimoto, were

14    specifically traveling to that restaurant to see some of the

15    changes.  So those are just some of the examples.

16    Q.   Did Mr. Akaosugi's position change at some point?

17    A.   It did.  He was --

18    Q.   What --

19    A.   He was demoted to general manager.

20    Q.   And when did Mr. Akaosugi become the general manager in

21    San Francisco?

22    A.   If memory serves, September 7th, 2009.

23    Q.   Who made the decision to demote Mr. Akaosugi?

24    A.   Taka Yoshimoto.  And I delivered the message.

25    Q.   And did you tell Mr. Akaosugi the reasons for his

1  demotion?

2  **A.**   I went over many of these, what I just explained, with the

3  exception of the incident of the Contra Costa County incident,

4  because that had happened sometime in the past.

5  **Q.**   He was aware of it?

6  **A.**   Of course.  He was part of it.

7  **Q.**   Is there -- is there another position called -- or was

8  there another position called unit manager?

9  **A.**   Yes.  Primary [sic] to our CEO, Richard Stock, and their

10  COO came on board, the general manager was -- they were called

11  unit managers.  One and the same job.  Just if -- it was an

12  older term in the industry.  So "general manager" is more of a

13  common term in the hospitality business.

14  **Q.**   So is there any real difference in the duties between a

15  general manager and the unit manager?

16  **A.**   Just a title change.

17  **Q.**   When Mr. Akaosugi became a general manager, who did he

18  report to?

19  **A.**   He reported to me for a short time until his replacement

20  was hired, which was Steve Diaz.  And I believe it was -- I'm

21  not absolutely positive, but I think it was approximately three

22  to six months before that transition took place.

23  **Q.**   And in your capacity as senior director of operations,

24  what do you expect general managers to do?

25  **A.**   I expect them to run the restaurants, to meet their

1  financial -- meet or exceed their financial obligations, to run

2  clean, safe restaurants, to hire strong, excellent performers,

3  to build guest count in the community.

4      To ensure that the employees are happy, that they're

5  working in a safe environment, and that we are delivering on

6  the guest experience.

7  **Q.**  I'd like to show you what has been previously marked as

8  Exhibit 53.

9          **MS. EDWARDS:**  May I approach, Your Honor?

10         **THE COURT:**  You can.  After this, we're going to

11  break.  Go ahead and finish up No. 53.

12  **BY MS. EDWARDS:**

13  **Q.**  Showing you Exhibit 53, would you tell me what that is,

14  please.

15  **A.**  This is the general manager's -- general manager's

16  responsibilities.

17  **Q.**  Is this a job description for general managers?

18  **A.**  Job description, yes.

19  **Q.**  Did you participate in the creation of that job

20  description?

21  **A.**  Yes, ma'am.

22  **Q.**  Does it accurately describe the expectations of a general

23  manager?

24  **A.**  It does.

25          **MS. EDWARDS:**  Your Honor, I'd like to move Exhibit 53

JONES - DIRECT / EDWARDS

1  into evidence.

2          **MR. ALLEN:**  No objection, Your Honor.

3          **THE COURT:**  Received in evidence.

4      (Trial Exhibit 53 received in evidence.)

5          **THE COURT:**  So we're going to break right now and pick

6  it up there tomorrow.  We stop at 1:00 o'clock.

7      Now, I need to say to you over there in the jury box,

8  don't talk with your loved ones about this case or anyone else.

9  Don't do any research about the case.  Go back to your normal

10  lives.  Come back here tomorrow and continue on with the

11  evidence.  But no talking about the case with anyone while

12  you're away.

13      So you all have a great day.  Dawn is going to take you

14  back into the jury room right now.  Remember, 7:45.  7:45 in

15  the morning.  If you're not all here, we have to wait for you.

16  So you've got to be here.  Please be on time.  I know you can

17  do it.  Thank you.

18      All right, Dawn.

19          **THE CLERK:**  All rise.

20      (Jury out at 12:59 p.m.)

21          **THE COURT:**  Be seated, please.

22      Mr. Jones, you need to be back here at 7:30 tomorrow.  So

23  good for you.  You can just step down now.

24      Counsel, I've got a couple of things I'd like to go over

25  with you.

PROCEEDINGS

1          What is this week-by-week thing that Mr. Allen brought up?

2   Is that the test, a week-by-week thing?

3          **MS. EDWARDS:**  Well, this is an area where I think that

4   counsel do not agree.

5          As we briefed in our trial brief, as a practical matter,

6   the way these cases get decided is, rather than have a trial

7   week by week, there is evidence put in that shows that the job

8   has essentially remained the same and that people are behaving

9   consistently over time and that certain kinds of behaviors are

10  typical, because to actually say that there would have to be a

11  week-by-week review of what people do each week is completely

12  impractical.

13         So in no wage and hour case that we were able to find was

14  the proof put in that way nor was the evidence considered that

15  way in motions for summary judgment, for example, by the Court

16  or by juries.

17         So this week-by-week controversy, I think, is an effort to

18  try to create, essentially, an illusion that there must be some

19  sort of proof that the week of September 2nd, you know, a

20  particular plaintiff did -- spent this much time that

21  particular week, and then the week of September 9th the same

22  thing.  And that is not the way we have been able to find any

23  case that treats this matter.

24         What the law says is that you look at the exempt status

25  issue from the standpoint of a workweek.  And so you look at

 1  the percentage of time in the workweek.  That's what the

 2  California law says.

 3      It doesn't say you have to prove it for each week.  It

 4  says that you look at it on a workweek basis from the

 5  standpoint of what's a typical workweek.

 6          **THE COURT:**  Where do you see the word "workweek"?

 7          **MS. EDWARDS:**  I'm not sure that it's --

 8          **THE COURT:**  I see the work actually performed by the

 9  employee during the course of the workweek.

10          **MS. EDWARDS:**  Yes, that's it.

11      So it's a generalization.  It's not a requirement that it

12  be proved for each workweek, one by one *seriatim*, which I

13  believe is really the implication of what the plaintiffs are

14  trying to say our burden is.  And that's not -- it's a

15  misquotation of law.

16          **MR. ALLEN:**  Your Honor, I think we have two things

17  here.  One is the burden, and the burden is to show that they

18  were exempt for any week that they weren't paid overtime.

19      The method of proof that most employers use is what

20  Ms. Edwards is talking about, you know, was this a typical

21  week, how much time did you spend on this?  And they show that

22  the person spent more than that, you know, half their time on

23  exempt activities during a typical week.

24      But if there are certain weeks where they're spending more

25  time and other weeks they're not, there are cases where they

1  separate it out and they decide that they were exempt for

2  certain time periods and not exempt for others.

3         For instance, commission salesperson exemption, I don't

4  know if you've had any cases involving that exemption.  But you

5  have to actually look and see whether half of their pay --

6  whether more than half their pay was commission in order to

7  determine whether the exemption --

8             **THE COURT:**  When this goes to the jury, is there going

9  to be, in your view, a question for every single week?

10            **MR. ALLEN:**  No, Your Honor, but they have to prove

11  that the exemption applied every week though.

12            **THE COURT:**  So it's going to be one question.  How are

13  we going to word that question?

14            **MR. ALLEN:**  We had proposed jury instructions:  Has

15  Benihana proven that the plaintiffs performed more than half

16  their time on exempt tasks for all the weeks that they worked?

17        And if they say no:  How many weeks did Benihana fail to

18  meet the that burden?  You know, and they could put five.

19        How many overtime hours did they work during those weeks?

20  You know, 40, whatever it is.

21        But it is a week-by-week test, Your Honor.  Otherwise, how

22  would you do it?

23            **THE COURT:**  Is there law on that point?

24            **MR. ALLEN:**  Well, the wage order says --

25            **THE COURT:**  Well, that's ambiguous.

PROCEEDINGS

```
 1              MR. ALLEN:  Well, Your Honor, how else would --

 2              THE COURT:  That doesn't -- I mean, possibly, it means

 3    what you're saying, but possibly it means what Ms. Edwards

 4    says.

 5              MR. ALLEN:  How else -- I'm sorry, I'm sorry.

 6              THE COURT:  Is there case law?

 7              MR. ALLEN:  There is -- as I sit here right now, I'm

 8    thinking of case law involving the sales commission exemption.

 9              THE COURT:  No, no.  Is there case law on overtime

10    that says it's got to be proven up week by week?

11              MR. ALLEN:  Yes.  And I'm saying it's in overtime.

12    It's involving a different exemption in the same wage order,

13    the salesperson.  They look to see whether the person makes

14    more than half their pay in commission each pay period or each

15    week.

16         You know, and if they don't, they get overtime that week.

17    If they do, they don't get overtime.  It's a week-by-week test.

18    Otherwise, it's unworkable.  You know, does Benihana just prove

19    that they spent one week performing more than half their time

20    on management tasks and that gets them off the hook for

21    overtime during the entire employment period?

22         You know, if Benihana shouldn't -- if someone works for

23    four years and their job changes and maybe some months they

24    spend more --

25              THE COURT:  Who has the burden to prove that it didn't
```

PROCEEDINGS

1   change?  Let's say they prove up that a typical week it was 80

2   percent management.

3           MR. ALLEN:  If they can prove it was a typical week

4   and 80 percent management, then, yeah, they would prevail on

5   that.  But if they can prove that -- you know, if there were

6   variations and, you know, during this six-month period, you

7   know, the typical week was 80 percent management, but during

8   this one-month period it was only 20 percent management, then,

9   yes, they would deserve -- be owed overtime for the time that

10  Benihana did not satisfy its burden.

11          THE COURT:  Has everyone briefed what I need to see on

12  this?  Because, honestly, I have no idea what the right answer

13  is right now.  But I don't want you to be coming in with

14  criticisms of my jury instructions because you didn't do the

15  case law.

16      Have you both researched this point fully?  Fully?

17          MS. EDWARDS:  We have researched the point, Your

18  Honor.  We have put in material in the trial brief.  However,

19  we are happy to go hit the books again.

20          THE COURT:  I think both sides ought to give me the

21  best they got so you don't come in criticizing my instructions

22  after the fact.  So try to give me whatever you're going to

23  give me on this in the morning.

24          MR. ALLEN:  What sort of parameters as far as page

25  limits, anything?  Just submit what we're going to submit?

PROCEEDINGS

```
 1            THE COURT:  I don't think I have to worry about page
 2   limits on this one.  All right.
 3            MR. ALLEN:  All right.  Thank you, Your Honor.
 4            THE COURT:  Anything else I can do for you today?
 5            MR. ALLEN:  Oh, Your Honor, the -- a couple of these
 6   witnesses were also on our witness list.  And I was wondering,
 7   am I doing direct during the cross?
 8        Does Benihana have any objection to that?  Seems to be the
 9   most time-efficient way of proceeding.
10            MS. EDWARDS:  I assume he's referring to Mr. Jones.
11   Mr. Jones is available.  I mean, he can be called in their case
12   if they -- if they wish to.  They can't subpoena him because
13   he's in Florida and he's outside subpoena range, but we can
14   make arrangements for him to be available in their case.
15            MR. ALLEN:  And that's why I asked, because they
16   wouldn't accept a subpoena for Mr. Jones.  He's here
17   testifying.
18            THE COURT:  If he is here and under the control of the
19   court, I will order him to stay here, not leave the district,
20   and to be here whenever you want to call him.
21        Now, if you don't like that arrangement, then he's going
22   to get cross -- he's going to be examined by Mr. Allen and
23   interrupt your case as if he was on direct.  It's up to you,
24   whichever way you want to go.  But he doesn't have to be
25   subpoenaed.
```

PROCEEDINGS

```
 1        Once he's in the courtroom, a direct order from the judge
 2   is all you need.  Doesn't need a subpoena.  And if he violates
 3   that, the U.S. Marshal goes to find him.
 4            MS. EDWARDS:  Well, we --
 5            THE COURT:  So he ought to be here.
 6            MS. EDWARDS:  We appreciate that, Your Honor, and we
 7   will make sure he's here.
 8            THE COURT:  All right.  So you two talk.  Any witness
 9   who comes has got to appear in the plaintiffs' case.  Upon
10   request, you ask me, I will direct the witness to come back,
11   stand out there in the hallway until needed, unless he's
12   allowed to be examined in the -- you know, the first time he's
13   here.
14            MR. ALLEN:  Thank you, Your Honor.  I'll meet and
15   confer with Ms. Edwards.
16            THE COURT:  All right.
17            MS. EDWARDS:  One small matter.
18            MR. ZALETEL:  Just one more thing, Your Honor.
19   Pursuant to your jury trial guidelines, we want to alert you
20   that we have a packet of deposition excerpts from Laurie Casey,
21   who was the former senior director of HR management for
22   defendant, and there are a couple objections that will require
23   your ruling on.  They have been flagged.
24            THE WITNESS:  We have --
25            THE COURT:  You can't call your own people by
```

PROCEEDINGS

1    deposition.  Is that what you're trying to do?

2            MR. ZALETEL:  Well, she no longer works for the

3    company and she's beyond subpoena range.

4            THE COURT:  Oh, all right.

5            MR. ZALETEL:  She's unavailable.

6            THE COURT:  All right.  Has it gone through the

7    process and all the objections are noted and all of that?

8            MR. ZALETEL:  Yes, Your Honor.

9            THE COURT:  Hand it up to me and let me see it.

10           MR. ZALETEL:  How many copies would you like?

11           THE COURT:  Just one.  Okay.  Anything more?

12           MR. ZALETEL:  That's it, Your Honor.

13           THE COURT:  All right.  I'll try to give you the

14   answers on this tomorrow.

15       All right.  Be here at 7:30, please, and we'll sort out

16   any problems you have for tomorrow.

17           MR. ALLEN:  Thank you, Your Honor.

18           MS. EDWARDS:  Thank you, Your Honor.

19           MR. ZALETEL:  Thank you, Your Honor.

20           THE COURT:  I have a criminal calendar in about 45

21   minutes, so you'll need to clear the tables.

22           MR. ALLEN:  Thank you, Your Honor.

23       (At 1:09 p.m. the proceedings were adjourned until

24   Wednesday, October 10, 2012, at 7:30 a.m.)

25                       -  -  -  -

1                        **I N D E X**

2                                              **PAGE**      **VOL.**

3  Opening Statement by Ms. Edwards                23         1
   Opening Statement by Mr. Allen                  39         1
4

5  **DEFENDANT'S WITNESSES**

6  **JONES, ANTHONY**
   (SWORN)                                         54         1
7  Direct Examination by Ms. Edwards               55         1

8

9                          - - - - -

10

11                      **E X H I B I T S**

12 **TRIAL EXHIBITS**            **IDEN**   **VOL.**   **EVID**   **VOL.**

13 53                                                  67         1
   336                                                 61         1
14                          - - - - -

15

16               **CERTIFICATE OF REPORTER**

17         I certify that the foregoing is a correct transcript

18 from the record of proceedings in the above-entitled matter.

19

20 DATE:   Monday, January 7, 2013

21

22

23  _____  _Katherine Sullivan_

24       Katherine Powell Sullivan, CSR #5812, RPR, CRR
                    U.S. Court Reporter
25

*Katherine Powell Sullivan, CSR, RPR, CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*